UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
TIM BAKKEN, Individually and on behalf of a putative class of all those similarly-situated,

Plaintiff,

No. 25-cv-07826 (CS)

-against-

UNITED STATES MILITARY ACADEMY; LT. GENERAL STEVEN W. GILLAND, in his Official Capacity; BRIGADIER GENERAL SHANE R. REEVES, in his Official Capacity; COL. KRISTA WATTS, in her Official Capacity; COL. WINSTON WILLIAMS, in his Official Capacity; COL. JOSHUA BERRY, in his Official Capacity; and LT. COL. CAITLIN CHIARAMONTE, in her Official Capacity,

Defendants.
--------------------------------------------------------------------x

**MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

GOLDMAN LAW, PLLC
*Co-Counsel for Plaintiff*
372 South Plank Road, Ste. 2
Newburgh, New York 12550
(845) 534-6472 Ext. 1001
(845) 579-3064 [Fax]
jgoldman@jrgoldmanlaw.com

BERGSTEIN & ULLRICH
*Co-Counsel for Plaintiff*
5 Paradies Lane
New Paltz, New York 12561
(845) 419-2250 [Tel]=
(845) 469-1277 [Fax]
steve@tbulaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 1

A. The United States Military Academy ........ 1

B. Plaintiff Tim Bakken ........ 2

C. USMA begins to scrutinize faculty speech ........ 2

D. The Dean's Policy and Operating Memorandum No. 03-24 requires faculty members to obtain prior approval from their Department Heads before they are permitted to speak or write externally while on duty and when using their USMA affiliation ........ 3

E. The impact of the Academic Engagement Policy on Bakken ........ 8

F. The Academy's scrutiny and suppression of faculty speech as embodied by DPOM 03-24 extends to the classroom ........ 11

STANDARD OF REVIEW ........ 13

ARGUMENT ........ 13

Point I

Bakken has suffered irreparable injury, and he will continue to suffer irreparable injury absent a preliminary injunction ........ 14

Point II

Bakken is likely to succeed on the merits of his claims ........ 17

Point III

The balance of hardships tips in Bakkens' favor ........ 26

CONCLUSION ........ 27

WORD COUNT CERTIFICATION ........ 28

# TABLE OF AUTHORITIES

## Cases

*Agudath Isr. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) .......... 14

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 14

*Harmon v. City of New York*,
140 F.3d 111 (2d Cir. 1998) .......... 17, 18, 19, 20, 21, 22, 23

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996) .......... 13

*Latino Officers Ass'n. v. City of New York*,
196 F.3d 458 (2d Cir. 1999) .......... 14, 24, 25

*Pickering v. Board of Educ.*,
391 U.S. 563 (1968) .......... 17

*State Farm Mut. Auto Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024) .......... 14, 26

*United States v. Nat'l. Treasury Emples. Union*,
513 U.S. 454(1995) .......... 17, 25

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 65 .......... 13

## PRELIMINARY STATEMENT

Plaintiff Tim Bakken is a civilian Professor of Law at the United States Military Academy ("USMA") at West Point. Bakken challenges USMA's promulgation of Dean's Policy and Operating Memorandum 03-24 ("DPOM 03-24" or the "Academic Engagement Policy") as an unconstitutional preclearance regime and a prior restraint of \ speech in violation of the First Amendment. On behalf of himself and a putative class of USMA civilian professors, Bakken seeks declaratory and injunctive relief, including an order permanently enjoining enforcement of the Academic Engagement Policy.

Because he is likely to succeed under the First Amendment, and because the Academic Engagement Policy continues to cause him irreparable injury, Bakken seeks a preliminary injunction enjoining enforcement of the Academic Engagement Policy while this action is pending.

## STATEMENT OF FACTS

Plaintiff incorporates the facts asserted in the Complaint and in his Declaration in support of this motion, which Declaration verifies the allegations in the Complaint. *See* Bakken Decl. ¶ 2.

### A. The United States Military Academy.

USMA is a federally-established undergraduate institution at West Point, which prepares students ("Cadets") to become officers in the U.S. Army and for other employment positions. It is an instrumentality of the Department of Defense, within the Department of the Army. USMA is overseen by its Superintendent, Defendant Lt. General Gilland, the commanding officer of USMA and of the military post at West Point. *See* Complaint ¶¶ 12-14.

The Law and Philosophy Department is one of USMA's 13 academic departments and is comprised of the Law and Legal Studies Program and the Philosophy Program. Defendant Col. Williams is the Department Head of the Law and Philosophy Department. Defendant Col. Berry

is the Deputy Department Head of the Law and Philosophy Department. Defendant LT. Col. Chiaramonte is the Program Director of the Law and Legal Studies Program. *Id.* ¶¶ 22, 24-26.

**B. Plaintiff Tim Bakken.**

Bakken, who earned his J.D. from the University of Wisconsin Law School and LL.M. from Columbia University School of Law, has been employed by USMA as a civilian professor of law since June 2000 (assistant, associate, and full, as of 2004) and is the longest serving law professor in USMA's history. *See* Complaint ¶¶ 27-29.

During his employment at USMA, Bakken has authored books, articles, and essays and lectured and participated in discussions at national conferences and international engagements. *See* Bakken Decl. ¶ 6. For every external and public event, conference, speaking engagement, media interview, and publication of any writing, Bakken was identified as a professor at USMA. *See Id;* Complaint ¶ 37.

During his employment at USMA, Bakken has spoken out critically about certain policies and practices of the Academy and/or the U.S. Military. *See* Complaint ¶¶ 39-43. After West Point disciplined Bakken for whistleblowing activities, he prevailed before the Merit Systems Protections Board in 2012. *Id*. By way of further example, in 2020, Plaintiff published the book The Cost of Loyalty: Dishonesty, Hubris, and Failure in the U.S. Military. *Id*. ¶ 44.

