UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIM BAKKEN,

Plaintiff,

- against –

UNITED STATES MILITARY ACADEMY, *et al.*,

Defendants.

**No. 25 Civ. 7826 (CS)**

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the United States
86 Chambers Street, Third Floor
New York, New York 10007
Tel: (212) 637-2761/2741
*Attorney for Defendants*

DANA WALSH KUMAR
*Assistant United States Attorney*
– Of Counsel –

## TABLE OF CONTENTS

**PAGE**


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

I. Factual and Procedural Background ..... 3

A. West Point and Civilian Faculty ..... 3

B. Rules and Regulations Governing West Point Faculty Speaking Engagements and Academic Freedom ..... 4

i. Army Regulation 360-1 ..... 4

ii. Dean's Policy Memorandum 03-24 ..... 5

iii. Other Relevant Policies ..... 6

C. The Complaint and Motion for a Preliminary Injunction ..... 8

LEGAL STANDARDS ..... 8

I. Subject Matter Jurisdiction ..... 8

II. Preliminary Injunction Standard ..... 9

III. Motion to Dismiss for Failure to State a Claim ..... 9

ARGUMENT ..... 10

I. The Civil Service Reform Act of 1978 Precludes Jurisdiction Over Plaintiff's Claims ..... 10

II. Plaintiff Has Not Shown Irreparable Harm ..... 15

III. Plaintiff Is Not Likely to Succeed on the Merits ..... 18

IV. A Preliminary Injunction Would Not Serve the Public Interest ..... 24

V. The Complaint Should Be Dismissed Pursuant to Rule 12(b)(6) ..... 25

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AALJ v. Colvin*,
777 F.3d 402 (7th Cir. 2015) .... 13

*Able v. United States*,
155 F.3d 628 (2d Cir. 1998) .... 20

*ACLU v. DoD*,
901 F.3d 125 (2d Cir. 2018) .... 20

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
766 F.2d 715 (2d Cir. 1985) .... 15, 16

*Andrew v. Clark*,
561 F.3d 261 (4th Cir. 2009) .... 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... 9

*Austin v. U. S. Navy Seals 1-26*,
142 S. Ct. 1301 (2022) .... 19, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 9

*Bionpharma Inc. v. CoreRx, Inc.*,
582 F. Supp. 3d 167 (S.D.N.Y. 2022) .... 25

*Boumediene v. Bush*,
553 U.S. 723 (2008) .... 20

*Burns v. Wilson*,
346 U.S. 137 (1953) .... 21

*Chappell v. Wallace*,
462 U.S. 296 (1983) .... 21

*Chinniah v. FERC*,
62 F.4th 700 (2d Cir. 2023) .... 11

*Council for Responsible Nutrition v. James*,
No. 24-CV-1881 (ALC), 2024 WL 1700036 (S.D.N.Y. Apr. 19, 2024) .... 16, 17

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ........ 25

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........ 19, 21

*Doolen v. Wormuth*,
5 F.4th 125 (2d Cir. 2021) ........ 21

*Dotson v. Griesa*,
398 F.3d 156 (2d Cir. 2005) ........ 10

*Elgin v. Department of the Treasury*,
567 U.S. 1 (2012) ........ 11, 13, 24

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 15

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ........ 15

*Ferry v. Hayden*,
954 F.2d 658 (11th Cir. 1992) ........ 13

*Fleming v. Spencer*,
718 F. App'x 185 (4th Cir. 2018) ........ 13

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) ........ 15

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ........ 18

*Gilligan v. Morgan*,
413 U.S. 1 (1973) ........ 20, 21

*Goldman v. Weinberger*,
475 U.S. 503 (1986) ........ 20, 21, 23

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ........ 9

*Haig v. Agee*,
453 U.S. 280 (1981) ........ 21

*Harman v. City of New York*,
140 F.3d 111 (2d Cir. 1998)........................................................................................ 22

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023)................................................................................... 19, 22

*Hester v. French*,
985 F.3d 165 (2d Cir. 2021).......................................................................................... 9

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019)............................................................................................ 9

*Irizarry v. United States*,
427 F.3d 76 (1st Cir. 2005) ......................................................................................... 13

*Kloeckner v. Solis*,
568 U.S. 41 (2012) ...................................................................................................... 11

*Krafsur v. Davenport*,
736 F.3d 1032 (6th Cir. 2013)...................................................................................... 11

*Laird v. Tatum*,
48 U.S. 1 (1972) .......................................................................................................... 15

*Latino Officers Ass'n, New York, Inc. v. City of New York*,
196 F.3d 458 (2d Cir. 1999)......................................................................................... 22

*Lindahl v. Office of Pers. Mgmt.*,
470 U.S. 768 (1985) ..................................................................................................... 10

*Luckett v. Bure*,
290 F.3d 493 (2d Cir. 2002)........................................................................................... 8

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000)........................................................................................... 8

*Monowise Ltd. Corp. v. Ozy Media, Inc.*,
No. 17-CV-8028 (JMF), 2018 WL 2089342 (S.D.N.Y. May 3, 2018).................................... 17

*Mule v. Dep't of Educ. of City of New York*,
797 F. Supp. 3d 9 (E.D.N.Y. 2025).............................................................................. 18

*Nat'l Association of Immigration Judges v. Owen*,
139 F.4th 293 (4th Cir. 2025)................................................................................. 11, 14

*New York v. U.S. Dep't of Homeland Security*,
969 F.3d 42 (2d Cir. 2020) .......... 15

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 24

*Orloff v. Willoughby*,
345 U.S. 83 (1953) .......... 21

*Parker v. Levy*,
417 U.S. 733 (1974) .......... 23

*Payne v. Biden*,
62 F.4th 598 (D.C. Cir.) .......... 13

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) .......... 18

*Pilchman v. DoD*,
154 F. Supp. 2d 415 (E.D.N.Y. 2001) .......... 21

*Pinar v. Dole*,
747 F.2d 899 (4th Cir. 1984) .......... 11

*Piscottano v. Murphy*,
511 F.3d 247 (2d Cir. 2007) .......... 18

*Renne v. Geary*,
501 U.S. 312 (1991) .......... 8

*Robinson v. Overseas Mil. Sales Corp.*,
21 F.3d 502 (2d Cir. 1994) .......... 8

*Rodriguez ex rel. Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999) .......... 15

