UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
TIM BAKKEN, Individually and on behalf
of a putative class of all those similarly-situated,

                        No. 25-cv-07826 (CS)

               Plaintiff,

    -against-

UNITED STATES MILITARY ACADEMY;
LT. GENERAL STEVEN W. GILLAND, in his Official
Capacity; BRIGADIER GENERAL SHANE R. REEVES,
in his Official Capacity; COL. KRISTA WATTS, in her
Official Capacity; COL. WINSTON WILLIAMS, in his
Official Capacity; COL. JOSHUA BERRY, in his Official
Capacity; and LT. COL. CAITLIN CHIARAMONTE,
in her Official Capacity,

               Defendants.
--------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

GOLDMAN LAW, PLLC
*Co-Counsel for Plaintiff*
372 South Plank Road, Ste. 2
Newburgh, New York 12550
(845) 534-6472 Ext. 1001
(845) 579-3064 [Fax]
jgoldman@jrgoldmanlaw.com

BERGSTEIN & ULLRICH
*Co-Counsel for Plaintiff*
5 Paradies Lane
New Paltz, New York 12561
(845) 419-2250 [Tel]=
(845) 469-1277 [Fax]
steve@tbulaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 1

    Point I

    This Court has subject matter jurisdiction over Bakken's First
    Amendment claims alleging a prior restraint of his speech ................................... 1

    Point II

    Bakken has established irreparable harm ......................................................... 15

    Point III

    Bakken is likely to succeed on the merits of his claims ................................... 18

    Point IV

    A balance of the equities and public interest favor issuance of a
    preliminary injunction ...................................................................................... 27

CONCLUSION .......................................................................................................... 29

WORD COUNT CERTIFICATION ........................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Able v. United States*,
    155 F.3d 628 (2d Cir. 1988)................................................................25

*ACLU v. DoD*,
    901 F.3d 125 (2d Cir. 2018)................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................6

*Axon Enter., Inc. v. Fed. Trade Comm.*,
    598 U.S. 175 (2023)...........................................................................9

*Bennett v. U.S. Sec. & Exch. Comm'n*,
    844 F.3d 174 (4th Cir. 2016) .............................................................9

*Bowles v. Russell*,
    551 U.S. 205 (2007)...........................................................................9

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)..............................................................18

*Council for Responsible Nutrition v. James*,
    2024 U.S. Dist. LEXIS 72982 (S.D.N.Y. Apr. 19, 2024).................17

*Council for Responsible Nutrition v. James*,
    159 F.4th 155 (2d Cir. 2025) ............................................................18

*Dellinger v. Bessent*,
    766 F. Supp. 3d 57 (D.D.C. 2025).....................................................13

*Dellinger v. Bessent*,
    2025 WL 935211 (D.C. Cir. March 27, 2025)...................................13

*Dept. of Def. Dependents Schs. v. Fed. Lab. Rels. Auth.*,
    863 F.2d 988 (D.C. Cir. 1988) .......................................................4, 5

*Doolen v. Wormuth*,
    5 F.4th 125 (2d Cir. 2021) ................................................................25

*Dotson v. Griesa*,
    398 F.3d 156 (2d Cir. 2005)................................................................2

*Elgin v. Dept. of the Treasury*,
    567 U.S. 1 (2012).................................................................................7

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) ...........................................................4

*Firenze v. NLRB*,
    2013 WL 639151 (D. Mass. Jan. 10, 2013) ...............................5, 6

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)...........................................................................8

*Gilligan v. Morgan*,
    413 U.S. 1 (1973).............................................................................25

*Goldman v. Weinberger*,
    475 U.S. 503 (1986).........................................................................25

*Haig v. Agee*,
    453 U.S. 280 (1981).........................................................................25

*Harman v. City of New York*,
    140 F.3d 111 (2d Cir. 1998)............................................16, 19, 27

*Harris v. Bessent*,
    160 F.4th 1235 (D.C. Cir. 2025) ....................................................14

*Heim v. Daniel*,
    81 F.4th 212 (2d Cir. 2023) ......................................................24, 26

*Hesse v. Dept. of State*,
    217 F.3d 1372 (Fed. Cir. 2000).........................................................3

*Kelly v. Hegseth*,
    2026 WL 391777 (D.D.C. Feb. 12, 2026) ......................................25

*King v. Innovation Books*,
    976 F.2d 824 (2d Cir. 1992)............................................................18

*Latino Officers Ass'n. v. Safir*,
    1997 U.S. Dist. LEXIS 10983 (S.D.N.Y. 1997)......................16, 17

*Latino Officers Ass'n. v. Safir*,
    170 F.3d 167 (2d Cir. 1999)......................................................16, 17

*Lusk v. Vill. of Cold Spring*,
    475 F.3d 480 (2d Cir. 2007)......................................................................................7

*National Association of Immigration Judges v. Owen*,
    139 F.4th 293 (4th Cir. 2025) ..............................................8, 11, 12, 14, 15

*Nebraska Press Assn. v. Stuart,*
    427 U.S. 539 (1976)........................................................................................7, 10

*Parker v. Levy,*
    417 U.S. 733 (1974).............................................................................................25

*Riley v. Bondi*,
    606 U.S. 259 (2025)..............................................................................................6

*Rostker v. Goldberg,*
    453 U.S. 57 (1981)...............................................................................................25

*Rydie v. Biden*,
    2022 WL 1153249 (4th Cir. Apr. 19, 2022) .....................................................11

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994)..............................................................................................9

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995) ..................................................................................17

*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) .................................................................4

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025).........................................................................................14

*U.S. v. Nat'l Treasury Employees Union,*
    513 U.S. 454 (1995)...........................................................................................5, 6

*Weaver v. U.S. Information Agency,*
    87 F.3d 1429 (D.C. Cir. 1996) ...................................................................5, 7, 27

*Webster v. Doe,*
    486 U.S. 592 (1988)..............................................................................................9

*Weight Watcher's Int'l. v. Luigino's, Inc.,*
    424 F.3d 137 (2d Cir. 2005)................................................................................17

iv

**Statutes**

5 U.S.C. § 2302(a)(2)(A) ................................................................................1, 3 8

5 U.S.C. § 2302(b)(8) ..............................................................................................10

5 U.S.C. § 2302 (b)(9)(A)(i)(B)(C)(D) ..................................................................10

5 U.S.C. §7703(b) .............................................................................................2, 7, 10

5 U.S.C. § 7703(b)(1)(a) ...............................................................................2, 10, 11

5 U.S.C. § 7503(c) .........................................................................................10, 11

5 U.S.C. § 7511-15 ........................................................................................10, 11

5 U.S.C. § 7512(1)-(5) ...............................................................................2, 10, 11

5 U.S.C. § 7513(d) .........................................................................................10, 11

5 U.S.C. § 1214(a)(1)(A) .......................................................................2, 7 10, 12

5 U.S.C. § 1214(a)(2) ...............................................................................................7

5 U.S.C. § 1214(a)(3) ............................................................................................10

5 U.S.C. § 1214(b)(2)(C) ..................................................................................2, 10

5 U.S.C. § 1214(c) .............................................................................................2, 7

5 U.S.C. § 1221(h) ...........................................................................................2, 10

**Other Authorities**

Exec. Order No. 14215, 90 Fed. Reg. 10447, § 7 ...............................................13

## PRELIMINARY STATEMENT

Plaintiff Tim Bakken submits this memorandum of law in opposition to Defendants' cross-motion to dismiss and in further support of his motion for a preliminary injunction. Contrary to Defendants' arguments, this Court has jurisdiction over Bakken's viable First Amendment claims. Moreover, Bakken establishes irreparable injury, is likely to succeed on the merits, and the equities and public interest favor a preliminary injunction.