**C. USMA begins to scrutinize faculty speech.**

On January 27, 2025, President Trump issued an Executive Order that referred to the federal service academies. The Executive Order reads, in part, "The Secretary of Defense and the Secretary of Homeland Security shall carefully review the leadership, curriculum, and instructors of the United States Service Academies and other defense academic institutions associated with their respective Departments to ensure alignment with this order. In addition, these institutions

shall be required to teach that America and its founding documents remain the most powerful force for good in human history." *See* Executive Order, Restoring America's Fighting Force, § 6(c), (Jan. 27, 2025) available at, https://www.whitehouse.gov/presidential-actions/2025/01/restoring-americas-fighting-force/ (last visited Dec. 4, 2025). *See* Complaint ¶ 46.

In spring 2025, USMA withdrew books from its library, removed words and phrases from faculty members' syllabi, eliminated courses and majors, and threatened or inflicted punishment on faculty members for engaging in teaching, speaking, and writing without the prior approval of Defendants or other Department Heads at USMA. In summer 2025, USMA removed from all faculty members' webpages on the USMA website the "Publications" tab, which had listed the faculty members' published books, articles, essays, and scholarship entries. *Id*. ¶¶ 47-48.

**D. The Dean's Policy and Operating Memorandum No. 03-24 requires faculty members to obtain prior approval from their Department Heads before they are permitted to speak or write externally while on duty and when using their USMA affiliation.**

On February 13, 2025, the Office of the Dean (headed by Defendant Reeves) promulgated and implemented Dean's Policy and Operating Memorandum No. 03-24, entitled Academic Engagement Policy ("DPOM 03-24" or the "Academic Engagement Policy"). The Academic Engagement Policy applies to all faculty members covered by USMA Regulation 150-4, Academic Freedom, and, as such, applies to Plaintiff and all other civilian and military faculty members of the Academy. *See* Exhibit 1 to Complaint at 1 ¶ 3. Its stated purpose is to "standardize[] procedures for engaging with audiences external to USMA." *Id.* at 1 ¶ 1. The Academic Engagement Policy provides, in pertinent part, as follows:

> Department Heads are the approval authority for engagements with any audience external to USMA that are within faculty members' disciplinary areas of expertise *while on duty or when using any USMA affiliation or branding*. Examples of such engagements include (but are not limited to) journal publications, conference presentations, media interviews, podcasts, opinion editorials, blog

> posts, social media posts, etc. Department Heads are also the approval authority for military faculty members to speak publicly in uniform. The Director of Library Services and Vice Deans serve in the same capacity as Department Heads for works related to librarian or staff duties.

*See Id.* at 1-2 ¶ 4(b) (emphasis supplied). Moreover, the policy provides that "Department Head approval may be contingent on conditions such as use of a disclaimer (AR360-1 7-44f(3)) or prohibition from using affiliation or branding."

Defendant Col. Watts, as Vice Dean for Operations, signed the Academic Engagement Policy for the Dean of the Academic Board and is identified as the "proponent" of DPOM 03-24. *Id.* at 2. Like all USMA regulations, directives and policies, a faculty member's failure to comply with DPOM 03-24 may lead to disciplinary action, up to and including termination.

On March 4, 2025, Plaintiff attended a monthly Faculty Council meeting comprised of senior faculty members, the first such meeting since DPOM 03-24 was promulgated. At the meeting, Defendant Reeves, who serves as Chair of the Faculty Council, introduced and defended the new Academic Engagement Policy. As legal support for the regulation, Reeves cited *Parker v. Levy*, 417 U.S. 733 (1974), which upheld the Army's conviction under the military's penal code of an Army captain who spoke against the Vietnam War. Defendant Gilland attended the part of the meeting when Plaintiff argued that DPOM 03-24 is unconstitutional. *See* Complaint ¶¶ 57-60.

At the meeting, Bakken said DPOM 03-24 was unconstitutional because it imposed an improper and standardless licensing regime, constituted a prior restraint upon speech, and permitted the Academy to prohibit speech based on content. While he spoke in opposition to the regulation, one of the senior administrators at USMA, the Deputy Department Head of English & World Languages, Col. John Gregory, directed Bakken to stop speaking. After the meeting, Col. Gregory, who holds a law degree, told Bakken he should file a "class action" lawsuit to challenge

the constitutionality of the regulation. Also after the meeting, Col. Julia Coxen, the Department Head of the Systems Engineering Department and Vice Chair of the Faculty Council, told Plaintiff that the Dean's Office promulgated DPOM 03-24 so that the Academy's senior military officers could show to the new administration "radical compliance" as a way to protect their positions. *Id.* ¶¶ 61-64. Echoing Col. Coxen's remark, on July 18, 2025, Col. Williams told Bakken that the purpose of DPOM 03-24 was to protect the Dean and Superintendent from termination by showing their obedience to the new administration. Col. Williams further stated that he believed that DPOM 03-24 would lead to *Parker v. Levy* being overruled. *Id.* ¶ 66.

On March 5, 2025, Plaintiff attended a Law and Philosophy Department faculty meeting, where Department Head Williams defended the Academic Engagement Policy and emphasized that all faculty members must follow it. At that meeting, Bakken again said DPOM 03-24 was unconstitutional, citing Supreme Court cases to support his position. In response, Defendant Berry turned red, pounded the table, and admonished that Bakken must obey the regulation. After the meeting, Berry approached Bakken and said he should file a "class action" lawsuit to challenge the constitutionality of the regulation. *Id.* ¶¶ 67-70.