*Rostker v. Goldberg*,
453 U.S. 57 (1981) .......... 20

*Rydie v. Biden*,
No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022) .......... 11, 12

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 15

*Schlesinger v. Councilman*,
420 U.S. 738 (1975) ..................... 21

*Students for Fair Admissions v. U.S. Military Academy at West Point*,
709 F. Supp. 3d 118 (S.D.N.Y. 2024) ..................... 9, 21

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
60 F.3d 27 (2d Cir. 1995) ..................... 16

*United States v. Fausto*,
484 U.S. 439 (1988) ..................... 10, 11

*United States v. Nat'l Treas. Emps. Union*,
513 U.S. 454 (1995) ..................... 18, 23

*United States v. Nixon*,
418 U.S. 683 (1974) ..................... 21

*Weaver v. U.S. Info. Agency*,
87 F.3d 1429 (D.C. Cir. 1996) ..................... 11, 24

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
423 F.3d 137 (2d Cir. 2005) ..................... 17

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ..................... 9, 20

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ..................... 21

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ..................... 8, 9, 26

Federal Rule of Civil Procedure 65(c) ..................... 26

**Statutes**

5 U.S.C. § 1214(a) ..................... 11, 12

5 U.S.C. § 1214(b)(2)(b) ..................... 12

5 U.S.C. § 1214(c) ..................... 12

5 U.S.C. §§ 1221 ..................... 12

5 U.S.C. § 2301(b) .......... 11

5 U.S.C. § 2302(a)(2)(A) .......... 11, 14

5 U.S.C. § 7502 .......... 14

5 U.S.C. § 7512(1)-(5) .......... 12, 14

5 U.S.C. § 7703 .......... 12

10 U.S.C. § 7438 .......... 4

28 U.S.C. § 1295(a)(9) .......... 12

28 U.S.C. § 1331 .......... 13

Defendants the United States Military Academy ("USMA"), Lt. General Steven W. Gilland, Brigadier General Shane R. Reeves, Col. Krista Watts, Col. Winston Williams, Col. Joshua Berry, and Lt. Col. Caitlin Chiaramonte, in their official capacities (together, "Defendants"), by their attorney Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to the motion for a preliminary injunction (ECF No. 47) filed by the Plaintiff Tim Bakken ("Bakken" or "Plaintiff") and in support of Defendants' motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

The United States Military Academy at West Point ("USMA" or "West Point") is a four-year undergraduate institution responsible for building, educating, training, and inspiring the future leaders and officers of the United States Army. To accomplish this mission, West Point, a component of the Department of the Army, employs both military and civilian faculty members to teach cadets to prepare them to meet the intellectual requirements to be leaders in the Army. Because faculty members' speech, both externally and in the classroom, can affect West Point's mission, and that of the Department of the Army, West Point has adopted multiple policies over the years that govern when a civilian faculty member, such as Professor Bakken, can use his West Point affiliation in public broadcasts or messaging. Plaintiff has recently taken issue with a policy published in February 2025, which requires faculty members to inform their supervisor prior to speaking or writing publicly while using their West Point affiliation. Notably, the policy does not impose any restrictions on internal or external engagements undertaken by a faculty member in his or her personal capacity. The only requirement of the policy is that if a faculty member chooses to use his or her West Point affiliation publicly, any statements made must be cleared with a supervisor.

Plaintiff asserts that this requirement has chilled his speech and thus violates his First Amendment rights. These claims, however, fall outside of the Court's jurisdiction because they have to be administratively exhausted pursuant to the Civil Service Reform Act of 1978. The Complaint must be dismissed on that basis alone. If the Court proceeds to evaluate the merits of Plaintiff's claims, it is clear that Plaintiff is unlikely to succeed on the merits because the challenged policy satisfies the First Amendment, which gives the Government-as-employer broad ability to regulate the speech of its personnel. The policy does not prohibit any faculty member's speech outright; it simply establishes a process by which West Point supervisors review whether a proposed speech or publication would violate underlying rules. And any minimal burdens on Plaintiff's speech are outweighed by the policy's goal of furthering West Point's mission. Nor does Plaintiff establish irreparable harm. Plaintiff waited months after the policy's implementation to file a lawsuit and move for a preliminary injunction, and any alleged harm is speculative since Plaintiff has not been denied any ability to speak or publish any works. And finally, the equities weigh against an injunction. The only interest asserted is Plaintiff's own interest in being able to publish a book or to discharge the duties of his job. Plaintiff has not been denied the ability to discharge his duties, and Plaintiff's personal interest in utilizing his West Point affiliation for his own benefit is outweighed by the importance of a policy aimed to preserve West Point's mission.

Accordingly, Plaintiffs' motion for a preliminary injunction should be denied and the complaint should be dismissed.

## BACKGROUND

### I. Factual and Procedural Background

#### A. West Point and Civilian Faculty

The United States Military Academy at West Point was established in 1802. Declaration of Krista Watts, dated January 30, 2026 ("Watts Decl.") ¶ 7. West Point is a four-year, federally established undergraduate institution that prepares cadets to become leaders and officers in the United States Army. *Id.* West Point's mission is "to build, educate, train, and inspire the Corps of Cadets to be commissioned leaders of character committed to the Army values and ready for a lifetime of service to the Army and Nation." *Id.* West Point is under the immediate supervision and control of the Department of the Army. *Id.* ¶ 8. West Point's Superintendent is the commander of the Academy and the military installation on which it is located. *Id.* Upon entry to West Point, cadets are members of the Army. Each cadet receives an annual salary, room, board, medical, and dental care, and is subject to the Uniform Code of Military Justice. *Id.*