## ARGUMENT

### Point I

### This Court has subject matter jurisdiction over Bakken's First Amendment claims alleging a prior restraint of his speech

Defendants argue that this Court lacks subject matter jurisdiction because the Civil Service Reform Act of 1978 ("CSRA") sets out the exclusive avenues for relief when federal employees wish to challenge "disciplinary or corrective action" or any "significant change" in "duties, responsibilities, or working conditions" such as "prohibited working practices," including constitutional violations. *See* Def. Mem. at 11 (citing 5 U.S.C. § 2302(a)(2)(A)). This Court should find otherwise and exercise jurisdiction under 28 U.S.C. § 1331.

**A. Prior restraints are not covered under the statute requiring federal employees to first petition the Office of Special Counsel for relief.**

**1. The Civil Service Reform Act.**

The CSRA ensures that federal employees and their agencies have a venue for resolving common workplace disputes, but only when they first experience a "prohibited personnel practice" or an adverse action. The CSRA "'comprehensively overhauled the civil service system,' replacing a patchwork of rules and regulations with a 'new framework for evaluating adverse personnel actions against [federal employees].' '[T]o balance the legitimate interests of the various categories

1

of federal employees with the needs of sound and efficient administration,' the CSRA creates 'an integrated scheme of administrative and judicial review' for adverse employment actions." *Dotson v. Griesa*, 398 F.3d 156, 163 (2d Cir. 2005).

Setting forth how federal employees may seek relief from certain personnel actions, the CSRA categorizes personnel decisions in two ways.  Under Chapter 23, "prohibited personnel practices" – including any "significant change" in an employee's "duties, responsibilities, or working conditions" – cannot be immediately filed in federal court and must instead comply with administrative prerequisites.  Under this Chapter, employees must file their grievance with the Office of Special Counsel ("OSC"), who will review the claim and, upon finding reasonable grounds to believe the employee suffered a prohibited personnel practice, may petition the Merit Systems Protections Board ("MSPB") for an order directing the agency to take corrective action. 5 U.S.C. § 1214(a)(1)(A) & § 1214(b)(2)(C). Judicial review of the MSPB's final determination lies with the Federal Circuit. 5 U.S.C. §§ 1221(h) & 7703(b).

Chapter 75 lists more significant adverse actions that federal employees may initially challenge directly with the MSPB.  These include removal, suspensions lasting more than 14 days, certain furloughs, and reductions in grade or pay. 5 U.S.C. § 7512(1)-(5).  The Federal Circuit reviews the final MSPB ruling. 5 U.S.C. §§ 1214(c), 7703(b)(1)(a).

Chapter 23 identifies the personnel actions that require federal employees to initially bring their grievances to the OSC. After noting specific personnel decisions, Chapter 23 also references any "significant change" in the employee's "duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A). The personnel actions under this Chapter do not include constitutional challenges to prior restraints.

**2. Prior restraint policies do not fall under Chapter 23.**

In challenging jurisdiction, Defendants argue that, under Chapter 23, prior restraints qualify as a "significant change ... in working conditions" (Def Mem. at 11-15). Under this interpretation, pre-enforcement First Amendment challenges to prior restraints must first proceed through the OSC, and the plaintiff cannot initiate an action in federal court. Defendants are mistaken, and this Court should resolve this case on the merits.

The CSRA's plain language does not support Defendants' interpretation. A prior restraint – requiring a federal employee to obtain approval of the content of any public speech or writing when incidentally using USMA affiliation – does not resemble the "prohibited personnel practice[s]" under 5 U.S.C. § 2302(a)(2)(A). A prior restraint is not a "significant change in working conditions" as that phrase is commonly understood. *See Hesse v. Dept. of State*, 217 F.3d 1372, 1378 (Fed. Cir. 2000) ("'working conditions' most naturally connotes the physical conditions under which an employee labors"). As the Fifth Circuit recently stated:

> Romanette xii is a residual clause that appears at the end of a twelve-item list. After defining Chapter 23's "personnel action[s]" to include things such as appointments, promotions, and reassignments, Congress concluded the list by covering "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). Such residual clauses trigger the maxim *ejusdem generis*, the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *All eleven of the personnel actions that precede romanette xii are typical, everyday employment decisions to, say, promote or reassign a single employee*[.]

*Feds for Med. Freedom v. Biden*, 63 F.4th 366, 375 (5th Cir. 2023) (emphasis supplied), *judgment vacated on different grounds,* 144 S. Ct. 480 (2023). While the Second Circuit has not addressed whether constitutional challenges to prior restraints are exempt from the CSRA's administrative requirements, other courts persuasively hold that litigants like Bakken may proceed directly to federal court.

3

In *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020), plaintiff Chao "challenge[d] defendants' alleged transformation ... of [Voice of America] and the networks . . . into 'organ[s] of state media' that actively suppress the First Amendment rights of their employees." *Id*. at 367; *See also Id.* at 377, 379, 383 (referring to challenge of "prior restraint[] on speech"); *Id*. at 377-78 ("Chao challenges 'generally applicable' policies and practices . . . rather than a 'particularized disciplinary action' taken against her"); *Id*. at 372.

*Turner* held that Chao was excused from the CSRA's administrative requirements because the challenged policy was not a covered "working condition" under the statute.  The Court rejected the defendants' argument that "Chao's 'basic contention,' understood to be a claim that defendants' actions 'have affected, or might affect, the conditions of her employment or the way she does her job,' falls 'squarely within the CSRA's structure' as a 'significant change in her working conditions' that allegedly violates her constitutional rights." *Id*. at 366-67.