Later that same day, March 5, 2025, the Law and Philosophy Department's Executive Officer, Lt. Col. Joshua Lehman, sent an email to DLP (Department of Law and Philosophy) faculty, attaching a copy of DPOM 03-24 and specifying the protocol for faculty members to obtain prior approval for speaking and writing: "DLP faculty should run their proposals through either Col. Mayer (philosophers) or LTC Chiaramonte (lawyers). These officers will serve as reviewers of the academic engagement proposals. Col. Mayer and LTC Chiaramonte have delegated authority from Col. Williams to **approve** proposals. Col. Williams has NOT delegated disapproval authority. Col. Williams should only receive proposals through these two officers" (boldface in

original). Thus, to seek prior approval under the Academic Engagement Policy, Plaintiff (and all other law professors) must submit his proposal to Program Director Chiaramonte, who may approve the proposal or refer it to Department Head Williams, who has ultimate authority to approve or disapprove the proposed engagement. *Id*. ¶¶ 71-72.

On July 16, 2025, Defendant Chiaramonte solicited requests for funding for the academic year. The next day, Bakken wrote to Chiaramonte., "I'd like to attend and/or present a paper at a conference this academic year, if approved." On July 21, 2025, Chiaramonte wrote to Bakken, "Awesome! Do I get to read it? I will add it to the budget!" One minute later, Chiaramonte wrote back to Bakken, "What is the title?" Bakken had not previously received such an inquiry at USMA. As he could not write a paper until he knew what topic Chiaramonte and Williams would approve, Bakken wrote to Chiaramonte: "I haven't prepared a paper or a title for a conference, so I don't have those to relay to you." *Id*. ¶¶ 73-78; Bakken Decl. Exhibit 5.

On July 17, 2025, Bakken sought clarification from Defendant Berry about how the Academic Engagement Policy would be implemented: "So that I may know what writing, speaking, and engagements are approved and what I may speak and write about, will you please let me know the USMA and DLP standards, if any, for approving engagements, topics, and external audiences that apply to me?" *See* Complaint ¶¶ 74-79. The next day, Defendant Berry, copying Defendant Williams, responded as follows:

> In the absence of specific information about the nature of the scholarship you are considering, I am unable to provide a definitive determination regarding whether the proposed academic engagement may be approved in an official capacity.
>
> That said, it may be helpful for you to have a general understanding of the types of academic engagements that have been approved or disapproved for publication or media involvement when conducted in an official capacity.

In the vast majority of cases, requests have been approved when the engagement involves scholarship that:

> (1) yields in-depth disciplinary knowledge accepted by other scholars (see USMA Regulation 150-3), and
>
> (2) does not conflict with applicable Presidential Executive Orders, Department of Defense (DoD), or Department of the Army directives or memoranda.

Approved academic engagements typically involve peer-reviewed scholarship grounded in original research and supported by citations. Media engagements have also been approved when the content focuses specifically on the faculty member's research and academic expertise. A good example is this podcast / video discussion between the Dean and COL John Gregory: (US China Competition: Col. Gregory on Law & Military Culture).

Requests have not been approved when the proposed engagement conflicted with applicable Executive Orders or DoD/Army guidance, or when the content did not meet the standard of academic scholarship—particularly when the material reflected personal opinions on current events rather than research-based scholarly analysis.

As you are aware, DPOM 03-24 applies only to official engagements—that is, those conducted on duty or using a USMA affiliation or branding. Engagements undertaken solely in a personal capacity are not governed by this directive, though they may still be subject to other laws and policies applicable to federal employees.

I also encourage you to review USMA Regulation 150-3, which provides guidance on what constitutes scholarship. Not all engagement qualifies as academic or scholarly under institutional definitions.

If you would like assistance evaluating whether a specific topic or project might meet the relevant standards and policies, either I or COL Williams would be glad to meet with you. Given your expertise in criminal law, you might consider exploring topics related to the Supreme Court's recent term that align with your previous scholarship (e.g., The Plea of Innocence). Engagements focused on such topics would likely align well with DPOM 03-24.

> As always, LTC Chiaramonte, COL Williams, and I are available to discuss your ideas and concerns. We are committed to encouraging world-class scholarship that contributes to the academic development of Cadets, advances the discipline of law, and supports the broader mission of the Army.

*Id*. at ¶ 80; Bakken Decl., Exhibit 4.

**E. The impact of the Academic Engagement Policy on Bakken.**

Over the last 25 years, Bakken has spoken and written to external audiences using his USMA affiliation on countless occasions, including speaking at conferences and to journalists, lecturing at institutions other than USMA, and publishing articles, opinion pieces, essays, and books. Since 2020, he has participated in approximately 72 "external engagements" in which his "institutional affiliation" was indicated. *See* Bakken Decl. ¶¶ 5-6.

Bakken's experience and affiliation with the Academy provide him with unparalleled insight, credibility, and *bona fides* when writing and speaking on matters critical to the U.S. government, U.S Military, USMA, as well as the nation, and to academic, professional, and general audiences nationally and internationally, strengthening his reputation, increasing the demand for his speaking engagements in academic and non-academic writings, and making his commercial works more marketable. *See* Complaint ¶ 82.

Bakken does not have a security classification and has not agreed with USMA or any government entity not to write or speak or engage in expression to audiences external to USMA and the government. He has not agreed to any type of approval or censorship regime by USMA or any entity of the government, and he wishes to continue to speak and write to external audiences while using his USMA affiliation to communicate his experience and expertise in and outside his discipline and his work history over 25 years. Absent such cursory information about where he has been employed and continues to be employed, Bakken would have a 25-year gap in his life

that could not be explained if USMA and the other Defendants were permitted to prohibit him from communicating his professional affiliation. *Id*. ¶¶ 83-87.