West Point's academic program is designed to develop cadets' critical thinking and creative problem-solving skills. *Id.* ¶ 9. Upon graduation, all cadets receive a Bachelor of Science degree and are fully prepared to meet the intellectual requirements of a leader in today's Army. *Id.* In addition to courses in science, engineering, mathematics, the humanities, and social sciences, West Point offers courses in military instruction that are not offered outside of the military service academies. *Id.* Cadets must also participate in rigorous military training and mandatory athletic activities. *Id.* ¶ 10. Following graduation, cadets are commissioned as active-duty officers with an obligation to serve a minimum of five years on active duty. *Id.* West Point is a significant source of officer commissions for the Army; it historically provides approximately 20% of those commissions, and West Point graduates constitute 33% of general officers in the

Army. *Id.* Accordingly, West Point is a vital pipeline to senior leadership in the Armed Forces. *Id.*

West Point faculty members, both military and civilian, are members of the academic profession and are simultaneously employees of the Federal government. *Id.* ¶ 11. Military professors are uniformed members of the United States Army. *Id.* Civilian professors are Federal civilian employees of the Department of the Army employed under 10 U.S.C. § 7438. *Id.* Currently, West Point employs 495 military officers and 188 civilians as members of the faculty. *Id.* Plaintiff is a civilian member of the faculty, who has been employed at West Point since 2000. *Id.*

**B. Rules and Regulations Governing West Point Faculty Speaking Engagements and Academic Freedom**

All faculty are subject to Department of Defense ("DoD"), Headquarters, Department of the Army ("HQDA"), and USMA rules and regulations. Uniformed members of the faculty are further subject to rules and regulations governing United States Army officers. Watts Decl. ¶ 12. In drafting internal policies and procedures, USMA remains cognizant of overarching DoD and HQDA regulations. *Id.* ¶ 13. These regulations apply to all members of the Department of the Army, including both military members and Federal civilian employees. *Id.* Except in very rare circumstances (for example, the Hatch Act, which relates to off-duty political activity) these regulations apply to civilian employees only when in the performance of their duties or when utilizing their Army affiliation. *Id.*

**i. Army Regulation 360-1**

The Department of the Army Regulation relating to Public Affairs is Army Regulation ("AR") 360-1. *Id.* ¶ 15. The current edition of AR 360-1 went into effect on October 8, 2020, and remains in effect today. *Id.* Army Regulation 360-1, paragraph 7-44, requires military members

and civilian employees to gain "clearance through security review and PA [Public Affairs]" "[f]or all official speeches and writings that are presented or published in the civilian domain, to include materials placed on the internet, or released via similar digital media." *Id.* The Applicability portion of the regulation states that the regulation applies to both military members and civilian employees of the Department of the Army. *Id.* At West Point, this works through supervisory channel awareness. *Id.* ¶ 16. When any military member assigned to West Point or any civilian employed by West Point seeks to make an external statement, give a speech to an external audience, or publish any scholarly work that utilizes their official position, they must inform their supervisor. *Id.* The same is not true for statements, speeches, writings, or internet postings conveyed in their personal capacity, where their affiliation is not apparent. *Id.* In those cases, West Point employees are not required to inform anyone of their personal, unofficial activities. *Id.*

**ii. Dean's Policy Memorandum 03-24**

Locally, West Point has published a similar policy, which applies to academic faculty. *Id.* ¶ 17. Because West Point is both an accredited academic undergraduate university and a critical component of the DoD officer training and accession structure, the intent of the Army's Public Relations regulation required further emphasis and explanation for those faculty members engaged in the college-level academic space. *Id.* West Point's professors routinely attend academic conferences, present scholarly research findings, publish academic work, and speak with external audiences and the media. *Id.* These external, public-facing engagements are planned, encouraged, and critical to the accomplishment of USMA's mission. *Id.* It is imperative that the American public be aware of USMA and its stature in college academic circles. *Id.* Public exposure serves as a critical element of the Army's officer recruiting mission. *Id.* USMA, however, must adhere

to DoD and HQDA guidance. *Id.* For this reason, on February 13, 2025, the Office of the Dean reissued Policy Memorandum ("DPOM") 03-24, the Academic Engagement Policy. *Id.*

This Academic Engagement Policy restates the Army's posture on external communications and applies it to external engagement circumstances commonplace for West Point faculty. *Id.* ¶ 18. In paragraph 4.b., for example, it identifies Department Heads as the approval authority for external engagements of any sort and qualifies that it applies only "while on duty or when using any USMA affiliation or branding." *Id.* & Ex. A. For this reason, a civilian employee speaking or writing in a personal capacity and without West Point affiliation is unaffected by DPOM 03-24. *Id.* ¶ 18. If a member of the faculty is going to say something to external audiences, he or she must inform their supervisor when using the imprimatur of the employer, in this case, West Point. *Id.*

**iii. Other Relevant Policies**

Several other USMA policies applicable to civilian faculty are relevant here. On October 8, 2020, West Point issued "United States Military Academy (USMA) at West Point Policy for Social Media and External Official Presence Websites." *Id.* ¶ 20. The policy applies to staff and faculty, cadets, and all others employed by USMA. *Id.* It emphasizes the critical distinction between official West Point-affiliated social media sites and participation in personal social media activity, reminds internal content creators of government ethics rules, and requires notification to the Public Affairs Office. *Id.* It also reinforces the importance of awareness of West Point affiliation in both official and unofficial internet postings. *Id.*

On February 20, 2025, West Point revised and reissued USMA Regulation 150-2, Civilian Faculty Career Model. *Id.* ¶ 22 & Ex. D. This regulation affirms the critical nature of the civilian faculty at West Point and emphasizes their importance in providing "specialized knowledge of

their disciplines," and notes how they "bring perspectives, ideas, and backgrounds that enrich the curriculum and expand instructional methodology." *Id.* It reinforces the Federal employment aspects of the civilian professor cohort. *Id.* Paragraph 7-6e, for example, contains extensive rules on the Professional Conduct of members of the civilian faculty, including rules related to their appearance and dress, and limitations on faculty-cadet personal and financial relationships. *Id.* These rules relating to personal and financial relationships extend to off-duty situations, even when the parties may consent. *Id.*