"The Supreme Court, in interpreting 'working conditions' in the labor-management provisions of the CSRA, has stated the term 'more naturally refers, in isolation, only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job,' not to the agreed-upon terms of employment." *Id*. at 367. *Turner* cites *Dept. of Def. Dependents Schs. v. Fed. Lab. Rels. Auth.*, 863 F.2d 988, 990 (D.C. Cir. 1988), *judgment vacated on other grounds*, 911 F.2d 743 (D.C. Cir. 1990), which interpreted the same provision, finding that "working conditions" is a term of art "ordinarily call[ing] to mind the day-to-day circumstances under which an employee performs his or her job." *Id*.  "In other words, these courts have determined that the term 'working conditions' generally refers to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources." *Id*.  Accordingly, *Turner* held, "Chao's constitutional claim does not relate to 'working conditions.' ... Chao thus does not

allege a change in the conventionally understood circumstances of her employment, like a change in schedule or chain of command." *Id.*

In finding a speech restriction does not involve "working conditions" under the CSRA, *Turner* favorably cited other decisions that have consistently interpreted the statute. In *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), the Court held that a Voice of America employee was not required to proceed under the CSRA when challenging a prior restraint mandating that she submit "all speaking, writing, and teaching material on matters of 'official concern' to [her] employer[ ] for review." *Id.* at 1431. While the Court held the CSRA guided plaintiff's admonishment over her speech, her challenge to the policy, framed as a "simple pre-enforcement attack on a regulation restricting employee speech," *id.* at 1434, "s[tood] independently of the oral admonishment ... and therefore it raise[d] no exhaustion problem." *Id.* at 1432. *Weaver* cited *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), and *Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995), where the district courts had jurisdiction to resolve pre-enforcement challenges to speech restrictions. *Id.* at 1434.

*Turner* further cited *Firenze v. NLRB*, No. 12-10880-PBS, 2013 WL 639151 (D. Mass. Jan. 10, 2013), *report & recommendation adopted*, 2013 WL 639148 (D. Mass. Feb. 19, 2013), where the plaintiff challenged "a prior restraint on its [agency] employees and not allowing him to 'publicize' his grievances while at work." *Id.* at *1. The court held the CSRA did not preclude jurisdiction over his claim, concluding, "the promulgation ... of such a rule" was not a "personnel action" under the statute and "there [was] no allegation that [any other] prohibited 'personnel action' ha[d] taken place *vis-à-vis* the First Amendment claim." *Id.* at *8.

*NTEU* is also instructive. There, the Court resolved a challenge to a speech policy barring employees from accepting honoraria for making speeches or writing articles. *Id.* at 457. As

Defendants have characterized the speech policy in Bakken's case, the policy in NTEU "represent[ed] a change in how [the plaintiffs were] permitted to engage with external audiences" and thus "impos[ed] additional burden upon [them] and [their] employment that limit[ed] [their] abilities ... to engage with outside[] ... [audiences]." Def. Mem. at 13-14.

The *NTEU* plaintiffs sued in district court, challenging the constitutionality of the restriction and, without determining whether they were required to first go to the OSC or MSPB, the Supreme Court resolved the case on the merits. The significance of this omission is that federal courts, including the Supreme Court, cannot resolve any case without first determining whether they have jurisdiction, "even if the parties fail to spot a jurisdictional issue." *Riley v. Bondi*, 606 U.S. 259, 273 (2025); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) ("We are not free to pretermit the question. Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt"). In striking down the speech rule in *NTEU*, the Court impliedly found it had jurisdiction to resolve the case. Since Bakken's challenge to the prior restraint here is comparable to the challenge in *NTEU*, this Court should find that the Supreme Court's silence on this issue recognized that challenges to comparable speech rules are not subject to the exhaustion requirements under the CSRA.

The CSRA's structure confirms Plaintiff's interpretation of the statute. In enacting it, Congress distinguished among disciplinary actions according to the severity of the punishment, providing for different tiers of review. *See Elgin v. Dept. of the Treasury*, 567 U.S. 1, 11-12 (2012). Since the 12 "personnel action[s]" under Chapter 23 are less severe than the "adverse actions" under Chapter 75 – removals, certain suspensions, certain furloughs, and reductions in pay and grade – they do not guarantee affected employees judicial review. *See Weaver*, 87 F.3d at 1434. As demonstrated above, an employee challenging a personnel action as a "prohibited personnel

practice" must first complain to the OSC, who has discretion to terminate the matter or refer it to the MSPB, *see* 5 U.S.C. §§ 1214(a)(1)(A) & 1214(a)(2), whose final decisions may be appealed to the Federal Circuit. If the OSC declines to pursue a complaint, the CSRA provides no further administrative or judicial review. 5 U.S.C. §§ 1214(c), 7703(b).

 Here, Bakken challenges Defendants' prior restraint, which authorizes them to disapprove the content of his expression if he mentions he works at West Point. That policy is neither minor nor comparable to the lesser personnel actions for which there is no judicial review if the OSC does not refer the case to the MSPB. Since prior restraints, by definition, are not "minor," Congress could not have intended to channel review of such actions through a statutory framework that provides no assurance of judicial review. *See Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) ("The Supreme Court has referred to '[p]rior restraints on speech and publication [as] the most serious and the least tolerable infringement on First Amendment rights'") (quoting *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 559 (1976)).

The only assurance of judicial review an employee could have in respect to the speech policy would be to risk violating it, inviting a concrete personnel action that might fall under Chapter 75's more generous provisions permitting judicial review. But, as the Supreme Court has held, plaintiffs do not have to "bet the farm . . . by taking violative action" to obtain judicial review. *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477, 490 (2010). Defendants' argument thus creates a Catch-22: absent an adverse action, Bakken cannot petition the OSC or the MSPB, and if this Court declines jurisdiction, then Bakken must wait until Defendants punish him or terminate his employment before he can petition the MSPB.

In asserting otherwise, Defendants cite *National Assn. of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025) ("*NAIJ*"), where the plaintiff alleged that a personnel policy requiring

immigration judges to obtain prior approval for any official speech violated the First Amendment. In resolving the jurisdictional question, *NAIJ* interpreted Article 23's requirement that certain personnel actions, including a "significant change in duties, responsibilities, or working conditions," must proceed through the OSC and the MSPB before the employee may proceed in federal court.  In so holding, the Fourth Circuit's analysis was brief, reasoning that (1) "working conditions" under 5 U.S.C. § 2302(a)(2)(A)(xii) encompass the speech policy at issue because other personnel actions under this provision can also apply to multiple employees, not just an individual plaintiff, and (2) 5 U.S.C. § 2302(a)(2)(A)(xi) includes "the implementation and enforcement of any nondisclosure policy," which "can altogether prohibit speech on certain topics." *Id*. at 310.  And it held, "the Speech Policy broadly affects how immigration judges 'interact with their supervisors and the EOIR' and governs what types of speaking or writing they may do within their official capacities.'" *Id*.

This Court should decline to follow *NAIJ*.  As outlined above, speech policies resemble neither the concrete personnel actions under § 2302(a)(2)(A)(i)-(xi) nor "significant changes in duties, responsibilities, or working conditions." *Id*. at 2302(a)(2)(A)(xii).  The Fourth Circuit's reasoning that speech policies "broadly affect[] how [federal employees] 'interact with their supervisors' ... and governs what types of speaking or writing they may do within their official capacities'" is a stretch.  In resolving this case on a clean slate in the Second Circuit, this Court should adopt the reasoning in the cases discussed above and hold that Bakken properly filed this action directly in this Court.