Bakken has contracted with a book publisher to publish a new book and intends to communicate in the book his affiliation with USMA; he does not wish to seek the prior approval of the Defendants to do so prior to its publication. The book, on which Bakken began working before promulgation of the Academic Engagement Policy, is scheduled for release in August 2026 and is on the subject of decision-making. The book includes stories, including those from his experience while working at USMA, which range from how soldiers under stress respond to emergencies to how adult children must decide whether to send their elderly parents to a nursing home. Given its contents, including lessons from the law, from teaching, and from his experience at USMA, the book contains material concerning Bakken's "disciplinary areas of expertise," as that phrase is used in the DPOM. *See* Bakken Decl. ¶ 7.

Under his contract with the publisher, Bakken agreed to purchase 1,000 copies of the book, at a cost of approximately $10,000 to $12,000, to advance the ideas in the book through distributing it at public events. He has also spent in excess of $10,000 in preparing a podcast to describe the contents of the book, as well as other matters that he understands to be within his disciplinary areas of expertise. Under the Academic Engagement Policy, Bakken would need prior approval from Defendants before he can publish his book and launch his podcast. Moreover, if the Defendants were to deny approval, he would subject himself to discipline and/or termination of employment or forego publication and his podcast at a cost exceeding $20,000.00. *Id*. ¶¶ 8-9.

As further demonstrated in his Declaration, in addition to its impact on his anticipated book and podcast, the Academic Engagement Policy has curtailed Bakken's ability to participate in other external engagements. *Id*. ¶ 10.

Bakken's concerns about Defendants' enforcement of the DPOM against him if he were to speak without prior approval are not speculative, as he has become aware of Defendants' repeated enforcement of the policy against some of his colleagues over the last several months, which demonstrates the reasonableness of his belief about how Defendants would enforce the policy against him if he were to violate it by speaking without first obtaining their prior approval, as well as the likelihood that they would deny him approval based upon the content of the expression in which he would like to engage. *Id*. ¶¶ 12-20.

In addition to his own outside writings and other external engagements, USMA has required Bakken to teach courses, to participate in external engagements, and to speak and publish writings publicly so as to avoid termination, to be promoted, to earn tenure, and to receive increases in salary. Notably, on July 17, 2025, Defendant Berry, Bakken's immediate supervisor, emailed to Bakken a four-page memorandum, dated July 1, 2025, dictating that, since they previously evaluated Bakken in January 2025, Berry and Williams had changed the evaluation standards for Bakken for the 2025-2026 evaluation period. Berry wrote: "As described above, we will implement 'Teaching, Scholarship, Service, Cadet Development, and Faculty Development' as your performance elements." *See* Complaint ¶¶ 89-91.

Berry described the standards that he and Williams would apply to Bakken, including: "Evidence of excellence in teaching and curriculum development such as a published textbook (or contribution to a textbook) in the discipline . . . . Scholarship is active engagement, participation, and growth in an academic discipline. Quality scholarship yields in-depth disciplinary knowledge that has been shared with and accepted by other scholars." *Id*. at ¶ 92.

In his email, Berry wrote to Bakken: "Shortly, I will transfer your 2026 Performance Plan to you for your review and input. You will notice that I have changed several elements of your

performance plan . . . . An example for scholarship might be, 'I will write an article for submission to a peer-reviewed law journal for publication.'" *Id*. ¶ 93.

**F. The Academy's scrutiny and suppression of faculty speech as embodied by DPOM 03-24 extends to the classroom.**

On August 12, 2025, Defendant Reeves addressed civilian and military members of the faculty and instructed them on what they may say while teaching Cadets: "The classroom is meant to be a professional environment . . . . If you start to feel that perhaps maybe you're starting to advocate for a particular position or ideology, which I don't think you do, when you're taking a position where you're like why we believe this so I'll help the Cadets believe this way, you're wrong. That's not what we do. They don't need to know what I believe." *See* Bakken Decl. ¶ 26.

Reeves' August 12, 2025 edict is consistent with the January 27, 2025 Presidential Executive Order and USMA's response thereto, as well as with DPOM 03-24, in that its intent is to control, chill, and suppress, faculty speech.

Bakken understood Reeves' August 12, 2025 edict as a directive from a superior, disobedience of which could result in discipline, including termination. As a result, when asked by his students about his opinions on the subject matters in his classes, Bakken, beginning in the first class of the semester on August 19, 2025, has declined to express his expert opinions in his Criminal Law course, such as, for example, whether a particular majority or dissenting opinion is persuasive and why. *Id.* ¶ 27.

For example, in this current semester (Fall 2025), in teaching *McCleskey v. Kemp*, 481 U.S. 279 (1987) (where the Court upheld a death sentence), a Cadet asked Bakken whether the death penalty is effective. Because of Defendant Berry's and Defendant Reeves' prohibitions on opinions, Bakken declined to offer his opinion. By further example, in teaching the insanity defense, a Cadet asked his opinion of the value of the deinstitutionalization movement (moving

mentally ill people out of institutions and into independent living), which might have increased the number of people who are homeless and who evince mental disease or defect and might be able to assert an insanity defense. Bakken declined to offer his opinion. *Id*. at ¶¶ 28-29.