On May 19, 2023, West Point revised and reissued USMA Regulation 150-4, Academic Freedom at the United States Military Academy. *Id.* ¶ 23 & Ex. E. This regulation contains USMA's expansive vision for academic freedom within the undergraduate collegiate intellectual space, and states that USMA subscribes to the principles of academic freedom captured in the American Association of University Professors ("AAUP") 1940 Statement of Principles on Academic Freedom and Tenure, the most commonly accepted statement of academic freedom's tenets. *Id.* ¶ 23. The regulation explicitly identifies the prepublication review requirement of DoD and HQDA and delegates prepublication reviews to the lowest possible level, which is the Department Head level. *Id.* Paragraph 6-2e highlights that prepublication review requirements have been in place prior to 2025, and is a typical requirement of employment. *Id.* Finally, the regulation provides a process to seek redress for a faculty member who believes they have been harmed by an unjust abridgement or violation of academic freedom. *Id.*

On July 1, 2020, West Point incorporated two pre-existing DPOMs into USMA Regulation 150-6, Academy Research, reinforcing the Army's public relations prepublication review requirement and stating that "publications and presentations by cadets and researchers in public venues are to be done in accordance with Army Regulation 360-1, Chapters 5 and 6." *Id.* ¶ 24 &

Ex. F at 10. It also identifies the requirement for a disclaimer when a title or other DoD or USMA affiliation is apparent in the publication. *Id.* ¶ 24. Additionally, this regulation provides for further mechanisms of institutional review for certain research topics. *Id.* This is another example of how the scope of a professor's academic work can be delineated by his or her employer when it involves areas and topics inimical to West Point's mission. *Id.* It does not affect research completed in an off-duty status that does not involve West Point affiliation. *Id.*

### C. The Complaint and Motion for a Preliminary Injunction

Plaintiff, a civilian faculty member at West Point, commenced this action on September 22, 2025, asserting three claims alleging violations of the First Amendment. ECF No. 1 ("Compl."). Plaintiff mailed a copy of the summons and Complaint to the U.S. Attorney's Office for this District on October 8, 2025. ECF No. 42. On December 5, 2025, Plaintiff filed a motion for a preliminary injunction, asking the Court to enjoin West Point from implementing its policies. ECF Nos. 47-50.

## LEGAL STANDARDS

### I. Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A court should "presume that [it] lack[s] jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). In considering whether a plaintiff has met this burden, the Court will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations," but "will not draw 'argumentative inferences' in the plaintiff's favor." *Robinson v. Overseas Mil. Sales Corp.*, 21

F.3d 502, 507 (2d Cir. 1994).

## II. Preliminary Injunction Standard

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Military Academy at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *accord Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). To demonstrate its entitlement to this extraordinary and drastic remedy, a movant must clearly demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, [] (3) public interest weighing in favor of granting the injunction," and (4) "that the balance of equities tips in his or her favor," *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quotation marks and footnotes omitted).

## III. Motion to Dismiss for Failure to State a Claim

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id.* at 678, 681. In deciding a Rule 12(b)(6) motion, "the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which

judicial notice may be taken." *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (alteration, citation, and internal quotation marks omitted).

## ARGUMENT

Plaintiff is not entitled to any relief and the complaint must be dismissed because this Court lacks subject matter jurisdiction over the claims. Plaintiff is also not entitled to injunctive relief because he has not made a clear showing that he is likely to succeed on the merits of his First Amendment claims, that he will be harmed irreparably absent an injunction, or that the balance of equities and the public interest weigh in his favor.

### I. The Civil Service Reform Act of 1978 Precludes Jurisdiction Over Plaintiff's Claims

The Court lacks subject matter jurisdiction because, pursuant to the CSRA, Plaintiff cannot bring the sort of constitutional challenge alleged here to district court. Before 1978, federal employment law consisted of an "outdated patchwork of statutes and rules built up over almost a century." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quoting S. Rep. No. 95-969, at 3 (1978)). There was no systematic scheme for reviewing adverse employment actions. Some employees were afforded administrative review of employment actions by statute or executive order; others had no right to such review. Employees often sought judicial review of agency personnel decisions in "district courts in all Circuits and the Court of Claims," through "various forms of action . . . , including suits for mandamus, injunction, and declaratory judgment." *Id.* at 444-45 (citations omitted); *see also* S. Rep. No. 95-969, at 63.

Congress enacted the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, to replace these "haphazard arrangements for administrative and judicial review" of personnel actions. *Fausto*, 484 U.S. at 444; *see also Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 797-99 (1985). In so doing, Congress created an "integrated scheme of administrative and judicial review,

designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Fausto*, 484 U.S. at 445; *see Dotson v. Griesa*, 398 F.3d 156, 163 (2d Cir. 2005). This comprehensive framework regulates virtually every aspect of federal employment and "prescribes in great detail the protections and remedies applicable to [adverse personnel] action[s], including the availability of administrative and judicial review." *Fausto*, 484 U.S. at 443; *see also Nat'l Association of Immigration Judges v. Owen*, 139 F.4th 293, 302 (4th Cir. 2025) ("*NAIJ*"); *Chinniah v. FERC*, 62 F.4th 700, 702 (2d Cir. 2023); *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *3 (4th Cir. Apr. 19, 2022).

Under the CSRA, as amended, different administrative and judicial review procedures apply depending on, inter alia, the nature of the challenged employment action and the types of claims an employee asserts. *See generally Kloeckner v. Solis*, 568 U.S. 41, 44-45 (2012); *Elgin v. Department of the Treasury*, 567 U.S. 1, 11-12 (2012); *Fausto*, 484 U.S. at 445-47. Two of those procedures are relevant here. First, Chapter 23 of the CSRA lays out "merit systems principles" by which agencies must abide. 5 U.S.C. § 2301(b). One such principle provides that "[a]ll employees . . . should receive fair and equitable treatment . . . with proper regard for their . . . constitutional rights." *Id.* § 2301(b)(2). The chapter further classifies certain actions taken in violation of these principles—including "disciplinary or corrective action" or any "significant change" in an employee's "duties, responsibilities, or working conditions"—as "prohibited personnel practice[s]." *Id.* § 2302(a)(2)(A). Courts have explained that these prohibited practices include claims that a personnel action violated the Constitution. *See, e.g.*, *Krafsur v. Davenport*, 736 F.3d 1032, 1034-35, 1038 (6th Cir. 2013); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1432 (D.C. Cir. 1996); *cf. Pinar v. Dole*, 747 F.2d 899, 906, 908 (4th Cir. 1984).