**B. The CSRA does not contemplate that actions challenging an unconstitutional prior restraint must be litigated through the MSPB.**

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Statutory schemes that deprive federal courts of jurisdiction to hear a given claim must satisfy certain requirements, one of which is the availability of "meaningful judicial review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). "Meaningful judicial review" is the "most important factor under *Thunder Basin*." *See Bennett v. Sec. & Exch. Comm.*, 844 F.3d 174, 183 n.7 (4th Cir. 2016) (citing *inter alia Tilton v. Sec. & Exch. Comm.*, 824 F.3d 276, 282 (2d Cir. 2016). *Thunder Basin* "recognizes that Congress rarely allows claims about agency action to escape effective judicial review." *Axon Enter., Inc. v. Fed. Trade Comm.*, 598 U.S. 175, 186 (2023).

"[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. We require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592 (1988).

Since the CSRA does not provide for "meaningful judicial review" for federal employees who wish to challenge prior restraints, it does not deprive this Court of jurisdiction here. As demonstrated above, certain personnel actions – including "disciplinary or corrective action" or any "significant change" in an employee's "duties, responsibilities, or working conditions" – constitute "prohibited personnel practices" that cannot be filed in district court and must satisfy administrative prerequisites. Federal employees seeking to challenge even unconstitutional personnel actions – when they have suffered a prohibited personnel action or adverse action – must initially file their grievance with the OSC, who shall review the claim and, upon finding reasonable grounds to believe a prohibited personnel action has occurred, "may petition" the MSPB for an

order directing the agency to take corrective action. 5 U.S.C. § 1214(a)(1)(A) & § 1214(b)(2)(C). The MSPB's final determination is subject to judicial review. 5 U.S.C. §§ 1221(h) & 7703(b).

However, as Defendants recognize, if the OSC does not find reasonable grounds to believe a prohibited personnel practice has occurred, then the CSRA offers no further administrative or judicial review, except that employees may file an "individual right of action" with the MSPB, but only for whistleblower claims and those alleging retaliation for exercising certain appeal and related rights. Def. Mem. at 12; *see also* 5 U.S.C. § 1214(a)(3) (incorporating 5 U.S.C. §§ 2302(b)(8) & 2302 (b)(9)(A)(i)(B)(C)(D)).  These exceptions do not include challenges to prior restraints.

If the OSC determines there are no reasonable grounds to pursue a challenged prior restraint before the MSPB, then the employee cannot independently file his claim before that agency, necessarily foreclosing judicial review.  The absence of any judicial review is especially troubling because prior restraint policies are "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Assn.,* 427 U.S. at 559.  As employees like Bakken would have no meaningful judicial review, Congress could not have contemplated that challenges to a prior restraint cannot be immediately filed in district court.

And, while federal employees can challenge Chapter 75 actions by appealing to the MSPB and later obtain judicial review, *see* 5 U.S.C. §§ 7503(c), 7511-15, 7512(1)-(5), 7513(d), 7703(b)(1)(A); *see generally Rydie v. Biden*, 2022 WL 1153249, at *3 (4th Cir. Apr. 19, 2022), this framework offers no relief to Bakken because, in Defendants' view, he would have suffered no such adverse action.  In short, Congress did not intend to foreclose federal employees from challenging prior restraints in federal court in the first instance.

10

On this issue, this Court should decline to follow the Fourth Circuit's analysis in *NAIJ*, which held the plaintiff was required to litigate its First Amendment challenge under the CSRA. The plaintiff there "correctly point[ed] out that the Special Counsel is afforded leeway regarding which claims to bring to MSPB" and that "this discretion effectively eliminates meaningful judicial review because the Special Counsel could prevent a claim from ever reaching the MSPB, thereby preventing the plaintiff from appealing an adverse determination to the Federal Circuit." 139 F.4th at 311. But the Court rejected that argument, reasoning that, since it did not initially bring its claim to the OSC, the plaintiff failed to utilize the remedies under the CSRA despite the Supreme Court's counsel in *Elgin*, that the CSRA "would be seriously undermined ... if a covered employee could challenge a covered employment action first in a district court, and then again in one of the court of appeals." *Id*. at 311 (quoting 567 U.S. at 13).

The Fourth Circuit's analysis glides over the exception under the CSRA that would nonetheless deny federal plaintiffs judicial review in certain cases, *i.e.*, if the OSC deems the claim unfounded or otherwise declines to purse it. The analysis in *NAIJ* also fails to consider the Supreme Court's directive that meaningful judicial review weighs heavily in determining if Congress intended to deprive the district courts of jurisdiction in certain claims. *See e.g. Tilton*, 824 F.3d at 282. Here, as demonstrated above, the potential unavailability of judicial review for Bakken is especially troublesome, as he asserts a First Amendment prior restraint, a serious constitutional violation.

**C. Serious questions have arisen over whether the MSPB is functioning as an independent agency, as required under the CSRA.**

"To maintain Congress' intent, the MSPB and Special Counsel must function such that they fulfill their roles prescribed by the CSRA." *NAIJ*, 139 F.4th at 305. "[T]he CSRA was designed to protect the independence of the agencies reviewing federal employees' claims. The

CSRA devised an adjudication system that was to serve as 'a vigorous protector of the merit system'—the crux of this was the 'establishment of a *strong and independent* [MSPB] and Special Counsel.'" *Id*. at 305-06 (emphasis in original). "Congress recognized that the MSPB must be 'insulated from the kind of political pressures that [had] led to violations of merit principles in the past.'" *Id*.

Relatedly, "Congress left little doubt about the importance of an independent MSPB and Special Counsel free from '*any control or direction by the President.*' The MSPB and the Special Counsel 'exercise statutory responsibilities independent of any Presidential directives.' For this reason, the CSRA mandates that the members of the MSPB and the Special Counsel can be removed by the President 'only for inefficiency, neglect of duty, or malfeasance in office.'" *Id*. at 306 (citing 5 U.S.C. §§ 1202(d), 1211(b)) (emphasis in original); *see also id*. (the MSPB "provides a quasi-judicial role intended to be fully independent from the president," and "The CSRA also gives the MSPB substantial independent authority to allow it to act outside the influence of the President").

If the MSPB operates as Congress intended, it can process employee grievances and personnel challenges independently. The same holds true for the OSC. If the employee's complaint is a "prohibited personnel practice" (as Defendants maintain here), the OSC has discretion whether to forward it to the MSPB. *See* 5 U.S.C. § 1214(a)(1)(A). But that dynamic has changed, as recent events prove that the independence of the OSC and MSPB is now in doubt.

Executive Order 14215, issued on February 18, 2025 and entitled "Ensuring Accountability for All Agencies," states:

> The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch. The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of

the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General.