By further example, in teaching *Robinson v. California*, 370 U.S. 660 (1962) (where the Court held that status crimes, such as drug addiction, are unconstitutional), a Cadet asked whether the Court decided the case correctly. As a result of Defendant Berry's and Defendant Reeves' edicts, Bakken declined to offer his opinion. By further example, in teaching *McQuirter v. State*, 36 Ala. App. 707 (1953) (where an Alabama court concluded a jury may consider social conditions in reaching a verdict), a Cadet asked whether courts should allow juries to consider social conditions in reaching verdicts. Bakken declined to offer his opinion. *Id*. at ¶ 30.

From his more-than 32 years of teaching at colleges and universities (25 at USMA), Bakken believes his opinions and views in response to questions from his students are critical to the educational process in that they prompt further discussion and debate, foster critical thinking skills, and teach students respect for differing viewpoints. In these cited examples, Bakken would have provided the Cadets with his opinions and beliefs in response to their questions if not for Berry's and Reeves' edicts, their prohibitions on opinions, and he wishes to provide his opinions and beliefs in classes on the subject matters and cases in his course, but he is currently prohibited from doing so by Defendant Berry's and Defendant Reeves' edicts. *Id*. at ¶¶ 31-32.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 65, a court may grant a preliminary injunction if the movant has established (1) "he will suffer irreparable harm in the absence of an injunction" and (2) "either [] a likelihood of success on the merits or [] sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's

favor." *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).[1] "Where a moving party challenges a government action taken in the public interest pursuant to a statutory or regulatory scheme . . ., the moving party cannot resort to the 'fair ground for litigation' standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Id.*.

## ARGUMENT

Bakken asserts three claims, all arising under the First Amendment. First, the Academic Engagement Policy is unconstitutional to the extent it requires him to seek prior approval before he may speak or write publicly ("external engagements") with the use or mention of his USMA affiliation while off-duty and independent of his job duties. Second, the Academic Engagement Policy is unconstitutional to the extent it requires him to seek prior approval before communicating with any external audience while on duty and for purposes of discharging various obligations of his job, which require him to speak and write for external audiences. And third, Defendants Berry's and Reeves' July and August 2025 directives to refrain from offering his beliefs or opinions in speaking and writing and to the Cadets in his classes unconstitutionally infringe upon his academic freedom.

As explained below, the challenged policies have caused, and continue to cause, Bakken irreparable injury, and he is likely to succeed on the merits of his claims. Accordingly, he is entitled to a preliminary injunction enjoining enforcement of these policies.

[1] Unless otherwise specified, all case citations in this memorandum of law omit internal quotation marks and citations and accept all alterations.

**Point I**

**Bakken has suffered irreparable injury, and he will continue to suffer irreparable injury absent a preliminary injunction.**

"The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction." *State Farm Mut. Auto Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024). "To make this showing, the moving party must demonstrate that absent a preliminary injunction it will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. Thus, irreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied. But where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances. Therefore, the moving party must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.*

"The loss of Fist Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Agudath Isr. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020); *Latino Officers Ass'n. v. City of New York*, 196 F.3d 458, 462 (2d Cir. 1999) ("Violations of First Amendment rights are commonly considered irreparable injuries for purposes of a preliminary injunction"). Such an injury may arise where free speech is "either threatened or in fact being impaired at the time relief is sought." *Elrod,* 427 U.S. at 373.

The Academic Engagement Policy has curtailed, and continues to curtail, Bakken's ability to speak freely to external audiences, whether for his own independent purposes or for purposes

of discharging his job duties. As described in the Amended Complaint and accompanying Declaration, Bakken has historically spoken externally on a regular basis using his USMA affiliation, whether it be to publish books or articles, to speak or lecture at conferences or otherwise, or to give interviews on podcasts or through other media. And, as Bakken avers, since USMA promulgated the Academic Engagement Policy, he has largely, but reluctantly, curtailed such activities because he does not wish to seek prior approval before doing so, which the policy requires him to do.

For example, Bakken has forgone opportunities to be interviewed and to write about controversial topics, such as recent high-profile criminal charging decisions by the U.S. Department of Justice and the legality of using the U.S. military to kill alleged drug smugglers on the high seas. Notably, given Defendant Berry's July 18, 2025 admonition that engagements that "conflict[] with applicable Executive Orders or DoD/Army guidance" or where the material "reflected personal opinions on current events rather than research-based scholarly analysis," and given that these proposed writings would be critical of current administration activities, it is highly likely, if not certain, that Defendants would disapprove of such works if Bakken sought approval.

In addition, Bakken is under contract to publish a book on the topic of decision-making, due to be released in August 2026. The book draws on his experiences as a lawyer, law professor, and USMA employee. Not only is his use of his USMA affiliation indispensable to the substance of the book, but also, Bakken's job provides him with a level of credibility and integrity as an author and commentator on its subject matter, an attribute that is important for the book's success. Bakken does not wish to seek prior approval before publishing this book, but the Academic Engagement Policy requires him to do so.

In addition to his independent, off-duty activities, Bakken is also required to speak and write externally as part of his job duties, particularly as they relate to his obligations to contribute to academic scholarship. As demonstrated in his Declaration, Bakken does not wish to seek prior approval before engaging in external speaking and writing activities in the discharge of his job duties, but the Academic Engagement Policy requires him to do so.

Finally, during his 25 years working at USMA, Bakken has shared with Cadets his beliefs and opinions on any number of subject matters, as doing so is critical and essential to the educational process in the university setting in that a teacher's opinions on the subject matters taught prompt further discussion and debate, foster critical thinking skills, and teach respect for differing viewpoints. But since Defendant Berry directed Bakken – and Reeves directed all USMA instructors – not to share their opinions, Bakken has complied and, accordingly, has been restricted in his ability to teach in the manner he believes would provide the Cadets in his classes a necessary educational experience.