A federal employee who has experienced a prohibited personnel practice may file the allegation with the Office of the Special Counsel (Special Counsel or OSC). 5 U.S.C. § 1214(a)(1)(A). The Special Counsel is then required to "investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken" which requires corrective action. *Id.* If the Special Counsel concludes that there are such grounds, it "shall report the determination together with any findings or recommendations" to, inter alia, the Merit Systems Protection Board ("MSPB") and the employing agency. *Id.* § 1214(b)(2)(B). If the employing agency fails to correct the personnel practice, the Special Counsel "may petition" the MSPB for an order directing the agency to take corrective action. *Id.* § 1214(b)(2)(C). An employee adversely affected by the MSPB's final decision may obtain judicial review in the United States Court of Appeals for the Federal Circuit. *Id.* §§ 1214(c), 7703(b)(1)(A).

If the Special Counsel determines that there are not reasonable grounds to believe a prohibited personnel practice has occurred, the CSRA does not provide for any further administrative or judicial review, with one exception: after exhausting the OSC remedy, employees may pursue an "individual right of action" in the MSPB for whistleblower claims and claims alleging retaliation for exercising certain appeal and related rights. 5 U.S.C. §§ 1214(a)(3), 1221(a). This individual right of action does not extend to any other claims of prohibited personnel practices. The MSPB's final decision is subject to judicial review. *Id.* §§ 1221(h), 7703(b).

Second, federal employees can challenge certain adverse actions through the statutory scheme outlined in Chapter 75 of the CSRA. *See Rydie*, 2022 WL 1153249, at *3. This scheme governs, inter alia, any challenge to employee removal, suspensions for more than 14 days, or reduction in pay. 5 U.S.C. § 7512(1)-(5). Employees subject to such adverse actions do not need

to petition the Special Counsel, but can instead appeal directly to the MSPB. *Id.* §§ 7512, 7513(d). Any employee aggrieved by the final decision of the MSPB may obtain judicial review of the decision. *Id.* § 7703(a)(1). Such review takes place in the Federal Circuit. 28 U.S.C. § 1295(a)(9).

By setting forth this scheme in such intricate detail, Congress made clear its intent "to deny [covered] employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11-12. Given that history, the Supreme Court has observed that the CSRA provides the exclusive means by which covered federal employees may bring claims arising out of their employment, including those challenging constitutional violations. *Id.* at 13; *see also Payne v. Biden*, 62 F.4th 598, 603–04 (D.C. Cir.), *cert. granted, judgment vacated as moot*, 144 S. Ct. 480 (2023); *Fleming v. Spencer*, 718 F. App'x 185, 188-89 (4th Cir. 2018).

Plaintiff does not allege that he has exhausted any of his claims through the proper channels, but instead improperly brought suit directly in district court asserting that the Court has jurisdiction pursuant to 28 U.S.C. § 1331. Compl. ¶ 10. But federal employees like Plaintiff cannot make such contentions in federal district court without first exhausting their jurisdictionally required administrative remedies under the CSRA, even where the employee is alleging constitutional violations.[1] *Fleming*, 718 F. App'x at 188-89 (affirming dismissal of claims, including First Amendment claims, where plaintiff had not exhausted any of them); *see also Irizarry v. United States*, 427 F.3d 76 (1st Cir. 2005); *Ferry v. Hayden*, 954 F.2d 658, 660-61 (11th Cir. 1992); *AALJ v. Colvin*, 777 F.3d 402, 403-04 (7th Cir. 2015). According to the Complaint, the Academic Engagement Policy challenged by Plaintiff represents a change in how Plaintiff is permitted to engage with external audiences while using his West Point affiliation because Plaintiff

[1] As a civilian faculty member, Plaintiff is "subject to the same employment rules established under Title 5 of the U.S. Code as other Civil Service members unless specifically excepted." Watts Decl. Ex. D, USMA Reg 150-2, at 1.

asserts that he had been doing just that for 25 years. Compl. ¶ 81. Plaintiff is plainly dissatisfied with the new policy because he believes that it imposes additional burdens upon him and his employment that limit his abilities as a professor and to engage with outsider publications. And Plaintiff alleges that his "failure to comply with DPOM 03-24 may lead to disciplinary action, up to and including termination of employment." *Id.* ¶ 56. Plaintiff also claims that "if the Defendants were to deny me approval, I would be put to the choice of subjecting myself to discipline and/or termination of my employment or forego publication and my podcast at a cost exceeding $20,000.00." Bakken Decl., ECF No. 49, ¶ 9. Plaintiff further cites examples of several other professors who he alleges were disciplined for violating the policy, including examples where other professors were suspended and/or terminated. *Id.* ¶¶ 14-21.