Exec. Order No. 14215, 90 Fed. Reg. 10447, § 7.[1]  The Executive Order expressly applies to "so-called" independent agencies such as the MSPB. *Id.* §§ 1, 2(b), 5. It would also apply to the OSC, who is appointed by the President.  This is especially concerning because Defendants would have the OSC review Bakken's challenge to the prior restraint – promulgated during the current Administration – to determine whether to forward it to the MSPB, which would be subject to the same constraints on its authority to independently resolve the matter.

The Government is actively working to relax the independence of the OSC and MSPB.  In 2025, after President Trump terminated OSC Hampton Dellinger (appointed by President Biden), litigation ensued over the legality of his termination. *Dellinger v. Bessent*, 766 F. Supp. 3d 57 (D.D.C. 2025) (granting preliminary injunction and reinstating Dellinger as OSC). While that litigation was mooted by Dellinger's withdrawal of his claims, *see Dellinger v. Bessent*, 2025 WL 935211, at *1 (D.C. Cir. March 27, 2025), the Government took the position that 5 U.S.C. § 1211(b), which only permits the OSC's removal from office for "inefficiency, neglect of duty, or malfeasance in office," is unconstitutional. *See* 766 F. Supp. 3d at 63, and 768 F. Supp. 3d 33, 54 (D.D.C. 2025).

Questions have also arisen about the independence of the MSPB, also governed by the Executive Order.  In February 2025, the President removed a Democratic member of the MSPB without cause.  The D.C. Circuit upheld that determination in December 2025. In *Harris v. Bessent*,

---

[1] www.whitehouse.gov/presidential-actions/2025/02/ensuring-accountability-for-all-agencies/

160 F.4th 1235 (D.C. Cir. 2025), the Court struck down the CSRA's for-cause removal protection

for Board members, stating,

> Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Congress may
> restrict the President's ability to remove principal officers who wield only quasi-
> legislative or quasi-judicial powers.  But under *Seila Law LLC v. Consumer Fin.
> Protection Bureau*, 591 U.S. 197 (2020), Congress may not restrict the President's
> ability to remove principal officers who wield substantial executive power. ... [T]he
> NLRB and MSPB wield substantial powers that are both executive in nature and
> different from the powers that *Humphrey*'s *Executor* deemed to be merely quasi-
> legislative or quasi-judicial. So, Congress cannot restrict the President's ability to
> remove NLRB or MSPB members.

*Id*. at 1242.

Significantly, prior to the D.C. Circuit's December 2025 ruling, the Supreme Court stayed

the plaintiffs' reinstatement to their former positions with the MSPB and NLRB. In *Trump v.

Wilcox*, 145 S. Ct. 1415, 1415 (2025), the Court explained that the stay "reflects our judgment that

the Government is likely to show that both the NLRB and MSPB exercise considerable executive

power." *Id*.  In short, it appears that the MSPB is not presently the independent agency

contemplated by Congress when it enacted the CSRA. *See NAIJ*, 139 F.4th at 304 ("We take notice

that the function of the MSPB and Special Counsel, contrary to the CSRA's text and purpose, has

recently been called into question").  This finding prompted the Fourth Circuit's observation that,

depriving district courts of jurisdiction to resolve certain claims is only permissible when the

CSRA is "functioning as Congress intended." *Id*. at 304.  "To maintain Congress' intent, the MSPB

and Special Counsel must function such that they fulfill their roles prescribed by the CSRA, ... as

Congress enacted the CSRA for the express purpose that the merit system function and that claims

be addressed adequately and efficiently." *Id*. at 305.

The President also claims authority to remove the Administrative Law Judges who conduct

hearings and issue decisions for independent agencies, including the MSPB, despite Congress's

express prohibition of such removals. *See* Letter from Sarah M. Harris, Acting Solicitor General, to Hon. Charles Grassley (Feb. 20, 2025).[2]

In sum, as the Fourth Circuit noted in *NAIJ*, "in lawsuits challenging the removals of the Special Counsel and members of the MSPB, the Government has argued that the removal protections enshrined in the CSRA are violations of separation of powers, thereby calling into question the constitutionality of a critical aspect of the CSRA, and the continued vitality of the statute's adjudicatory scheme. This issue has yet to be resolved, however." 139 F.4th at 307. These recent cases testing the Administration's position that the President may remove the OSC and MSPB members, raise serious questions about whether Bakken would receive fair consideration of his prior restraint challenge should this Court adopt Defendants' position that his dispute qualifies as a "prohibited personnel practice" under Chapter 23 of the CSRA. As the ability of these institutions to fairly resolve Bakken's grievance is now in doubt, and since he seeks injunctive relief without which he will suffer irreparable harm, this Court should exercise jurisdiction and resolve the merits of his claims.

**Point II**

**Bakken has established irreparable harm**

Defendants contend that Bakken has failed to establish irreparable injury because (1) his alleged harms are speculative and (2) he waited too long to request relief. *See* Def. Mem. at 15-18. This Court should find otherwise.

First, Bakken's harms are not speculative, but immediate, and, in arguing otherwise, Defendants miss the point. The question is not whether Bakken has sought and been denied approval; rather, the harm is having to seek approval in the first place. *See Harman v. City of New*

---

[2] iptp-production.s3.amazonaws.com/media/documents/2025.02.20_DOJ_letter_re_ALJs.pdf

*York*, 140 F.3d 111, 119 (2d Cir. 1998) ("The kind of approval procedure mandated by the City is generally disfavored under First Amendment law because it chills potential speech before it happens."). Accordingly, when the government retains the right to veto speech before it occurs – rather than punish abuses after the fact – it exercises a prior restraint antithetical to the First Amendment. *See id.* at 119-20.

The district court's decision in *Latino Officers Assn. v. Safir*, No. 97-cv-3143, 1997 U.S. Dist. LEXIS 10983 (S.D.N.Y. 1997), *vacated due to changed circumstances by*, *Latino Officers Ass'n. v. Safir*, 170 F.3d 167 (2d Cir. 1999), is on point. There, officers challenged an NYPD policy requiring them *inter alia* to obtain prior approval from the Commissioner before speaking or testifying in their private capacity to public agencies or organizations. *See* 1997 U.S. Dist LEXIS at *4-*6. In granting a preliminary injunction, the Court found irreparable harm, even though no plaintiff sought or was denied permission. *See* Id. at *13-15. The Court explained: "[T]he relevant harm in this case arises not form the fact that a request to speak has actually been denied, or that particular sanctions have been imposed, but rather from plaintiffs' obligation to provide advance notice, obtain permission, and report their speech to their employer all under a threat – even if vague – of professional discipline. The point is not, as defendants suggest, that if "Sergeant Miranda asked us once in a while, he might like the answer he would get," but rather that he must ask at all." *Id.* at *14-15.[3]

---

[3] On appeal, the City stipulated to modify its policy, removing the prior-approval and supervisor presence requirements, leaving only the advance notice and after-the-fact summary requirements. *See Safir*, 170 F.3d at 168, 171. Given this modification, the Second Circuit vacated the injunction, finding *inter alia* the alleged chill from the remaining requirements insufficient to constitute irreparable harm. *Id.* at 171-72. Of course, DPOM 03-24's prior approval requirement resembles the NYPD policy *before* the City modified it. Despite vacatur of its injunction, the district court's decision in *Safir* is still instructive.