In short, the Academic Engagement Policy and Defendants' directives to refrain from expressing both his expert and personal beliefs and opinions when teaching have chilled Bakken's ability to speak freely on matters of public concern, on and off duty. And the Defendants' threat of enforcement of these policies against Bakken, if he speaks or writes without seeking their preclearance, will continue to chill and suppress his expression. These actual, ongoing and threatened impairments of Bakken's ability to speak or write constitute irreparable harm warranting entry of a preliminary injunction.

**Point II**

**Bakken is likely to succeed on the merits of his claims.**

"Individuals do not relinquish their First Amendment rights by accepting employment with the government." *Harmon v. City of New York*, 140 F.3d 111, 117 (2d Cir. 1998) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)). That said, "the government may impose restrains on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large. In evaluating the validity of a restraint on government employee speech, courts must arrive at a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

Where, like here, the plaintiff does not challenge an isolated, *post hoc* disciplinary action (like in *Pickering*), but rather, a blanket policy that deters expression *before* it ever occurs (a prior restraint), the government's burden is "particularly heavy." *See Id.* at 118; *United States v. Nat'l. Treasury Emples. Union*, 513 U.S. 454, 466-68 (1995) ("*NTEU*"). "To justify this kind of prospective regulation, the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *Harmon*, 140 F.3d at 118.

*Harmon* is almost directly on all fours with our case. There, plaintiff Harmon, who worked in New York City's child welfare agency, challenged an Executive Order which required agency employees to obtain approval before speaking with the media "regarding any policies or activities of the Agency," and designated the agency's Media Relations Office as the authority for handling

such media contacts and to make determinations "consistent with the efficiency and effective operation of the Agency and the achievement of its objectives." 140 F.3d at 116.[2]

Harmon was suspended for violating the Executive Order after she spoke, without first obtaining internal approval, to ABC's *World News Tonight* about the death of a six-year-old, allegedly beaten by his mother despite numerous reports to the child welfare agency about the mother. *Id.* In response, Harmon challenged the Executive Order as unconstitutional and sought preliminary and permanent injunctive relief enjoining its enforcement, as well as reinstatement and backpay. *Id.* at 116-17.[3]

While Harmon's action was pending, the Court permitted intervention by another employee, Diane Stadler, who worked for the same agency and was subject to the same Executive Order Harmon challenged. *Id.* at 117. Stadler had not yet been disciplined for violating the policy; rather, she "claimed that she wished to speak to the press and others regarding important issues such as the welfare of the children and families served by ACS, but that she was chilled and deterred from doing so by existence and threat of enforcement of [the Executive Order]." *Id.* The district court held that the Executive Order, to the extent it required employees to obtain agency approval before speaking with the press, was unconstitutional. *Id.*

Affirming the district court's order, the Second Circuit agreed that, since the suit challenged the constitutionality of a blanket policy that impacts speech before it occurs, the heightened *Pickering/NTEU* standard applied. *Id.* at 117-18. Thus, the Court evaluated whether "the interests of both potential audiences and a vast group of present and future employees in a

[2] The plaintiffs in Harmon challenged various iterations of the relevant directive; for ease of reference, we refer to the challenged orders herein simply as the "Executive Order."
[3] Harmon's claims for reinstatement, backpay, and monetary damages were resolved between the parties at various points during the litigation, and the only issue resolved by the Court was the plaintiffs' claims for injunctive relief.

broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *Id.* at 118.

Applying this standard, the Court first considered the interests of Harmon, Stadler and the public, and deemed them significant, noting that "Harmon and Stadler both possess interests, as citizens, in being able to comment on matters of public concern" and that these "interests go to the core of the freedoms the First Amendment was designed to protect." *Id.* Recognizing that "the government has special authority to proscribe the speech of its employees," the Court cautioned that "vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions, but simply because superiors disagree with the content of employees' speech." *Id.* at 118-19. And the Court noted that "restraint on government employee expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said." *Id.* at 119. Thus, where "there is an ongoing debate about the effectiveness of the City's child welfare agency," and where, by dint of their employment, the plaintiffs "can contribute valuable insights to the discussion" and expressed their desire to do so, "the public has a significant interest in hearing their comments and those of other employees concerning the workings of the city's social service agencies." *Id.*

The Court then addressed the City's contention that the challenged preclearance policy "will not prohibit employees from commenting on the non-confidential operations of the agency once they have ensured that the proposed speech is consistent with the efficient and effective operation of the agency." *Id.* Rejecting this argument, the Court reasoned:

> Even according to this interpretation, the regulations clearly interfere with employees' ability to communicate their views to the media. Under [the Executive Order], the government has the authority to prohibit speech altogether and to decide which employees may have contact with the media. In this way, these policies are broader than the honoraria ban struck down in *NTEU*.

> Whereas that regulation placed a burden on employee speech by denying compensation, the press policies here directly regulate speech.
>
> The kind of approval procedure mandated by the City is generally disfavored under First Amendment law because it chills potential speech before it happens. The press policies allow the agencies to determine in advance what kind of speech will harm agency operations instead of punishing disruptive remarks after their effect has been felt. For this reason, the regulations run afoul of the general presumption against prior restraints on speech. This aspect of the regulation weighs against the government in the *Pickering/NTEU* balance.