Plaintiff's challenges thus arise directly out of his employment relationship with West Point, his dissatisfaction with the working conditions of that employment—that he be required to get approval prior to engaging in external speaking events and publications and limit his communications in class—and his fear of disciplinary action resulting from any violation of the allegedly unlawful policy. Such employee grievances plainly fall within the scope of the CSRA and can be asserted through the CSRA procedures. *See, e.g.*, 5 U.S.C. § 2302(a)(2)(A)(xii) (covering challenges to "significant change[s] in duties, responsibilities, or working conditions"); *id.* §§ 7502, 7512 (covering employee suspensions and removals); *id.* § 2302(a)(2)(A)(iii) (covering other discipline). The CSRA therefore provides the exclusive remedy for the alleged unconstitutional actions, and this Court lacks jurisdiction over the claims asserted. *NAIJ*, 139 F.4th at 310 (finding that a challenged "personnel policy that required immigration judges to obtain prior approval before any official speech" fell squarely within Chapter 23 of the CSRA as a "significant

change in duties, responsibilities, or working conditions," and thus the CSRA applied and provided for meaningful judicial review of the claims).[2]

## II. Plaintiff Has Not Shown Irreparable Harm

Plaintiff's motion for a preliminary injunction must be denied because Plaintiff has failed to show irreparable harm, which is the "single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks and citation omitted). "Irreparable harm is injury that is neither remote nor speculative." *New York v. U.S. Dep't of Homeland Security*, 969 F.3d 42, 86 (2d Cir. 2020). Such injuries "cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quotation marks omitted). Accordingly, "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) (quotation marks omitted). Moreover, the Supreme Court has "articulated a particularly stringent standard for irreparable injury in government personnel cases." *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 721 (2d Cir. 1985) (citing *Sampson v. Murray*, 415 U.S. 61, 91–92 (1974)).[3]

---

[2] The Fourth Circuit remanded the action for the district court to consider whether the administrative scheme envisioned by the CSRA was operational in light of vacancies on the MSPB board in 2025. Since then, a quorum has been restored when the President's nominee to the board was appointed in October 2025, and even prior to that, the MSPB was performing its duties in adjudicating claims. Accordingly, there is no question that Plaintiff is required to exhaust his administrative remedies rather than filing suit in district court.

[3] Although the Supreme Court has held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), as explained in detail below, Plaintiff has not established any First Amendment violation, and thus there was no loss of First Amendment freedom to begin with. *See Am. Postal Workers Union*, 766 F.2d at 722 (in First Amendment context, "a party must articulate a 'specific

Plaintiff has failed to meet this stringent standard as the alleged injuries are both remote and speculative. Plaintiff claims that he has "forgone opportunities to be interviewed and to write about controversial topics" because "it is highly likely, if not certain, that Defendants would disapprove of such works if Bakken sought approval." ECF No. 50, Pl. Br. at 15. Plaintiff also claims that he is under contract to publish a book, which he claims he is unable to do because of West Point's policy. *Id.* But a party "must articulate a specific present objective harm or a threat of specific future harm to establish a cognizable claim based on the chilling of first amendment rights." *Am. Postal Workers Union*, 766 F.2d at 722. Here, Plaintiff refuses to comply with the policy by alerting his supervisor as to the topics of the book, articles, or other speaking engagements he wishes to undertake. As alleged in the Complaint, "Approved academic engagements typically involve peer-reviewed scholarship grounded in original research and supported by citations," and media engagements have been "approved when the content focuses specifically on the faculty member's research and academic expertise." Compl. ¶ 80. And if a request by Plaintiff was not approved based on a violation of law, policy, or other related issue, he could still undertake that engagement but he simply would not be allowed to use his West Point affiliation. The alleged harms asserted by Plaintiff are wholly speculative since Plaintiff refuses to even confirm whether he could, for example, move forward with his proposed book publication while noting his West Point affiliation.

Moreover, Plaintiff has failed to establish irreparable harm because of his ten-month delay in seeking preliminary relief, undercutting any claim that the alleged harm is imminent. "When determining whether a moving party faces irreparable harm without a preliminary injunction,

---

present objective harm or a threat of specific future harm' to establish a cognizable claim based on the chilling of first amendment rights") (quoting *Laird v. Tatum*, 48 U.S. 1, 92 (1972)).

district courts 'should generally consider [any] delay' on the movant's part in seeking the injunctive relief." *Council for Responsible Nutrition v. James*, No. 24-CV-1881 (ALC), 2024 WL 1700036, at *9 (S.D.N.Y. Apr. 19, 2024) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995)), *aff'd*, 159 F.4th 155 (2d Cir. 2025). Indeed, "months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief." *Id.* (internal quotation marks omitted).

Here, according to the Complaint, the challenged policy was promulgated and implemented on February 13, 2025. Compl. ¶ 50. Plaintiff also describes meetings in the spring of 2025 during which he expressed concerns about the policy, *id.* ¶¶ 57, 67-68, and describes a July 2025 interaction in which he inquired how the policy would be applied to Plaintiff regarding upcoming engagements, *id.* ¶¶ 75-80. Yet Plaintiff still waited another two months to file the instant lawsuit on September 22, 2025, and then waited another two and a half months to move for a preliminary injunction, on December 5, 2025. The preliminary injunction motion was thus filed nearly ten months after the policy was promulgated. This delay defeats any claim of irreparable harm, and Plaintiff's motion for a preliminary injunction should be denied on that basis. *Council for Responsible Nutrition*, 2024 WL 1700036, at *9 (in evaluating First Amendment claim, finding "substantial and inexcusable delay in moving for preliminary relief five months after the [statute] was enacted in October 2023, erodes its claims of immediate, irreparable, and impending injury"); *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028 (JMF), 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) ("There is no bright-line rule for how much delay is too much, but courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.") (internal quotation marks omitted); *see also Weight Watchers Int'l,*

*Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction.").

Because Plaintiff has not established irreparable harm, the preliminary injunction must be denied.

**III. Plaintiff Is Not Likely to Succeed on the Merits**

Preliminary injunctive relief is also not warranted because Plaintiff has not demonstrated a likelihood of success on the merits. First, as discussed above, the Court lacks jurisdiction over the claims asserted, and the motion must be denied on that basis. In addition, Plaintiff has not demonstrated a likelihood of success on his First Amendment claims because West Point's policies do not violate the First Amendment. As plaintiff concedes, the Supreme Court has recognized that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 465 (1995) ("*NTEU*"). Under the framework established in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), when considering a challenge to a government restriction on its employees' speech, a court must first ascertain whether the employee "'spoke as a [private] citizen on a matter of public concern.'" *Andrew v. Clark*, 561 F.3d 261, 268 (4th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418.