This logic applies here.  Moreover, now that his book is available for pre-sale and mentions his USMA affiliation, *see* Bakken Decl. ¶¶ 3-5, Bakken is presently in jeopardy, and there could be no greater imminent harm warranting an injunction.

Second, Defendants' delay argument is misplaced.  As the Second Circuit noted, "[m]ost of the caselaw on this issue [of delay] involves trademark and copyright disputes, where a presumption of irreparable harm arises once a plaintiff establishes a likelihood of success on a claim." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995).  In such cases, the presumption of irreparable injury arising when a plaintiff shows "that an infringer's use of its trademark creates a likelihood of consumer confusion ... may be defeated ... when a party has delayed in seeking injunctive relief." *Weight Watcher's Int'l. v. Luigino's, Inc.*, 424 F.3d 137, 144 (2d Cir. 2005).  Our case does not involve infringement claims, and Bakken's irreparable harm is not based on a presumption.

Except for one, all of Defendants' cases in support of their delay argument are trademark or copyright cases. *See* Def. Mem. at 17-18.  The one First Amendment case they cite is not helpful to them. *See Council for Responsible Nutrition v. James*, No. 24-cv-1881, 2024 U.S. Dist. LEXIS 72982 (S.D.N.Y. Apr. 19, 2024).

First, *James* does not bind this Court.  Second, its discussion of delay is arguably *dicta* because it already found plaintiffs unlikely to succeed on the merits and that this also meant no irreparable harm. *See id.* at *29-31.  Third, the cases cited in *James* are infringement cases or involve advertising or presumption of harm. *See id.* at *30-31.  Fourth, when the Second Circuit affirmed, it found no irreparable harm for other reasons and expressly declined to consider the impact of delay. *See* 159 F.4th 155, 171-72, n. 9 (2d Cir. 2025).

Even if Court were to consider delay, Bakken was not unduly dilatory, and any existing delay should not defeat his showing of irreparable harm. Where a plaintiff takes other actions prior to seeking an injunction, such delay should not be held against him. *See King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992). In *King*, during the eight-month period between learning of the improper use and moving for an injunction, the plaintiff "contacted [defendants] and repeatedly objected to any use of a possessory credit, and attempted to obtain the screenplay, tentative credits and fil for viewing." *Id.* The Court held, "This is not conduct that undercuts a sense of urgency or of an imminent threat, and indeed the circumstances in this case contrast with those in which we have found a delay negating the presumption of irreparable harm." *Id.*; *see also id.* (contrasting *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985), and noting it found undue delay where plaintiff "made no effort to verify the branch, made no objection concerning the branch, and had made no real objection to Citytrust's advertising in New York media markets in past years").

Likewise, here, before seeking relief, Bakken repeatedly objected to the policy and attempted to resolve the issue. *See* Bakken Decl. ¶¶ 60-20. Thus, even if a relevant consideration, any delay here should not vitiate the irreparable harm he has shown.

**Point III**

**Bakken is likely to succeed on the merits of his claims.**

Bakken is likely to succeed on the merits of his First Amendment claims challenging the prior restraint imposed by the Academic Engagement Policy because, under the heightened *Pickering/NTEU* standard, Defendants cannot "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression

are outweighed by that expression's necessary impact on the actual operation of the Government." *Harman*, 140 F.3d at 118.[4]

Defendants advance four interests that would justify the policy: First, the policy would "standardize the procedures for engaging with audiences external to USMA," and ensure that supervisors know when the "the imprimatur of West Point" is used in external engagements so that Defendants can "promote uniformity of its messaging." Def. Mem. at 21-22.  Second, it "provide[s] supervisors and senior USMA leaders notice when an employee is speaking, teaching, or writing to a public audience while utilizing their West Point affiliation" so they can "leverage faculty members' scholarly work for the benefit of the Academy." *Id.* at 22.  Third, the policy "permit[s] senior Academy officials to be prepared for follow up questions or concerns by the American public or by governmental leaders." *Id.* And fourth, it "delineate[s] the correct line between a professor's external communications using his or her affiliation, and any unscrutinized, external communications that may occur without utilizing the West Point affiliation and that do not require prior discussion." *Id.* at 22-23.

Defendants overlook the policy's central flaw: its pre-approval requirement.  It does not simply require that faculty provide notice or use a disclaimer.  Bakken does not object to either of those requirements and that is not the basis of this action.  Rather, DPOM 03-24 prohibits speech unless and until it is approved by the Department Head.  As no standards or guidelines govern the exercise of this power, this broad authority violates the First Amendment.

Defendants elide this issue by referring to various other policies, emphasizing the importance of notice and disclaimer. *See* Def. Mem. at 4-8.  But those policies do not require pre-

---

[4] Bakken's demonstration that he is likely to succeed on the merits also defeats Defendants' Rule 12(b)(6) motion.

approval outside of the context of "official" speech – *i.e.*, speech expressly intended to be, and made, on the Government's behalf – and notice and disclaimer are not the issue here.

For instance, Defendants cite Paragraph 7-44 of Army Regulation ("AR") 360-1, governing Public Affairs, specifically Subdivision (a)(1), providing: "Clearance through security review and PA channels is required for all *official* speeches and writings that are presented or published in the civilian domain, to include materials placed on the internet or released via similar digital media." Def. Mem. at 4-5 (emphasis supplied).[5]

But Defendants gloss over the word "official" in that provision. That term refers to speech made on behalf of the Army. Such interpretation is supported by the context in which it used. AR 360-1 governs "Public Affairs," which refers to the organization's official communications with the public, stating, "This regulation provides guidelines for release of command and public information released to the media, and community engagement programs intended for internal and external publics with interest in the U.S. Army." AR 360-1. Paragraph 7-44 is part of Chapter 7, entitled "Public Communication," and its first paragraph, entitled "Release of *official* information," provides that "DoDI 5230.29 requires any *official* information *intended for public release* that pertains to military matters, national security issues, or subjects of significant concern of DoD be cleared by appropriate security review and PA offices prior to release." *See* AR 360-1 ¶ 7-1 (emphasis added). While the singular term "official" is not itself defined, the AR defines the term "official statement" as "Statement on Army matters by an Amry representative acting in an official capacity." *See id.* at 78.