*Id.* at 119-120. Underscoring the constitutional perniciousness of preclearance policies, the Court observed that "preclearance requirements have a broad inhibiting effect on all employees, even those who might ultimately receive permission to speak." *Id.* at 120. It explained as follows:

> First . . . , preclearance requirements pose risks of self-censorship by speakers in order to avoid being denied a license to speak. Employees who are critical of the agency will naturally hesitate to voice their concerns if they must first ask permission from the very people whose judgments they call into question. Only those who adhere to the party line would view such a requirement without trepidation.
>
> Second, the prior approval mechanism allows the agencies to control the timing of the intended speech. By delaying the review process, the employer has the power to destroy the immediacy of the comment on agency affairs, and thus, in many cases, its newsworthiness. In such cases, dissemination delayed may prove tantamount to dissemination denied.
>
> Finally, the regulations raise concerns because they leave the determination of who may speak and who may not to the unbridled discretion of a government official. Outside the *Pickering* context, courts have mandated that regulations that impose licensing requirements on speech must possess narrow, objective, and definite standards to guide the decision-maker. Without such standards, a licensing regulation raises the specter of content and viewpoint censorship. In the context of the *Pickering/NTEU* balance, courts have found that the potential for censorship in a regulation justifies an additional thumb on the employees' side of the scales.

*Id.* at 120.

The Court also found wanting the City's contention that it would permit employee speech that "will not interfere with the efficient operations of the agencies," as this standard is "[in]sufficiently definite to limit the possibility for content or viewpoint censorship." *Id.* at 120-21. Indeed, "[b]ecause the press policies allow for suppression of speech before it takes place, administrators may prevent speech that would not actually have had a disruptive effect." *Id.* Moreover, "the standard inherently disfavors speech that is critical of agency operations, because such comments will necessarily seem more potentially disruptive than comments that toe the agency line." *Id.*

Based on these considerations, the Court concluded: "The challenged regulations thus implicate all of the above concerns. By mandating approval from an employee's superior, they will discourage speakers with dissenting views from coming forward. They provide no time limit for review to ensure that commentary is not rendered moot by delay. Finally, they lack objective standards to limit the discretion of the agency decision-maker. For these reasons we agree with the district court that [the Executive Order] clearly restricts the First Amendment rights of City employees." *Id.* at 121.

Finding that the City failed to meet its burden in demonstrating that the necessary impact of employee expression on its actual operations outweighed the First Amendment interests of its employees, as explicated above, the Court held that the Executive Order imposed an unconstitutional infringement of the First Amendment rights of City employees. *Id.* at 121-24.

The same First Amendment interests underlying *Harmon* are present here. Like the plaintiffs in *Harmon*, Bakken and the members of the putative class have an important interest in speaking externally on matters of public concern, whether it be to the press, at conferences, through

their publications, or otherwise. Likewise, the public has an important interest in hearing and reading what these professors have to say and write. But the Academic Engagement Policy imposes a significant deterrent and chilling effect, leading to self-censorship and, particularly given the standardless discretion provided to an individual decision-maker, the real risk of content and viewpoint discrimination.

For instance, and as noted above, Bakken is under contract to publish a book in August 2026 on the subject of decision-making, and which uses examples from, among other things, his experience working at USMA. Under the Academic Engagement Policy, the Defendants have standardless discretion to deny Bakken approval to do so and to silence him before he ever speaks and before USMA can rationally assess any potential disruptive effect and in a manner that censors speech that would not actually ever be disruptive in the first instance.

Likewise, Bakken has foregone recent opportunities to write and speak about controversial current events in a manner that would be critical of the current administration and on which his views as a lawyer and law professor at USMA would be valuable to the public and to the marketplace of ideas. Defendants would almost certainly have denied him approval had asked permission. In this way, the Academic Engagement Policy exists as a means of pure censorship – a prior restraint of speech before it ever occurs.

Thus, like *Harmon*, Bakken's First Amendment interests in speaking and writing on matters of public concern, as well as the public's interest in hearing his unique views, are entitled to significant weight. Moreover, and also like *Harmon*, the fact that the Academic Engagement Policy vests standardless discretion in a single individual "justifies an additional thumb on the employees' side of the scales." *Id.* at 120.

Finally, on its face, the Academic Engagement Policy does not indicate what, if any interest of the employer, it seeks to advance, making it difficult to evaluate and balance any such purported interests against those of Bakken, his colleagues, and their potential audiences. And, to the extent Defendants might contend the policy is required to prevent disruption to its operations, as the Second Circuit noted in *Harmon*, use of a prior restraint on speech to achieve that end, particularly where the regulation provides no objective standards for its enforcement, is hardly any appropriate means to achieve the purported end, and risks self-censorship and inhibiting non-disruptive speech. In this way, a preclearance regime such as USMA's Academic Engagement Policy is overbroad and insufficiently tailored to achieve whatever ends Defendants might assert. To the extent Defendants assert particular interests in their opposition to this motion, Bakken will address such purported interests in his reply.

In short, applying the heightened *Pickering/NTEU* standard, the record demonstrates, *prima facie*, that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are not outweighed by that expression's necessary impact on the actual operation of the Government. *Id.* at 118. Bakken will likely succeed on his First Amendment claim.

Defendants might argue that the challenged policy does not prevent Bakken from speaking externally on any subject matter, but rather, only requires prior approval to use his USMA affiliation when speaking externally on matters within his disciplinary area of expertise and, thus, does not burden his First Amendment rights. But this argument would fail.

As an initial matter, this argument relates only to Bakken's claim that the Academic Engagement Policy is unconstitutional to the extent it impacts his off-duty speech, as the policy applies to *all* on-duty speech in one's disciplinary area of expertise, whether or not USMA

affiliation is used. And, as to his claim about off-duty speech, Bakken's USMA affiliation is often an important aspect of his speech, as it lends him significant credibility when speaking and writing about matters within his disciplinary area of expertise and, without mentioning his 25-year affiliation with USMA, some members of his audience might be left to wonder what he has been doing professionally for the last quarter-century.