If the answer is yes, "then the possibility of a First Amendment claim arises." *Id.* To evaluate that possible claim, *Pickering* requires a court to balance (1) "the interests of the [employee], as a citizen, in commenting upon matters of public concern" and (2) "the interest of

the [government], as an employer," 391 U.S. at 568, including its interest in "maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute." *Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007); *see Mule v. Dep't of Educ. of City of New York*, 797 F. Supp. 3d 9, 39 (E.D.N.Y. 2025).

Although the Second Circuit has held that *Garcetti's* holding does not apply in the "special context of academia," *Heim v. Daniel*, 81 F.4th 212, 224 (2d Cir. 2023), restrictions on a "professor's well-established First Amendment interests are not set only against the usual government employer's interests in the efficient, effective, disruption-free delivery of public services, but also against the countervailing First Amendment principles that propel a . . . university's own underlying mission," *id.* at 230 (internal quotation marks and citations omitted). In *Heim*, the Second Circuit held that it was permissible for a university to "prioritize, for purposes of scarce tenure-track positions, a particular methodology" even if that decision may have had a chilling effect on a professor's chosen type of research. *Id.* at 234. "If the Supreme Court's (and this Court's) enthusiastic endorsement of the First Amendment principles supporting a university's academic freedom is to be given any practical bite, decision-makers within a university must be permitted to consider the content of an aspiring faculty member's academic speech, and to make judgments informed by their own scholarly views, when making academic appointments." *Id.*

Here, where the academic institution in question is a military academy, the institution has a unique underlying mission that must align with the objectives of training military leaders and comply with the broader mission of the Department of the Army in pursuing national security, and there is an even greater need for the institution to make its own judgments regarding the views it espouses. Indeed, "unless Congress specifically has provided otherwise, courts traditionally have

been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). "The President, after all, is the 'Commander in Chief of the Army and Navy of the United States.'" *Id.* at 527 (citation omitted); *see also Austin v. U. S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring). The "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," and it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see also Boumediene v. Bush*, 553 U.S. 723, 797 (2008) ("neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.")

While courts "are not free to disregard the Constitution in the military context," courts still must defer to the "government's justification for its action" because they "are ill-suited to second guess military judgments that bear upon military capability or readiness." *Able v. United States*, 155 F.3d 628, 634 (2d Cir. 1998). Thus, the Supreme Court and the Second Circuit have repeatedly deferred to the professional judgment of military authorities on particular military interests. *See, e.g.*, *Austin*, 142 S. Ct. at 1302 (staying order precluding the Navy from considering vaccination status in making "deployment, assignment, and other operational decisions"); *id.* (Kavanaugh, J., concurring) (denying "judicial intrusion into military affairs . . . . because the Navy has an extraordinarily compelling interest in maintaining strategic and operational control over the assignment and deployment [of] personnel"); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (reversing preliminary injunction prohibiting the Navy from conducting sonar exercises, and deferring to "declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to

counter this threat"); *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986) (deferring to the "considered professional judgment of the Air Force" that standardized uniforms promote "discipline and unity"); *Rostker v. Goldberg*, 453 U.S. 57, 64-68 (1981) (judgments concerning registration and the draft "are based on judgments concerning military operations and needs" and "unquestionably due" deference); *ACLU v. DoD*, 901 F.3d 125, 136 (2d Cir. 2018) ("Courts are not well-suited to evaluate the constantly evolving military conditions and national security challenges faced by U.S. forces and personnel."). Indeed, the Supreme Court has "give[n] great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," even when challenged on constitutional grounds. *Goldman*, 475 U.S. at 507 ("Our review of [constitutional challenge to] military regulations . . . is far more deferential than constitutional review of similar laws or regulations designed for civilian society."); *see also Students for Fair Admissions*, 709 F. Supp. 3d at 135 n. 11 ("Deference in this context is not judicial abdication, but rather simple recognition that in the area of military affairs . . . the Constitution itself requires such deference.") (internal quotation marks omitted) (alteration in original).[4]

Such deference is due here, given West Point's considered decision that the challenged policy is necessary to "standardize[] the procedures for engaging with audiences external to

---

[4] *See also Gilligan*, 413 U.S.at 4, 10; *Egan*, 484 U.S. at 530; *Chappell v. Wallace*, 462 U.S. 296, 301-302 (1983); *Haig v. Agee*, 453 U.S. 280, 291-294 (1981); *Schlesinger v. Councilman*, 420 U.S. 738, 757-758 (1975); *United States v. Nixon*, 418 U.S. 683, 710 (1974); *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953); *Burns v. Wilson*, 346 U.S. 137, 142, 144 (1953); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) (the Court "should indulge the widest latitude" to sustain the President's "function to command the instruments of national force"); *Doolen v. Wormuth*, 5 F.4th 125, 133 (2d Cir. 2021) (upholding West Point's cadet removal process and recognizing that "[c]ourts grant 'greater deference' in the context of national defense and military affairs than perhaps any other area"); *Pilchman v. DoD*, 154 F. Supp. 2d 415, 422 (E.D.N.Y. 2001) (holding that standards of admission to military officer programs are "entitled to a high degree of deference"), *aff'd*, 40 F. App'x 614 (2d Cir. 2002).

UMSA," and particularly because West Point is aware of a faculty member using the imprimatur of West Point in engagements when such speech has the potential to be viewed as containing messaging unapproved by DoD, HQDA, or West Point. Watts Decl. ¶ 18 & Ex. A. And given West Point's unique status as a higher education institution responsible for preparing the future leaders of the Army and its role in the country's national security, its implementation of the academic engagement policy to promote uniformity in its messaging should be given deference. As explained by Col. Watts, the policies requiring clearance of speaking engagement and publications, as well as those limiting classroom content, achieve compliance with mandatory DoD and HQDA rules. Watts Decl. ¶ 25. Second, these policies provide supervisors and senior USMA leaders notice when an employee is speaking, teaching, or writing to a public audience while utilizing their West Point affiliation. *Id.* This permits the Academy to leverage faculty members' scholarly work for the benefit of the Academy, by calling attention to it and recognizing excellence where appropriate. *Id.* Positive academic press is critical for colleges and universities, who are competing for talent. *Id.* Success in this space results in a higher caliber of cadet and consequently, a higher caliber of U.S. Army officer. *Id.* Third, these regulations and policies permit senior Academy officials to be prepared for follow-up questions or concerns by the American public or by governmental leaders. *Id.* The risk that a professor is perceived to be speaking on behalf of West Point or the government is high when a disclaimer is not utilized. *Id.* Public discourse in the digital age develops too rapidly for after-the-fact disclaiming clarifications to be effective. *Id.* Finally, these policies delineate the correct line between a professor's external communications

using his or her affiliation, and any unscrutinized, external communications that may occur without utilizing the West Point affiliation and that do not require prior discussion. *Id.*[5]