By contrast, DPOM 03-24 does not simply "restate[] the Army's posture on external communications," Def. Mem. at 6, because it is not limited to *official* communications made in an

---

[5] https://home.army.mil/benning/5517/4369/7221/ARN43134-AR_360-1-002-WEB-4.pdf

*official* capacity on behalf of USMA or the Government; rather, it applies to *all* external communications within a faculty member's disciplinary area of expertise, including those undertaken off-duty if USMA affiliation is used.  As such, it exceeds the scope of AR 360-1, and Defendants do not explain why this is necessary.  While Defendants may have an interest in controlling and pre-approving the content of public statements made in an *official* capacity on their behalf, they have asserted no justification for the discretionary authority to prohibit Bakken from expressing his opinions in public.

Likewise, the October 8, 2020 Memorandum, entitled "[USMA] at West Point Policy for Social Media and External Official Presence Websites," applies only to official communications and is therefore much narrower than the Academic Engagement Policy. *See* Def. Mem. at 6 (Citing Watt's Decl. ¶ 20 & Exhibit B).  That policy applies only to those "who have administrative rights to post content on any USMA EOP or intend to create a new EOP." Watts Decl., Exhibit B ¶ 4.  It therefore governs communications made through an *official* USMA social media or web presence, whereas DPOM 03-24 is not so limited, and Defendants do not explain why its stricter and more burdensome rule is necessary considering the Social Media policy.

Nor does USMA Regulation 150-2, governing civilian faculty, justify DPOM 03-24's broad prior restraint. *See* Def. Mem. at 6-7 (citing Watts Decl. ¶ 22 & Exhibit D).  This policy merely demonstrates that, like any workplace, there are standards for recruitment, compensation, employment, and conduct.  But there is no explanation why the Government must burden civilian faculty speech by requiring pre-approval of all public expression on matters within their disciplinary expertise.

 Defendants next cite USMA Regulation 150-4, entitled Academic Freedom at the United States Military Academy, claiming it "explicitly identifies the prepublication review requirement

of DoD and HQDA" and that "Paragraph 6-2e highlights that prepublication review requirements have been in place prior to 2025, and is a typical requirement of employment. Def. Mem. at 7 (citing Watts Decl. ¶ 23 & Exhibit E).  Again, Defendants miss the mark.  First, because there is no pin citation, it is not clear where in the document Defendants point for the proposition that it "explicitly identifies the publication review requirement[s]."  The closest we could find is Paragraph 5-4n, which reads:

> USMA restricts the public release of scholarly works produced by members of the USMA faculty or USMA librarians to the minimum extent permitted under federal law and regulation. When security or policy reviews are required, clearance approval is delegated to the lowest possible level. Academic freedom does not allow faculty members to publicly publish works containing official Department of Defense information or works directed by the Department of Defense or the Army until the works have been cleared for public release.

Watts Decl., Exhibit E ¶ 5-4n.  To the extent this provision imposes any restrictions, it does so "to the minimum extent permitted under federal law and regulations," which includes the First Amendment, and only with respect to "works containing official [DoD] information or works directed by the [DoD] or the Army," or when "security or policy reviews are required"—in other words, "official" speech made on behalf of the Government, which is not the issue here.

Nor does Paragraph 6-2e say what Defendants contend.  While this section reminds faculty that their speech may reflect on "their profession and our institution" and professors must ensure they are not speaking on the institution's behalf, *see* Watts Decl., Exhibit E ¶ 6-2e, this provision does not reference prepublication review or clearance and affirmatively states that faculty members "should be free from institutional censorship or discipline."  Nothing in the Academic Freedom policy supports the broad veto power and prior restraint imposed by the Academic Engagement Policy, which is inconsistent with Academic Freedom.

Finally, Defendants cite USMA Regulation 150-6 governing Academic Research. *See* Def. Mem. at 7-8. While that policy requires that publications and presentations comply with AR 360-1, as explained, that Regulation deals with "official" Army communications. Notably, Regulation 150-6 defines "Official government" work as "limited to any publication or presentation that is created in fulfillment of direction or a tasking by USMA, Department or the Army, or DoD leadership, or that is completed on government time or using government resources (beyond the incidental use allowed in the course of unofficial work by the JER and USMA policy) in accordance with 17 U.S.C. 105, USMA Policy Memorandum 228-01 (Academic Freedom), and the Local Interpretation of AR 360-1. Such works are in the public domain." Watts Decl., Exhibit F ¶ 1(c)(5).

The policy also distinguishes between such "official" speech and "unofficial" communications: "Any individual who uses a title or other identification connected with DOD in an unofficial writing or speech will include with such material a disclaimer stating that 'the views expressed in this article (book) are those of the author and do not reflect the official policy or position of the Department of the Army, DOD, or the U.S. Government.'" *Id.* ¶ 4(a)(2). While it contemplates use of a disclaimer if a faculty member communicates on his research externally and "unofficially," it does not contemplate standardless pre-clearance or pre-approval of such communications.

In short, none of the cited policies support – and none of Defendants' purported interests are served by – the Academic Engagement Policy's prior-approval requirement for all external engagements, including off-duty when USMA affiliation is used. This is particularly so where the Government's objectives can be fully achieved by simple notification and disclaimer requirements, about which Bakken does not complain. Nor do Defendants articulate why this absolute veto

power is necessary to achieve their purported interests, rendering the Academic Engagement Policy overinclusive.

The policy is also underinclusive, as it applies only to speech that falls within one's "disciplinary areas of expertise." In other words, since he is a law professor, not of military strategy or political science, Bakken would not need to seek pre-approval before publishing an article or newspaper column using his USMA affiliation and overtly criticizing recent DoD military operations or its anti-DEI stance as a matter of strategy, politics, or public policy, as this would fall outside his "disciplinary area of expertise." He could even present on the same subject at a conference while on duty without having to seek approval. Such speech would certainly frustrate Defendants' purported interests, but is not covered by DPOM 03-24.

Defendants contend they are entitled to considerable deference because of their special status as the military and an academic institution. *See* Def. Mem. at 19-21, 23 n.5. They are not, but even if they were, their purported interests still do not outweigh Bakken's substantial First Amendment interests under *NTEU*.

As an initial matter, Defendants cite *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023), in claiming an academic institution's educational mission factors in the *Pickering* balance. Def. Mem. at 19. But Defendants do not apply this standard beyond their argument for military deference, addressed herein. Other than citing its purported military objections, Defendants do not cite any specific academic objectives that separately warrant deference. *Heim* is also inapposite because it did not involve a prior restraint and application of the heightened test under *NTEU*.

Defendants cite a series of cases holding that federal courts must defer to military judgments. But these cases are inapposite because they generally involve claims by active-duty servicemembers or which implicate decisions about the "composition, training, equipping, and

24

control of a military force." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).[6]  The Court recognizes that the "fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Parker v. Levy*, 417 U.S. 733, 758 (1974).