In this regard, *Latino Officer's Association* is on point. There, members of the NYPD's Latino Officer's Association ("LOA") challenged an NYPD policy that prevented them from marching at parades in their NYPD uniforms without prior approval, which approval was denied. Applying the heightened *Picking/NTEU* standard, the Court recognized that the LOA members had a strong First Amendment interest in marching in uniform behind their banner as a means of publicly protesting alleged discrimination in their department. *See* 196 F.3d at 465.

Rejecting the City's arguments that the plaintiffs lacked a First Amendment interest in marching in uniform and that the plaintiffs could just as easily communicate their message by marching without uniforms and by carrying signage or handing out pamphlets, the Second Circuit reasoned as follows:

> First, members of the public specifically, the spectators at each of the parades are more likely to discern and understand the LOA's message about discrimination and misconduct in the NYPD if plaintiffs wear uniforms. To be sure, as defendants contend, spectators are unlikely to understand the LOA's message merely from the fact that its members are in uniform. However, in conducting the necessary inquiry into whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, a court should not disregard the context in which that conduct occurred. Here, the context of plaintiffs' conduct includes the significant publicity that the LOA has received in the NYPD. In view of that context, we think it is fair to infer that the likelihood was great that plaintiffs' message would be understood by those who viewed it.
>
> * * * * *

> Finally, defendants' own policies make it difficult for us to accept that plaintiffs could communicate the same message or that they could communicate their message as effectively without wearing their police uniforms. As defendants acknowledge by allowing other groups, including Hispanic Society, to march in uniform, wearing the uniform of the NYPD in a public parade like the Puerto Rican Day parade has a unique expressive quality that would be lost were plaintiffs merely to hand out fliers or carry a banner proclaiming their message.

*Id.* at 465-66.

Likewise, here, as noted, Bakken's USMA affiliation is important to the effective communication of the ideas he seeks to express. It also makes his speech more desirable, allowing him to reach a wider audience. And the fact that USMA's policy appears to permit use of one's USMA affiliation in various contexts demonstrates its recognition that such affiliation can be useful. Moreover, denial of Bakken's ability to use his USMA affiliation is likely to impair and inhibit his opportunities to engage with certain external audiences. The Academic Engagement Policy thus imposes a real, and significant, burden on his expressive activities.

Also relevant is *NTEU*, where the Supreme Court held that a law banning federal employees from receiving honoraria in exchange for certain speaking and writing engagements was unconstitutional. The Court recognized that, while the law "neither prohibits speech nor discriminates among speakers based on the content or viewpoint of their message, its prohibition on compensation unquestionably imposes a significant burden on expressive activity." *Id.* at 468. As the Court recognized, "[p]ublishers compensate authors because compensation provides a significant incentive toward more expression. By denying respondents that incentive, the honoraria ban induces them to curtail their expression if they wish to continue working for the Government." 513 U.S. at 469.

Likewise, here, the prohibition on using one's USMA affiliation without approval, while not an outright ban on the underlying speech itself, stands as a potential barrier and disincentive to expressive activities. Again, Bakken's USMA affiliation can be an important factor in providing him access to certain audiences and in increasing the reach and impact of his speech.

In short, Bakken has established a likelihood of success on the merits.

**Point III**

**The balance of hardships tips in Bakkens' favor.**

To the extent the Court deems this to be a necessary factor, the balance of the hardships tips in Bakken's favor. In evaluating this prong, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *State Farm*, 120 F.4th at 84. "This factor is related to the irreparable harm requirement as both consider the harm to the parties with the relevant harm being that which (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Id.*

Every day he is subjected to the Academic Engagement Policy and Defendants' prohibitions on his expression, Bakken is chilled in his ability to exercise his First Amendment right to speak freely on matters of public concern and otherwise inhibited in his ability to discharge his job duties to the utmost of his abilities. These injuries cannot be remedied by money damages; indeed, compensatory damages are not even available on his claims.

Defendants have not asserted any interest that would be harmed if they were enjoined from enforcing the challenged policies pending resolution of this action. In this regard, it is notable that, over his 25-year career at USMA, Bakken was never subjected to a preclearance regime, nor was he ever expressly directed to refrain from expressing his views and beliefs to his students, and

there is no evidence that these new polices, which he now challenges, were enacted to address any particular evil or that reverting back to the status quo ante would cause any disruption or cause Defendants any particular harm.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Bakken's motion and enter a preliminary injunction enjoining the challenged policies during the pendency of this action.

Dated: Newburgh, New York
December 5, 2025

Respectfully Submitted,
GOLDMAN LAW, PLLC
*Co-Counsel* for *Plaintiff*

By: /s/ Jonathan R. Goldman

Jonathan R. Goldman, Esq. (JG8710)
372 South Plank Road, Ste. 2
Newburgh, New York 12550
(845) 534-6472 Ext. 1001
(845) 579-3064 [Fax]
jgoldman@jrgoldmanlaw.com

BERGSTEIN & ULLRICH
*Co-Counsel for Plaintiff*

By: /s/ Stephen Bergstein

Stephen Bergstein (SB6810)
5 Paradies Lane
New Paltz, New York 12561
(845) 419-2250 [Tel]
(845) 469-1277 [Fax]
steve@tbulaw.com

**WORD COUNT CERTIFICATION**

Pursuant to, and in compliance with, Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern District of New York and Section 2(B)(i) of this Court's Individual Rules of Practice, the total number of words in the foregoing Memorandum of Law, exclusive of any cover page(s)/caption(s), table of contents, table of authorities, and signature block, is 8,216 words.

Dated: Newburgh, New York
December 5, 2025

*/s/ Jonathan R. Goldman*
JONATHAN R. GOLDMAN, ESQ. (JG8710)