Plaintiff's claim regarding a right to academic freedom in the classroom similarly fails. As the Supreme Court has noted, "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." *Parker v. Levy*, 417 U.S. 733, 758 (1974). Upon entry at West Point, cadets become members of the Army. Watts Decl. ¶ 8. What they are taught or not taught in the classroom, therefore, is different from a typical university or other public forum. The different application means that the "considered professional judgment" of West Point to prohibit professors from injecting purely personal views into classroom lectures comports with the First Amendment. *Goldman*, 475 U.S. at 508.

Moreover, the *de minimis* burdens that West Point's policy places on the speech interests of Plaintiff or other civilian faculty members are far "outweighed by that expression's necessary impact on the actual operation of the Government," *NTEU*, 513 U.S. at 455, which includes the potential for non-compliance with ethics and workplace rules and messaging that could be attributed to the nation's academy for training the Army's leaders of the future, and the reasons set forth by Col. Watts and outlined above. West Point's policy places minimal burdens on the First Amendment "interest of both potential audiences and a vast group of present and future employees in a broad range of present and future expression." *NTEU*, 513 U.S. at 455. Contrary to many of

[5] The cases Plaintiff primarily relies upon, *Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998), and *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir. 1999), are inapposite because they do not involve the unique national security concerns of a military academy like West Point. Nor do they involve an academic institution and the different considerations that must be taken into account in light of West Point's interest in promoting its mission. *See Heim*, 81 F.4th at 224.

Plaintiff's speculative assertions that certain requests would be denied, West Point's policy does not prohibit any speech. Instead, the policy sets forth a review process, which advises faculty members whether proposed speaking engagements or publications would comply with longstanding Army regulations. Moreover, the policy in no way prohibits civilian faculty like Plaintiff from speaking or publishing in his personal capacity. The policy comes into effect only where Plaintiff seeks to use his West Point affiliation. Watts Decl. ¶ 14. And there is even an avenue in the policy to balance West Point's concerns with Plaintiff's speech, which is to allow for a disclaimer to be provided where appropriate.

West Point's policy is substantially similar to an agency prepublication review process that the D.C. Circuit upheld, in part because that process did not constitute an "actual prohibition of speech." *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439, 1443 (D.C. Cir. 1996). There, the agency's regulation stated that "[n]o employee shall publish any material of official concern . . . until it has been cleared" by the agency after review. *Id.* at 1435. The court held that this process did not constitute a speech prohibition because it "d[id] not . . . authorize any form of punishment for publication of material disapproved by the agency, so long as it was submitted for review beforehand." *Id.* In other words, the clearance process merely ensured that "the agency's judgment c[ould] be *expressed* to the employee," putting him or her "fully on notice" of a potential violation. *Id.* at 1437.[6] Here, the Policy does not prohibit speech, but instead establishes a process for reviewing speaking engagement or publication requests consistent with ethical and professional obligations, that allows West Point to achieve its mission in helping to shape the Army and teach its future leaders. *See* Watts Decl. ¶¶ 17-18.

[6] The Court in *Weaver* found that it had jurisdiction to review the constitutional claim seeking pre-enforcement injunctive relief. This decision, however, predated *Elgin*, which held that the CSRA precludes facial constitutional challenges. *Elgin*, 567 U.S. at 23.

For all of these reasons, including the deference owed to West Point as a military academy, the stated objectives of the policy, and the minimal burden on Plaintiff's rights, the policy on its face and as applied to Plaintiff complies with the strictures of the First Amendment.

## IV. A Preliminary Injunction Would Not Serve the Public Interest

The final two factors, balance of equities and the public interest, also weigh in the Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435–36 (2009) (final two factors merge when the government is the party opposing a motion for preliminary injunctive relief). "In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (quotation marks omitted).

As an initial matter, because Plaintiff cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear [he] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). Those factors also tip in Defendants' favor if the Court were to consider them further. As discussed above, in implementing the policy, West Point has articulated the concrete and legitimate goals of ensuring compliance with other military regulations and to ensure that West Point is aware of how its name and affiliation is being used in public engagements. It also seeks to train the future leaders of the Army in a consistent manner. These are goals that serve the public interest and ensure that the U.S. has a well-trained and

prepared military. That demonstrable public interest precludes Plaintiff from making the showing necessary to obtain injunctive relief.

### V. The Complaint Should Be Dismissed Pursuant to Rule 12(b)(6)

For the reasons set forth above as to why Plaintiff is not likely to succeed on the merits of his claims, those claims also do not plausibly allege any First Amendment violation, and the Complaint must therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).[7]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for a preliminary injunction and dismiss the complaint.[8]

Dated: New York, New York
January 30, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: */s/ Dana Walsh Kumar*
DANA WALSH KUMAR
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007
Telephone: (212) 637-2741
Email: dana.walsh.kumar@usdoj.gov

---

[7] The Government opposes Plaintiff's allegations regarding class certification, and reserves its rights with respect to answering those allegations and opposing any motion for class certification.

[8] In accordance with Fed. R. Civ. P. 65(c) and the President's March 11, 2025, memorandum titled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)," if the Court enters a preliminary injunction, the government respectfully requests that the Court require Plaintiff to post a bond of $10,000. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."); www.whitehouse.gov/presidential[1]actions/2025/03/ ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/. The government further requests that, if a preliminary injunction is entered, the Court enter a stay of this action pending the disposition of any appeal authorized by the Solicitor General.

**Certificate of Compliance**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,320 words.