By contrast, Bakken is a civilian – he is not subject to the Uniform Code of Military Justice ("UCMJ") or the military chain of command – and he does not teach courses on military strategy or which implicate military readiness.  Nor do his claims implicate strategic or tactical decisions about the "composition, training, equipping, and control of a military force." *Gilligan* 413 U.S. at 10.  As such, cases that justify deference to military judgment do not apply to Bakken. *Compare Kelly v. Hegseth*, No. 26-81, 2026 WL 391777, at *9 (D.D.C. Feb. 12, 2026) (rejecting Government's argument that Court should defer to a speech regulation when imposed against a retired Navy Captain for his citizen speech, as "same rationale does not hold true for retired servicemembers").  The logic in *Kelly* applies here, as deference would be more understandable against a retired Navy Captain than a civilian law professor.

Bakkens' first claim challenges the prior restraint of his off-duty speech when using his USMA affiliation.  Not only is Bakken a civilian, but such speech, even if using his USMA affiliation, is not made in his capacity as a USMA employee and does not interfere with military judgment or operations.

---

[6] *See e.g. Goldman v. Weinberger*, 475 U.S. 503 (1986) (upholding Airforce dress code prohibiting Jewish servicemember from wearing yarmulke); *Rostker v. Goldberg*, 453 U.S. 57 (1981) (rejecting challenge to all-male draft); *Haig v. Agee*, 453 U.S. 280 (1981) (upholding revocation of passport of former CIA officer living abroad, divulging confidential information, and undermining national security); *Parker v. Levy*, 417 U.S. 733 (1974) (upholding discipline of servicemember for criticizing Vietnam War); *Doolen v. Wormuth*, 5 F.4th 125 (2d Cir. 2021) (upholding West Point's cadet removal process); *ACLU v. DoD*, 901 F.3d 125 (2d Cir. 2018) (DoD followed statutory procedure for withholding production of photos in response to FOIA request); *Able v. United States*, 155 F.3d 628 (2d Cir. 1988) (rejecting servicemember challenge to "Don't Ask Don't Tell" policy).

Bakken's second claim challenges the prior restraint of his on-duty speech to external audiences, through publication of journal articles or speaking at conferences in fulfilling his duties. While such speech occurs in the context of his employment, Bakken is not acting as a member of the military and, so long as he is not purporting to speak on the Government's behalf, Defendants have no special military interest in controlling the content of this speech.

Bakken's third claim challenges the directive that professors refrain from expressing their opinions in class.  In *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023), the Court found that, under academic freedom principles, professors can teach and speak freely on subjects within their academic disciplines. *Id*. at 226-27.  Bakken teaches law, not military strategy or readiness, and under *Heim*, he has a First Amendment right "to speak, and to speak freely, guided by. . . [his] own professional expertise." *Id*. at 227.

As noted above, even accepting Defendants' justifications, they still have not explained why an absolute veto is necessary to achieve their stated goals.  Defendants' own argument proves this point – they assert the Academic Engagement Policy involves only a "review process" and, as to off-duty speech, applies only when USMA affiliation is used and, in this regard, "there is even an avenue in the policy to balance West Point's concerns with Plaintiff's speech, which is to allow for a disclaimer to be provided where appropriate." Def. Mem. at 24. Defendants therefore recognize that notice and disclaimer satisfy their interests, and they do not articulate why an absolute veto – imposing a prior restraint of speech unless and until approved by the Department Head – is necessary.

Defendants also claim that any burdens imposed by the Academic Engagement Policy are "*de minimis*" and it "does not prohibit any speech." (Def. Mem. at 23-24). But unless approved, the policy prohibits speech under its coverage.  This is censorship; the type of prior restraint

prohibited under the First Amendment.  And these burdens upon Bakken and his colleagues, and upon the potential audiences, are not substantially outweighed by the Defendants' asserted interests, particularly where they have not explained why their interests cannot be satisfied by the less restrictive means already discussed.

Finally, *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), upon which Defendants rely, Def. Mem. at 24, supports Bakken.  In that case, the majority construed the challenged regulation as *not* requiring prior *approval* of speech, *see* 87 F.3d at 1440-41, and recognized such pre-approval "would raise serious constitutional issues," *id.* at 1436; *see also id.* at 1444 (Wild, J., dissenting) (recognizing majority's narrow construction of regulation as "authorizing the agency only to review publications and make non-binding suggestions, while allowing the employee to publish over agency objections"); *Harman*, 140 F.3d at 120 (distinguishing *Weaver* because it construed regulation as not requiring pre-approval, and noting the "power to suppress speech in advance also distinguishes this case from *Weaver*").  Unlike *Weaver*, the Academic Engagement Policy contains a standardless pre-approval requirement.

### Point IV

### The balance of the equities and public interest favor a preliminary injunction

Defendants contend that a preliminary injunction would not serve the public interest because "West Point has articulated the concrete and legitimate goals of ensuring compliance with other military regulations and to ensure that West Point is aware of how its name and affiliation is being used in public engagements.  It also seeks to train the future leaders of the Army in a consistent manner.  These are goals that serve the public interest and ensure that the U.S. has a well-trained and prepared military." Def. Mem. at 25-26.

But as demonstrated above, Defendants' purported goals are not served by a pre-approval requirement and absolute right to veto speech, particularly where less restrictive means – *i.e.*, notice and disclaimer – are available.  Defendants also retain the right to punish after the fact for conduct that violates its legitimate rules.

Having shown that the challenged policy unduly infringes on his First Amendment rights, and those of his colleagues, and that Defendants' purported interests do not outweigh the interests of a vast group of potential speakers and audiences, the equities and public interest favor Bakken. "Protecting the exercise of First Amendment freedoms is always in the public interest.  Indeed, the Constitution is the ultimate expression of the public interest, and therefore, government actions in contravention of the Constitution are always contrary to the public interest.  This is especially so where government actions threaten to chill core political speech, which is entitled to the highest First Amendment protection." *Kelly*, 2026 WL 391777, at *12.

**CONCLUSION**

The Court should deny Defendants' motion to dismiss and grant Bakken's motion for a

preliminary injunction.

Dated: Newburgh, New York
         February 13, 2026

Respectfully Submitted,
GOLDMAN LAW, PLLC
*Co-Counsel* for *Plaintiff*

By:   /s/ Jonathan R. Goldman
       Jonathan R. Goldman (JG8710)
       372 South Plank Road, Ste. 2
       Newburgh, N.Y. 12550
       (845) 534-6472 Ext. 1001
       jgoldman@jrgoldmanlaw.com

BERGSTEIN & ULLRICH
*Co-Counsel for Plaintiff*

By:   /s/ Stephen Bergstein
       Stephen Bergstein (SB6810)
       5 Paradies Lane
       New Paltz, N.Y. 12561
       (845) 419-2250 [Tel]
       steve@tbulaw.com

29

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to, and in compliance with, Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern District of New York and Section 2(B)(i) of this Court's Individual Rules of Practice, the total number of words in the foregoing Memorandum of Law, exclusive of any cover page(s)/caption(s), table of contents, table of authorities, and signature block, is 8,612 words.

Dated: Newburgh, New York
     February 13, 2026                    */s/ Jonathan R. Goldman*
                                      JONATHAN R. GOLDMAN, ESQ. (JG8710)