UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
TIM BAKKEN, *individually and on behalf of a
putative class of all those similarly situated*,

                                 Plaintiff,

    - against -

UNITED STATES MILITARY ACADEMY, *et al.*,

                              Defendants.
----------------------------------------------------------------x

**OPINION & ORDER ON
MOTION FOR PRELIMINARY
INJUNCTION AND MOTION TO
DISMISS**

No. 25-CV-7826 (CS)

Appearances:

Jonathan R. Goldman
Goldman Law, PLLC
Newburgh, New York

Stephen Bergstein
Bergstein & Ullrich
New Paltz, New York
*Counsel for Plaintiff*

Dana Walsh Kumar
Assistant United States Attorney
New York, New York
*Counsel for Defendants*

Seibel, J.

    Before the Court are Plaintiff's motion for a preliminary injunction pursuant to Federal

Rule of Civil Procedure 65, (ECF No. 47), and Defendants' motion to dismiss pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), (ECF No. 53).  For the following

reasons, the motion for a preliminary injunction is GRANTED and the motion to dismiss is

DENIED.

## I.    BACKGROUND

Plaintiff Tim Bakken, a civilian professor at the United States Military Academy ("USMA", "the Academy" or "West Point"), brings this action against the Academy and several of its administrators and departmental supervisors – Lt. General Steven W. Gilland, Brigadier General Shane R. Reeves, Col. Krista Watts, Col. Winston Williams, Col. Joshua Berry and Lt. Col. Caitlin Chiaramonte (collectively, "Defendants") – in their official capacities, alleging unconstitutional infringements on his First Amendment right to freedom of speech and that of other civilian faculty.  (*See* ECF No. 11 ("Amended Complaint" or "AC").)

### A.    Facts

The Court draws the following facts from the AC, the document that it incorporates and the parties' affidavits and accompanying exhibits, but as discussed in more detail below, different materials are properly considered on each motion.

### 1.    West Point and Plaintiff's Employment

The Academy is a four-year, federally established undergraduate institution in West Point, New York, that prepares its students, known as cadets, to become officers in the United States Army.  (AC ¶ 12; ECF No. 55 ("First Watts Decl.") ¶ 7.)  West Point's mission is "to build, educate, train, and inspire the Corps of Cadets to be commissioned leaders of character committed to the Army values and ready for a lifetime of service to the Army and Nation." (First Watts Decl. ¶ 7.)  The Department of the Army controls the Academy:  the USMA Superintendent is a commanding officer who oversees the Academy and its military installation, and cadets are members of the Army who upon graduation must complete five years of active-duty service.  (*Id.* ¶¶ 8, 10; AC ¶¶ 13-14.)  Although military instruction and training are part of West Point's curriculum, the Academy also offers courses in more traditional college subject

matters, like the sciences and humanities.  (First Watts Decl. ¶¶ 9-10.)  USMA aims "to develop cadets' critical thinking and creative problem-solving skills."  (*Id.* ¶ 9.)  Cadets receive a Bachelor of Science degree upon graduation, and both active-duty military and civilian professors instruct them, though the former category makes up the majority of the faculty.  (*Id.* ¶¶ 9, 11; AC ¶¶ 18-20.)

Plaintiff has been employed at USMA since June 2000 as a civilian professor of law, (AC ¶ 27; ECF No. 49 ("First Bakken Decl.") ¶ 5; First Watts Decl. ¶ 11), and during that time has taught courses, and routinely spoken to external audiences, on constitutional, criminal and corporate law issues, (First Bakken Decl. ¶¶ 5-6, 28; AC ¶ 32).  He has written books, articles and essays and given television, radio, podcast and print media interviews – all while identifying himself as a member of the USMA faculty.  (AC ¶¶ 31, 34, 37; First Bakken Decl. ¶ 6.)[1] Plaintiff's academic research, writing and general engagement with the scholarly community in his areas of expertise are part of his job requirements, and such activities affect USMA faculty members' ability to earn promotions, raises and tenure.  (AC ¶¶ 89-93; First Bakken Decl. ¶ 5.) In addition to Plaintiff's legal writing and research, he has also written and spoken publicly about the U.S. military, including the Academy – at times critically.  (AC ¶¶ 38, 44.)  In 2011, for example, Plaintiff faced retaliatory action for a report that he filed concerning alleged wrongdoing by senior West Point military officers.  (*See id.* ¶¶ 39-43.)  In 2020, he published a book entitled *The Cost of Loyalty:  Dishonesty, Hubris, and Failure in the U.S. Military*.  (*Id.* ¶ 44.)  Given that Plaintiff has been employed at West Point for over twenty-five years, Plaintiff's institutional affiliation with USMA gives him credibility in commenting on issues related to both

---

[1] Plaintiff tallies seventy-two external engagements since 2020 in which he participated while using his USMA affiliation – two books, seven essays or articles, two lectures, and roughly sixty-one interviews.  (First Bakken Decl. ¶ 6.)

his academic expertise and the Academy and U.S. military.  (*Id.* ¶ 82; First Bakken Decl. ¶ 12.)

If he were not permitted to refer to his West Point affiliation in his external communications, he

would have no way to explain what he has been doing for the last twenty-five-plus years and

would not be taken seriously.  (AC ¶ 87; First Bakken Decl. ¶ 12.)[2]

All West Point faculty, military or civilian, are subject to certain Department of Defense,

Department of the Army and USMA regulations.  (*See* First Watts Decl. ¶¶ 12-13.)  Plaintiff's

lawsuit concerns two policies in particular that affect faculty speech and scholarship.

### 2.        DPOM 03-24

On January 27, 2025, President Donald Trump issued Executive Order No. 14,185,

Restoring America's Fighting Force, 90 Fed. Reg. 8763 (Jan. 27, 2025) ("EO 14185" or "the

Executive Order").  The Executive Order prohibited the Academy and other military academic

institutions from "promoting, advancing, or otherwise inculcating" certain "un-American,

divisive, discriminatory, radical, extremist, and irrational theories," EO 14185, 90 Fed. Reg. at

8764, including "that America's founding documents are racist or sexist," and required them "to

teach that America and its founding documents remain the most powerful force for good in

human history," *id.*; (*see* AC ¶ 46).  On February 13, 2025, Dean's Policy and Operating

Memorandum No. 03-24 came into effect at West Point.  (*See* AC ¶ 50; *id.* Ex. 1 ("DPOM 03-

24" or "the Academic Engagement Policy").)  DPOM 03-24 purports to "standardize[]

procedures for engaging with audiences external to USMA" for West Point faculty members and

librarians, and refers to previously promulgated Army and USMA regulations, such as USMA

---

[2] As Plaintiff puts it, he could not "be considered credible, treated seriously, or have any opportunity to speak or write publicly in the future if I told an editor or publisher that I cannot indicate my institutional affiliation and, therefore, I cannot tell you where I've worked for the past 25 ½ years."  (First Bakken Decl. ¶ 12.)

Regulation 150-4 on "Academic Freedom" and Army Regulation 360-1, the "Army Public Affairs Program." (DPOM 03-24 ¶¶ 1-3.) Under the Academic Engagement Policy, Plaintiff and other USMA faculty must obtain approval from department heads "for engagements with any audience external to USMA that are within faculty members' disciplinary areas of expertise while on duty or when using any USMA affiliation or branding." (*Id.* ¶ 4.b.) "Examples of such engagements include (but are not limited to) journal publications, conference presentations, media interviews, podcasts, opinion editorials, blog posts, social media posts, etc." (*Id.*) Defendant Watts, the Vice Dean for Operations at USMA, signed the Academic Engagement Policy "for the Dean of the Academic Board," who is Defendant Reeves. (AC ¶¶ 5-6, 15; DPOM 03-24 at 2.)

At a USMA faculty meeting a few weeks after the Academic Engagement Policy came into effect, Defendant Reeves, who chairs the Faculty Council, introduced and defended the new policy. (AC ¶¶ 57-58.) Plaintiff argued at the meeting that the policy was an unconstitutional restriction on speech. (*Id.* ¶ 61.) After the meeting Col. Julia Coxen, a departmental head and Vice Chair of the Faculty Council who is not a party to this lawsuit, advised Plaintiff that DPOM 03-24 was an effort by senior military officers at the Academy to "show to the new administration 'radical compliance' as a way to protect their positions." (*Id.* ¶ 64.) Defendant Williams, the head of the Department of Law and Philosophy, of which Plaintiff is a member, echoed these comments months later, telling Plaintiff on July 18, 2025 that the purpose of the policy was to protect Defendant Gilland, West Point's Superintendent, and Defendant Reeves, by showing their obedience to the new administration. (*Id.* ¶¶ 2, 14, 15, 24, 65.) The day after the Faculty Council meeting, the Department of Law and Philosophy held its own faculty meeting during which Defendant Williams defended the policy. (*Id.* ¶ 67.) Again, Plaintiff opined that

5

the policy was unconstitutional, (*id.* ¶ 68), but the Deputy Department Head, Defendant Berry, angrily "admonished that Plaintiff must obey the regulation" and told him after the meeting that he should file a class action lawsuit to challenge it, (*id.* ¶¶ 69, 70).  The same day, the Department of Law and Philosophy's Executive Officer, Lt. Col. Joshua Lehman, who is not a party to this case, sent the department's faculty an email with the protocol on how to obtain approval for external speaking and writing engagements.  (*Id.* ¶ 71.)  The email stated:

> [Department of Law and Philosophy] faculty should run their proposals through either Col. Mayer (philosophers) or [Defendant Lt. Col.] Chiaramonte (lawyers). These officers will serve as reviewers of the academic engagement proposals. [Col.] Mayer and [Lt. Col.] Chiaramonte have delegated authority from [Defendant] Col. Williams to **approve** proposals.  Col. Williams has NOT delegated disapproval authority.  Col. Williams should only receive proposals through these two officers.

(*Id.*) (emphasis in original).  Thus, Defendant Chiaramonte may approve Plaintiff's proposed external engagements, but only Defendant Williams can disapprove them.  (*Id.* ¶¶ 71-72.)

In July 2025, Defendant Chiaramonte solicited funding requests for the academic year, and Plaintiff responded indicating that he wanted approval to present a paper at a conference. (*Id.* ¶¶ 73-74.)  Defendant Chiaramonte replied by requesting the title, noting she would add it to the budget, and asking if she could read the paper.  (*Id.* ¶¶ 75-76; ECF No. 49-5.)  Plaintiff says Defendant Chiaramonte's request was unlike any prior inquiry he had received as a USMA professor.  (AC ¶ 77.)  Plaintiff had not yet written the paper, given that he needed approval for a topic, so he emailed Defendant Berry for clarification on how DPOM 03-24 would be implemented and applied.  (*Id.* ¶¶ 78-79; *see* ECF No. 49-3 at 3-4.)  Defendant Berry replied, stating that he could not determine what engagements would be approved without specifics, but he provided general guidance and examples.  (*See* AC ¶ 80; ECF No. 49-3 at 2-3.)  According to Berry:

6

In the vast majority of cases, requests have been approved when the engagement involves scholarship that:

> (1) yields in-depth disciplinary knowledge accepted by other scholars (see USMA Regulation 150-3), and

> (2) does not conflict with applicable Presidential Executive Orders, Department of Defense (DoD), or Department of the Army directives or memoranda.

Approved academic engagements typically involve peer-reviewed scholarship grounded in original research and supported by citations. Media engagements have also been approved when the content focuses specifically on the faculty member's research and academic expertise. . . .

Requests have not been approved when the proposed engagement conflicted with applicable Executive Orders or DoD/Army guidance, or when the content did not meet the standard of academic scholarship – particularly when the material reflected personal opinions on current events rather than research-based scholarly analysis.

(AC ¶ 80; ECF No. 49-3 at 2.)

### 3.    The Classroom Directive

The Academic Engagement Policy is not the only change that Plaintiff alleges affects USMA faculty members. In addition to removing books from its library, deleting words or phrases from syllabi, eliminating courses and majors, and removing the "Publications" tab on faculty pages on the USMA website, (AC ¶¶ 47-48), the Academy has also instructed professors not to share personal opinions in the classroom, (*see id.* ¶¶ 103-07). This policy (the "Classroom Directive") took the form of an address from Defendant Reeves to all faculty on August 12, 2025. (*See id.* ¶ 103.) Reeves said the classroom was meant to be a "professional environment" and told all faculty that while they are teaching cadets in the classroom,

> [i]f you start to feel that perhaps maybe you're starting to advocate for a particular position or ideology, which I don't think you do, when you're taking a position where you're like why we believe this so I'll help the Cadets believe this way, you're wrong. That's not what we do. They don't need to know what I believe.

(*Id.*)  Plaintiff alleges that he understood the Classroom Directive to be consistent with EO 14185 and DPOM 03-24 as a means "to control, chill and suppress faculty speech."  (*Id.* ¶ 104.) Plaintiff also took the Classroom Directive to be a direct order from a superior and a ban on expressing his personal opinions or views while instructing students on legal issues, such as sharing "whether a particular majority or dissenting opinion is persuasive and why."  (*Id.* ¶¶ 105-07.)  Plaintiff further understood Defendant Berry's guidance related to DPOM 03-24 as a "prohibition on my giving my 'opinions'" and therefore aligned with the Classroom Directive. (First Bakken Decl. ¶¶ 28, 33.)

### 4.    The Policies' Impact on USMA Faculty Speech

Plaintiff alleges that both DPOM 03-24 and the Classroom Directive are unlike other policies affecting faculty speech that have been in place at the Academy.  (*See* First Bakken Decl. ¶¶ 5-6, 28, 33; AC ¶¶ 77, 81-82, 84-85, 105-07.  *But see* First Watts Decl. ¶¶ 14-25.) Before DPOM 03-24, Plaintiff regularly spoke, wrote and appeared for audiences external to USMA while noting his affiliation without any requirement to seek prior approval.  (*See* First Bakken Decl. ¶¶ 5-6; AC ¶¶ 77, 81-82, 84-85.)  External speeches and publications are a regular part of Plaintiff's job, necessary for promotions, tenure and salary increases.  (AC ¶ 89.) Plaintiff now fears that if he were to seek prior approval he would in certain instances be denied. (First Bakken Decl. ¶ 13; AC ¶¶ 101-02.)  Plaintiff does not, however, believe that DPOM 03-24 itself, nor the guidance on its implementation that Defendant Berry gave, provides clear standards as to what speech would be approved.  (First Bakken Decl. ¶ 24; AC ¶ 99.)

In July 2025, Defendant Berry, Plaintiff's direct supervisor, informed Plaintiff that the standards for Plaintiff's performance evaluation had changed for the 2025-2026 period.  (AC ¶ 90.)  Included in the standards were teaching and curriculum development, such as publishing

or contributing to a textbook, and active engagement, participation and growth in scholarship. (*Id.* ¶ 92.)  Berry explained to Plaintiff that to satisfy the requirements, he could note on his "Performance Plan" that he planned to write an article for submission to a peer-reviewed journal. (*Id.* ¶ 93.)  In November 2025, the Department of Law and Philosophy also put out a "Publications data call" in which the Department sought to keep track of the number of "blog posts, articles, books, etc." that faculty had published in the prior year.  (First Bakken Decl. ¶ 25.)  Plaintiff states that this call "enables the Defendants to identify the faculty members who have engaged in speaking or writing without the Defendants' approval."  (*Id.* ¶ 26.)

Plaintiff believes that if he were to engage in any external engagement and note his affiliation without first getting approval, he would be subject to discipline and possibly termination.  (*Id.* ¶¶ 6, 12-13.)  He is aware of at least four examples of his colleagues facing discipline – such as suspension, admonition and removal from academic positions – because of external engagements for which they did not receive prior approval.  (*Id.* ¶¶ 14-21.)  Plaintiff himself, though, has not been subject to any discipline connected to DPOM 03-24, nor has he submitted work or a specific proposal that led to West Point denying his request.  (First Watts Decl. ¶ 26.)  Plaintiff instead has taken actions to ensure that his speech complies with the Academic Engagement Policy without him having to request approval.  (*See* AC ¶¶ 74-80;  First Bakken Decl. ¶¶ 9-11, 23-24, 27-32.)  Because of DPOM 03-24, he has refrained from speaking and writing, either independently or as part of his job, on issues he otherwise would have pursued, including the state of academic freedom, prosecutorial ethics, and the legality of U.S. attacks on boats allegedly transporting drugs.  (First Bakken Decl. ¶ 11.)  He has also appeared on at least one podcast in which he declined to refer to his professional affiliation with the Academy, (*id.* ¶ 10), despite the omission's negative impact on his credibility when speaking on

topics within his academic discipline and related to West Point and the military generally, (*see* AC ¶ 82).

Plaintiff has written a book to be released in August 2026 in which he wants to state that he is a USMA professor without having to first obtain approval from Defendants.  (First Bakken Decl. ¶ 7; AC ¶ 88.)  The book primarily concerns "how to make correct decisions," discusses military and non-military topics, and draws on lessons from the law, Plaintiff's teaching and his experience at West Point.  (First Bakken Decl. ¶ 7.)  In the book Plaintiff is at times critical of the government, sharing his "analysis, questioning, or agreement or disagreement with government policies, including those by USMA and/or the Department of Defense and Army" and providing his "view on how to improve conditions within the [U.S.] military, such as how to lower the rates of suicide and sexual assault."  (ECF No. 57 ("Second Bakken Decl.") ¶ 5; *see* AC ¶ 101.)  Given the connection to Plaintiff's employment and his academic expertise, Plaintiff believes that publishing the book would require prior approval, which he does not believe it would receive, and that declining to seek approval while still complying with DPOM 03-24 would substantially change its content.  (First Bakken Decl. ¶¶ 7, 9; AC ¶¶ 101-02.)  Under his contract with the publisher, Plaintiff has agreed to purchase in advance 1,000 copies, costing approximately $10,000 to $12,000, and he also has spent more than $10,000 to prepare a podcast related to the book.  (First Bakken Decl. ¶ 8.)

As to the Classroom Directive, before its implementation Plaintiff routinely shared his views on the topics that he taught in class, calling such speech "essential to the educational process in the university setting in that it prompts further discussion and debate, fosters critical thinking skills, and teaches respect for differing viewpoints."  (*Id.* ¶ 33; *see id.* ¶ 28; AC ¶¶ 105-07.)  Now Plaintiff has changed course and no longer shares his opinion or views on legal topics,

including when asked directly by students.  (First Bakken Decl. ¶ 28; AC ¶ 105.)  Plaintiff cites four specific examples in which he declined, in response to a student request, to share his opinion on a case or legal issue, such as the Supreme Court death penalty case *McCleskey v. Kemp* or the deinstitutionalization of people with mental illnesses and its effect on the legal system.  (First Bakken Decl. ¶¶ 29-32.)  In each instance, Plaintiff otherwise would have shared his personal views as part of his classroom instruction, but has declined to do so because of the Classroom Directive.  (*Id.* ¶ 33.)

### B.    Procedural History

Plaintiff initiated this action on September 22, 2025 and amended his complaint the same day.  (ECF No. 1; AC.)  The AC includes three class-action claims brought on behalf of civilian professors at the Academy:  (1) that DPOM 03-24 violates the First Amendment because it restricts, based on content, the "off-duty" (independent or commercial) speech of Plaintiff and other USMA civilian faculty while using their USMA affiliation, (AC ¶¶ 118-22); (2) that DPOM 03-24 violates the First Amendment because it restricts, based on content, Plaintiff's and other USMA civilian faculty's "on-duty" speech (journal publications or conference attendance) while using their USMA affiliation, (*id.* ¶¶ 123-27); and (3) that the Classroom Directive violates the First Amendment because it unlawfully burdens Plaintiff's and other USMA civilian faculty's "academic freedoms" and classroom instruction, (*id.* ¶¶ 128-30).  On December 5, 2025, Plaintiff filed a motion for a preliminary injunction.  (ECF No. 47.)  Defendant opposed and filed a motion to dismiss on January 30, 2026.  (ECF Nos. 53-54.)  The motions were fully briefed on March 3, 2026.  (*See* ECF No. 60.)  On May 6, 2026, the Court held oral argument on the parties' motions.  (*See* Minute Entry dated May 6, 2026.)  Neither side has requested an evidentiary hearing.

II.    **LEGAL STANDARDS**

A.    **Motion to Dismiss for Lack of Subject Matter Jurisdiction**

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on other grounds on reh'g en banc*, 585 F.3d 559 (2d Cir. 2009).[3] "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)); *see Seljak v. Pervine Foods, LLC*, No. 21-CV-9561, 2023 WL 2354976, at *4 (S.D.N.Y. Mar. 3, 2023). "The party invoking federal jurisdiction bears the burden of establishing" that it exists. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016), "but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd on other grounds*, 561 U.S. 247 (2010). The Court "may refer to evidence outside the pleadings" in resolving a motion under Rule 12(b)(1). *Makarova*, 201 F.3d at 113.

B.    **Preliminary Injunction**

Generally speaking, a plaintiff seeking a preliminary injunction must show

> (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs' favor, (2) that they are likely to suffer

---

[3] Unless otherwise indicated, case quotations in this Opinion omit internal quotation marks, citations, footnotes and alterations.

irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in their favor, and (4) that the public interest would not be disserved by the issuance of a preliminary injunction.

*Mendez v. Banks*, 65 F.4th 56, 63-64 (2d Cir. 2023).  Sometimes the Second Circuit frames the test as having three parts, requiring the movant to demonstrate

(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction.

*Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (summary order).

But "the serious-questions standard cannot be used to preliminarily enjoin governmental action," *Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *vacated and remanded on other grounds sub nom.*, *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020), at least "where the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations," *id.* at 638.  The Second Circuit has

ruled that the more rigorous likelihood-of-success standard was applicable when a preliminary injunction was sought to prohibit a municipal agency from enforcing a regulation, *see Central Rabbinical Congress of U.S. and Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014); to prohibit New York City's Taxi & Limousine Commission from enforcing changes to lease rates, *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010); to require one branch of a state legislature to undo its expulsion of a state senator, *see Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010); to prohibit a town from hiring police officers and firefighters, *see NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995); to prohibit the Metropolitan Transit Authority from implementing a staff reduction plan, *see Molloy v. Metropolitan Transportation Authority*, 94 F.3d 808, 811 (2d Cir. 1996); to prohibit the New York City Transit Authority from increasing subway and bus fares, *see New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036 n.7 (2d Cir. 1995); to prohibit New York State's Department of Social Services from suspending a health-care services provider from participating in the State's medical assistance program, *see Plaza Health*

*Laboratories* [*v. Perales*], 878 F.2d [577,] 580 [(2d Cir. 1989)], and to prohibit two commissioners of New York state agencies from enforcing provisions of state law, *see Medical Society* [*v. Toia*], 560 F.2d [535,] 538 [(2d Cir. 1977)].

*Id.* at 639.  While DPOM 03-24 and the Classroom Directive do not arise from a process involving both the legislative and executive branches, it appears that the likelihood of success on the merits standard applies here.

Courts in the Second Circuit "routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief, including affidavits, depositions, and sworn testimony." *725 Eatery Corp. v City of N.Y.*, 408 F. Supp. 3d 424, 455 (S.D.N.Y. 2019).  While determining whether to award injunctive relief involves less formal procedures and less complete evidence than trial, "motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact."  *Id.*  A preliminary injunction "is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

### C.    Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a

14

prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

## III.    **DISCUSSION**

"Federal courts must determine that they have jurisdiction before proceeding to the merits." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (*per curiam*).  Accordingly, I address Defendants' motion pursuant to Rule 12(b)(1) first.

### A.    **Subject Matter Jurisdiction and Exhaustion**

Defendants move to dismiss Plaintiff's claims for lack of subject matter jurisdiction, arguing that they must be brought through the administrative processes required by the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 *et seq.* (ECF No. 54 ("Ds' Mem.") at 2.)

> A special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action.  District courts may ordinarily hear those challenges by way of 28 U.S.C. § 1331's grant of jurisdiction for claims "arising under" federal law.  Congress, though, may substitute for that district court authority an alternative scheme of review. Congress of course may do so explicitly, providing in so many words that district

15

court jurisdiction will yield.  But Congress also may do so implicitly, by
specifying a different method to resolve claims about agency action.

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023).  "[T]he CSRA nowhere

*expressly* repeals district courts' § 1331 jurisdiction," and so the question becomes whether "the

CSRA *implicitly* repeals § 1331 jurisdiction" over Plaintiff's claims.  *Feds for Med. Freedom v.*

*Biden*, 63 F.4th 366, 370 (5th Cir.) (emphasis in original), *judgment vacated as moot*, 144 S. Ct.

480 (2023).

"Determining whether Congress implicitly precluded federal district court jurisdiction

over a claim prior to administrative review involves a two-step analysis."  *Lanier v. Bats Exch.,*

*Inc.*, 838 F.3d 139, 147 (2d Cir. 2016).  First, a court must determine "whether it is fairly

discernible from the text, structure, and purpose" of the applicable law that Congress intended

the "scheme of administrative and judicial review to preclude district court jurisdiction."  *Id.*

Second, a court "must then decide whether the . . . claim is of the type Congress intended to be

reviewed within the statutory structure."  *Id.*  To aid the second inquiry, courts consider three

factors identified in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994):  "First,

could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the

claim?  Next, is the claim 'wholly collateral to the statute's review provisions'?  And last, is the

claim 'outside the agency's expertise'?"  *Axon Enter.*, 598 U.S. at 185-86 (quoting *Thunder*

*Basin*, 510 U.S. at 212-13).  It is not necessary for all three prongs of the second half of the test

to be met for a district court to determine that it has jurisdiction to hear a claim, and the first

prong is the most significant.  *See Chau v. Sec. & Exch. Comm'n*, 665 F. App'x 67, 70 (2d Cir.

2016) (summary order) (The factors are "general guideposts useful for channeling the inquiry,"

not "inputs into a strict mathematical formula," and "the first factor – meaningful judicial review

– is most important"); *see also Axon Enter.*, 598 U.S. at 186 (If answer to all three *Thunder*

16

*Basin* questions is "yes," court presumes Congress does not intend to limit jurisdiction, but "same conclusion might follow if the factors point in different directions").

### 1.        The CSRA and its Remedial Scheme

"The CSRA 'established a comprehensive system for reviewing personnel action taken against federal employees.'" *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012) (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)).  The Act "create[ed] an elaborate new framework for evaluating adverse personnel actions against federal employees" and "prescribe[d] in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Fausto*, 484 U.S. at 443.  In enacting the CSRA, Congress sought to "'replace the haphazard arrangements for administrative and judicial review of personnel action' that previously had characterized 'the civil service system'" and create a system "'designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration.'" *Tiltti v. Weise*, 155 F.3d 596, 600 (2d Cir. 1998) (quoting *Fausto*, 484 U.S at 444-45).

When a federal employee covered by the CSRA[4] experiences some adverse action at work, the Act "afford[s] detailed procedural protections" depending on the nature of the action. *Dotson v. Griesa*, 398 F.3d 156, 163 (2d Cir. 2005).  Chapter 23 lays out the "merit system principles," which include that federal employees "should receive fair and equitable treatment in all aspects of personnel management . . . with proper regard for their . . . constitutional rights." 5 U.S.C. § 2301(b)(2); *see Dotson*, 398 F.3d at 163-64.  Chapter 23 also defines "prohibited personnel practices" as including those "personnel actions" taken in violation of any law or

---

[4] The parties do not dispute that Plaintiff, as a civilian professor at USMA, is covered by the CSRA.  (Ds' Mem. at 13 n.1; *see* ECF No. 56 ("P's Reply") at 10 (referring to the availability of judicial review under the CSRA for "employees like [Plaintiff]").)

regulation.  5 U.S.C. § 2302(b)(12).  The "personnel actions" that Chapter 23 covers include, among other actions, appointment, promotion, performance evaluation, and "any other significant change in duties, responsibilities, or working conditions."  *Id.* § 2302(a)(2)(A)(i)-(xii).  If an employee believes that a prohibited personnel action has been or will be taken, the employee must file his grievance with the Office of Special Counsel ("OSC"), which is charged with investigating "whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken."  *Id.* §§ 1212(a), 1214(a)(1)(A); *see Joseph v. Leavitt*, 386 F. Supp. 2d 487, 493-94 (S.D.N.Y. 2005).  If the OSC finds a prohibited personnel practice, the OSC must file a report of its determination, recommendations and findings to the agency in question and to the Merit Systems Protection Board ("MSPB").  5 U.S.C. § 1214(b)(2)(B).  If the agency takes no corrective action after a reasonable period of time, the OSC may petition the MSPB to direct the agency to do so.  *Id.* § 1214(b)(2)(C).

More severe actions taken against federal employees are governed by Chapter 75, *Elgin*, 567 U.S. at 5, under which employees subject to suspensions for more than 14 days and removals, among other actions, are afforded a range of procedural rights, such as notice of the proposed adverse action and an opportunity to answer, and may challenge the action before the MSPB – rather than first going through the OSC, 5 U.S.C. §§ 7512, 7513, 7701; *see Elgin*, 567 U.S. at 6.  Once the MSPB has reviewed the action and reached a final order or decision, the employee may seek judicial review of the MSPB action in the U.S. Court of Appeals for the Federal Circuit, which has exclusive jurisdiction over the appeal.  5 U.S.C. § 7703; *Elgin*, 567 U.S. at 6.  An employee challenging the less severe Chapter 23 actions who has received a final order from the MSPB may similarly challenge the action in the Federal Circuit.  5 U.S.C. § 7703(b); *Bush v. Lucas*, 462 U.S. 367, 387 n.35 (1983); *Nat'l Ass'n of Immigr. Judges v. Owen*

("*NAIJ*"), 139 F.4th 293, 311 (4th Cir. 2025), *cross-petition for cert. filed*, No. 25-1009 (U.S. Feb. 18, 2026); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 363 (D.D.C. 2020). But if the OSC terminates the investigation without having found reasonable grounds to believe that a prohibited personnel action occurred, or without itself petitioning the MSPB to act, judicial review is generally unavailable. *See Dotson*, 398 F.3d at 164 n.3 ("Chapter 23 does not provide for judicial review."); *Comey v. U.S. Dep't of Just.*, No. 25-CV-7625, 2026 WL 1142679, at *10 (S.D.N.Y. Apr. 28, 2026) ("[A] decision by the Office of Special Counsel not to pursue a claim is unreviewable and bars any substantive review of the claim in the Federal Circuit."); *Turner*, 502 F. Supp. 3d at 363 ("Though an employee can appeal an adverse final determination by the MSPB to the Federal Circuit, *see* [5 U.S.C.] §§ 1214(c), 7703(b), the CSRA does not grant the employee any further administrative or judicial review if OSC declines to petition the MSPB.").[5]

Given this scheme, the CSRA has generally overcome the "presumption favoring judicial review" for otherwise justiciable claims by federal employees, *see Fausto*, 484 U.S. at 452, and courts usually find that under the statute, "exhaustion of administrative remedies is a jurisdictional prerequisite to suit," *Chinniah*, 62 F.4th at 702. Thus, an employee challenging an action covered under Chapter 23 or 75 without first going through the CSRA's procedures is generally precluded from bringing claims – even constitutional claims – in federal court. *See*

---

[5] An exception exists for employees against whom an adverse personnel action is taken for making a whistleblower complaint, such as reporting a violation of law or gross mismanagement of funds. *See* 5 U.S.C. §§ 1214(a)(3), 1221(a), 2302(b)(8)-(9). Those employees may seek review directly from the MSPB after the OSC terminates its investigation, even if the OSC does not recommend further action. *See Chinniah v. Fed. Energy Regul. Comm'n*, 62 F.4th 700, 702 (2d Cir. 2023); *Jarvis v. Cardillo*, No. 98-CV-5793, 1999 WL 187205, at *4-5 (S.D.N.Y. Apr. 6, 1999). Additionally, an employee bringing a "mixed case," meaning that they have alleged a prohibited personnel action under Chapter 75 and discrimination based on a protected characteristic under Title VII, may also bypass certain administrative procedures to seek review in district court. *See Kloeckner v. Solis*, 568 U.S. 41, 44-45 & n.1 (2012); *Chinniah*, 62 F.4th at 703. Neither of these exceptions applies here.

*Elgin*, 567 U.S. at 13-15 (CSRA's scheme of review applies to constitutional challenges to federal statutes related to federal employees' removals); *Krafsur v. Davenport*, 736 F.3d 1032, 1039 (6th Cir. 2013) ("Covered prohibited practices include many actions that would offend the Constitution."); *Dotson*, 398 F.3d at 180 ("Congress's intent in fashioning the CSRA is clear: federal employees may seek court review for employment actions as provided in the CSRA *or not at all*.") (emphasis in original).  When reviewing instances of docked pay, firings and reassignments, or other personnel actions taken against covered federal employees, courts have routinely held that Congress intended that the CSRA's procedures would be the exclusive remedy for these claims covered by its provisions.  *See, e.g.*, *Elgin*, 567 U.S. at 23; *Chinniah*, 62 F.4th at 702-03; *Doe v. Fed. Deposit Ins. Corp.*, 545 F. App'x 6, 8 (2d Cir. 2013) (summary order); *Joseph*, 386 F. Supp. 2d at 493-94; *Williams v. McCausland*, 791 F. Supp. 992, 999 (S.D.N.Y. 1992).

In years past, the text, structure, and purpose of the CSRA and this detailed remedial scheme would have made it essentially a foregone conclusion at the first step of the *Thunder Basin* inquiry that district court jurisdiction is precluded where the statute applies.[6]  "That conclusion can only be true, however, when the statute functions as Congress intended." *NAIJ*, 139 F.4th at 305.  Recent firings of the Special Counsel and MSPB members and the administration's challenges to the removal protections that the CSRA affords those individuals "call into question whether the CSRA continues to function as Congress intended for purposes of the *Thunder Basin* analysis." *Id.* at 305-07.  The independence of both the MSPB and the OSC from presidential control are central features of the statutory scheme, and "Congress left little

---

[6] As discussed below in connection with the second half of the *Thunder Basin* test, the Court concludes that the CSRA does not apply to Plaintiff's claims.

doubt about the importance of [that] independen[ce]." *Id.* at 306.  As enacted, the statute requires that the Senate consent to MSPB members' appointments; the President may only remove MSPB members "for inefficiency, neglect of duty, or malfeasance in office"; no more than two members of the three-member board may be of the same political party; and members serve seven-year terms.  5 U.S.C. §§ 1201-02.  Senate consent is also necessary to appoint the Special Counsel, who serves a five-year term and can be removed "only for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1211(b).

Removal protections for MSPB members, however, were held to be unconstitutional by the D.C. Circuit after President Trump removed a Democratic member, *see Harris v. Bessent*, 160 F.4th 1235, 1242 (D.C. Cir. 2025), *petition for cert. filed*, No. 25-1110 (U.S. Mar. 17, 2026), and that court cast serious doubt on the constitutionality of the same protections for the Special Counsel, similarly after President Trump fired the officeholder, *see Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518, at *2-3 (D.C. Cir. Mar. 10, 2025) (*per curiam*).  The MSPB currently has only two members – both Republicans – which constitutes quorum for the MSPB to act but leaves vacant the third seat for a Democratic member.  *See* Sean Michael Newhouse, *Federal Employee Appeals Board Gets Quorum After Senate Confirms New Member*, Government Executive (Oct. 8, 2025), https://www.govexec.com/management/2025/10/federal-employee-appeals-board-gets-quorum-after-senate-confirms-new-member/408701/.

The parties dispute the impact of these changes and whether they are appropriate considerations in determining congressional intent at the first step of *Thunder Basin*.  (Ds' Mem. at 15 n.2; P's Reply at 11-15; ECF No. 60 ("Ds' Reply") at 7-8.)  Given my analysis under the second prong of *Thunder Basin*, however, I need not reach these questions, and note only that the

analysis at step one of *Thunder Basin* appears to implicate different considerations than it would have in the past.

### 2.    Application of the CSRA to Plaintiff's Challenge

Under the second step of the *Thunder Basin* analysis, "[t]he ultimate question is how best to understand what Congress has done – whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Axon Enter.*, 598 U.S. at 186.  I do not believe that Plaintiff's "claim is of the type Congress intended to be reviewed within the statutory structure," *Lanier*, 838 F.3d at 147, because the speech policies at issue here are not actions covered under Chapters 23 or 75 of the CSRA; channeling Plaintiff's challenge through the CSRA's procedures could foreclose all meaningful judicial review; and his claims are both wholly collateral to the statute's review provisions and outside the expertise of the OSC and MSPB.  Analysis of both the statute itself, and of the *Thunder Basin* factors that "aid in [the] inquiry," *id.*, suggest that neither DPOM 03-24 nor the Classroom Directive are actions as to which Congress wanted to preclude district court review by funneling them into the CSRA.

### a.    Statutory Analysis

The CSRA bars "personnel actions" that violate "any law, rule, or regulation implementing, or directly concerning, the merit system principles" set forth in the statute, 5 U.S.C. § 2302(b)(12), including "proper regard for . . . constitutional rights," *id*. § 2301(b)(2).  Although, as explained, an employee generally may not challenge an action covered under the CSRA in federal court in the first instance, not all "actions by supervisors against federal employees" are "defined as 'personnel actions' within the statutory scheme." *Lucas*, 462 U.S. at 385 n.28.  The CSRA's "exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of the employee and the challenged employment action." *Elgin*,

567 U.S. at 15.  When an employee brings a constitutional claim that "raises issues totally unrelated to the CSRA procedures," courts have exercised subject matter jurisdiction regardless of whether the employee has exhausted CSRA remedies.  *Turner*, 502 F. Supp. 3d at 365-66; *see, e.g.*, *Feds for Med. Freedom*, 63 F.4th at 373 ("[T]he CSRA creates a decades-old, well-established, bright-line rule:  Federal employees must bring challenges to CSRA-covered personnel actions through the CSRA, but they remain free to bring other, non-CSRA challenges under the district courts' general § 1331 jurisdiction."); *id.* at 378-79 (collecting "long line of cases establish[ing] that federal employees can bring facial, pre-enforcement actions against federal policies outside of the CSRA"); *Gustafson v. Adkins*, 803 F.3d 883, 888 (7th Cir. 2015) (district court did not err in finding jurisdiction where "the plain language of the CSRA and the relevant case law reveal that [defendant's] conduct is not a 'personnel action' within the ambit of the statute"); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1434 (D.C. Cir. 1996) ("We see no reason for disabling [plaintiff] from pursuing in federal court a constitutional claim that under First Amendment principles is as final, ripe and free from exhaustion difficulties as it need be, and that she has standing to pursue . . . ."); *Comey*, 2026 WL 1142679, at *6 ("[Plaintiff] challenges agency action taken separate and apart from the CSRA, not pursuant to it, and thus is not subject to administrative channeling."); *Turner*, 502 F. Supp. 3d at 370 ("[G]iven the non-traditional nature of the potential 'working conditions' at issue, the actions [Plaintiff] challenges appear to fall outside the 'working conditions' covered by the CSRA."); *Firenze v. NLRB*, No. 12-CV-10880, 2013 WL 639151, at *8 (D. Mass. Jan. 10, 2013) ("If the claim does not involve a prohibited personnel practice taking a personnel action, but is an independent claim arising under the Constitution, then the CSRA does not require that the claim be filed with the OSC prior to judicial review."), *report and recommendation adopted*, 2013 WL 639148 (D. Mass. Feb. 19,

23

2013); *see also Semper v. Gomez*, 747 F.3d 229, 242 (3d Cir. 2014) ("[A] federal employee who could not pursue meaningful relief through a remedial plan that includes some measure of meaningful judicial review has the right to seek equitable and declaratory relief for alleged constitutional violations in a 'federal question' action filed pursuant to § 1331."); *cf. Turner*, 502 F. Supp. 3d at 366 (cautioning that "[t]his loophole to CSRA preclusion is admittedly a narrow one, and does not excuse the exhaustion requirement for claims, that, while framed as constitutional challenges, are in truth a disguised 'vehicle' to challenge CSRA-covered personnel actions or practices") (quoting *Elgin*, 567 U.S. at 22)).

Here, Chapter 75 plainly does not apply because Plaintiff is not challenging an adverse employment action as defined in 5 U.S.C. §§ 7501-02, 7511-12. Plaintiff fears repercussions if he were to violate the policies at issue, (First Bakken Decl. ¶¶ 6, 12-13), and believes that four of his fellow professors at the Academy have been disciplined for taking actions in violation of DPOM 03-24, (*id.* ¶¶ 13-21). But Plaintiff himself has not been fired, suspended or furloughed, nor have his supervisors reduced his grade or pay. (*See* First Watts Decl. ¶ 26; P's Reply at 10.) In fact, Plaintiff has not violated either of the policies that he challenges and has taken steps to ensure he complies with them even though he believes they violate his rights. (AC ¶¶ 74-80; 87-88, 105; First Bakken Decl. ¶¶ 9-11, 23-24, 27-32; First Watts Decl. ¶ 26.) Nor does Plaintiff say that he intends to violate the policies. (*See* AC ¶¶ 86-88; First Bakken Decl. ¶¶ 7-9.) At this point the harm he alleges is that his First Amendment rights have been chilled. "Where no [adverse employment] action is taken or proposed, Chapter 75 plainly does not apply." *NAIJ*, 139 F.4th at 309.

Nor does Chapter 23 bring Plaintiff's challenge into the CSRA's reach. Defendants argue that implementation of the speech policies at issue falls within the definition of "personnel

24

action" set forth in the CSRA because it constitutes "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). (*See* Ds' Mem. at 14-15; Ds' Reply at 7). I agree that that is the only arguably applicable provision, but the shoe does not fit. While these policies are undoubtedly significant in that they affect the First Amendment rights of West Point professors, and Plaintiff argues it represents a change in how professors have previously published their scholarly work, interacted with the media and taught their students, (*see* AC ¶¶ 81, 84-86; First Bakken Decl. ¶¶ 4-5, 28, 33), the policies do not fall within the rubric of "working conditions," such that Plaintiff's claims are a challenge to a "personnel action" that must be addressed through the CSRA's review scheme, for several reasons.

The plain meaning of "working conditions" does not support Defendants' reading of the statute. The CSRA does not define "working conditions" in § 2302(a)(2)(A)(xii), and the Supreme Court has only interpreted its meaning in the context of another section of the statute related to collective-bargaining rules. *See Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 645-47 (1990). There, the Supreme Court interpreted the meaning of the phrase "conditions of employment," which the statute defined as a "personnel policies, practices, and matters . . . affecting working conditions." 5 U.S.C. § 7103(a)(14); *see Fort Stewart Schs.*, 495 U.S. at 645-47. The Court noted that "working conditions" "more naturally refers, in isolation, only to the 'circumstances' or 'state of affairs' attendant to one's performance of a job," meaning "the day-to-day circumstances under which an employee performs his or her job," but found because of the structure of the paragraph in which it appeared that the phrase took on the broader meaning of a "prerequisite for continued employment" and thus covered wages and fringe benefits. *Fort Stewart Schs.*, 495 U.S. at 645-47.

DPOM 03-24 and the Classroom Directive are neither "day-to-day" circumstances of Plaintiff's job nor even "prerequisites" for employment, such as salary or qualifications. They represent fundamental changes to Plaintiff's academic scholarship and pedagogical approach. *Cf. Turner*, 502 F. Supp. 3d at 367 ("alleged transformation" of agency and employees' work was not change in "working conditions"). Publishing scholarly research and structuring classroom discussions are not just among Plaintiff's job requirements, but are also core functions of what it means to be a university professor. Unlike

> in the typical government hierarchy, where the purpose of an employee's speech is to further the ends of the employer, . . . professors at public universities are paid – if perhaps not exclusively, then predominantly – to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines.

*Heim v. Daniel*, 81 F.4th 212, 226-27 (2d Cir. 2023). Yet under the challenged policies, faculty must refrain from expressing their own views on whether a theory is sound or a legal decision is meritorious in every classroom discussion, and virtually everything that USMA faculty write within their expertise must get prior approval. These radical changes to the nature of Plaintiff's job are hardly mere "working conditions," and to call these policies "personnel actions" could effectively transform any "actions by supervisors against federal employees" into CSRA-covered decisions – something against which the Supreme Court has warned, *see Lucas*, 462 U.S. at 385 n.28.

The nature of the speech policies at issue here are similar to those in *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020), which involved "dramatic shifts in policy and practice [at Voice of America ("VOA")] that implicate the very constitutional rights on which U.S.-funded international broadcasting is predicated" and that were deemed "outside the bounds of a 'working condition.'" 502 F. Supp. 3d at 367. In *Turner*, a VOA

26

journalist challenged policy changes that affected the VOA "firewall," which established the outlet's journalistic independence from the U.S. government despite receiving government funding. *Id.* at 344-47, 380-82. The court noted that "[plaintiff] thus does not allege a change in the conventionally understood circumstances of her employment, like a change in schedule or chain of command. She alleges instead major shifts to the background assumptions behind [her job]." *Id.* at 367. The court further observed that a request from an editor to see a script would be a "part of the everyday nature of journalism" and thus a working condition, but "directives from outside the newsroom . . . that run the risk of directly intruding on VOA's professional independence and interfering with news coverage" would not. *Id.* at 367-68.

Similarly, Plaintiff seeks review of DPOM 03-24, a policy that "authorizes [Defendants] to disapprove the content of his expression if he mentions he works at West Point," (P's Reply at 7), and the Classroom Directive, which further bars him from sharing his views on any topic of his instruction when in the classroom. In this way, the policies implicate not just ministerial aspects of being a USMA faculty member but functions that "are at the core of the official duties of teachers and professors." *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014). DPOM 03-24 also regulates Plaintiff's expression when it "conflict[s] with applicable Presidential Executive Orders," (AC ¶ 98), and Plaintiff plausibly sees a throughline from EO 14185 to both DPOM 03-24 and the Classroom Directive, (*id.* ¶ 104). Yet even at a public university, freedom from outside influence, including government influence, is a fundamental aspect of a professor's job and the university's mission. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) ("Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself."); *Rubin v. Ikenberry*, 933 F. Supp. 1425, 1433 (C.D. Ill.

1996) ("Academic freedom refers to the freedom of university professors and the university administrators to function autonomously, without interference from the government.  It also refers to the freedom of individual teachers to not suffer interference by the administrators of the university.").  As a result, the "essentiality" of academic freedom "is almost self-evident." *Sweezy v. New Hampshire by Wyman*, 354 U.S. 234, 250 (1957).  The implementation of policies that force a professor's research and instruction to align with the priorities of political administrations is not a day-to-day change in circumstance of the job nor merely a new requirement for continued employment; it is a "major shift[] to the background assumptions behind" being a professor and threatens the autonomy inherent in the role.  *See Turner*, 502 F. Supp. 3d at 367.

Strengthening his argument that these policies are fundamental shifts in his academic functions, and therefore not "working conditions," Plaintiff notes that never before in his employment at USMA has he had to obtain prior approval for original research, nor has USMA previously limited him from offering personal views in the classroom.  (First Bakken Decl. ¶¶ 5-6, 33; AC ¶¶ 77, 81-82, 84-85, 105-07.)  Defendants cite various policies that they say are similar to the Academic Engagement Policy, but these policies do not implement a similar preapproval regime for academic work or ban the sharing of personal views in the classroom.[7]

---

[7] For example, Defendants say that USMA Regulation 150-4, the "Academic Freedom" policy referenced in DPOM 03-24, contains a requirement in Paragraph 6-2(e) that shows that Plaintiff has been subject to a similar prepublication review.  (Ds' Mem. at 7.)  As Plaintiff points out, Paragraph 6-2(e) contains no such prior restraint.  (P's Reply at 21-22; *see* Ds' Ex. E ("USMA Reg. 150-4") ¶ 6-2(e).)  Paragraph 5-4(n) comes closer, but it still is not prepublication review in the same vein.  Instead, it applies to scholarly works "containing *official* Department of Defense information or works directed by the Department of Defense or the Army" which must be vetted before public release.  (USMA Reg. 150-4 ¶ 5-4(n) (emphasis added).)  Similarly, the USMA social media policy largely pertains to rules and procedures for running official USMA-branded social media accounts.  (Ds' Ex. B ¶¶ 6-7.)  Where the policy references employees

posting in personal capacities, it refers to "[l]eader responsibilities for individual social media conduct" – without defining the leaders to whom it applies – and states that those leaders must ensure that employees are aware that they should represent their unit and the Academy in a "professional manner" and clarify when commenting on USMA accounts' content that they are doing so in a personal capacity.  (*Id.* ¶¶ 8(a)-(b).)  Defendants also contend that USMA Regulation 150-2 is similar to the challenged policies because it extends to off-duty situations, such as limiting faculty-cadet relationships.  (Ds' Mem. at 6-7; Ds' Ex. D ¶ 7-6(e).)  But regulating off-duty *conduct* is different from a preapproval scheme affecting *speech*.  The rest of USMA Regulation 150-2, moreover, does not contain any policy for prepublication review of speech or a limit on sharing personal views, but does include policies that would squarely fall into the definition of "working conditions."  (*See* Ds' Ex. D ¶¶ 6-1 to 6-6 (tenure status and academic rank); 7-1(b) (hiring civilian faculty); 7-5 (compensation); 7-6(a)-(d) (workplace schedules, time cards and annual and sick leave).)

Army Regulation 360-1, the "Army Public Affairs Program" referenced in DPOM 03-24, is the only one that comes close.  Defendants do not include the policy as an Exhibit in support of their motion, but it is publicly available on the Army's website at https://home.army.mil/benning/5517/4369/7221/ARN43134-AR_360-1-002-WEB-4.pdf, ("Army Regulation 360-1").  The Court therefore takes judicial notice of it.  *See County of Rockland v. Triborough Bridge & Tunnel Auth.*, 791 F. Supp. 3d 433, 440 n.2 (S.D.N.Y. 2025).  Most of the policy, and the portions on which the parties focus, concern how military and civilian personnel should go about getting approval for official statements or speeches on the Army's behalf, (*see* First Watts Decl. ¶¶ 15-16; Ds' Mem. at 4-5; P's Reply at 20-21), and do not relate to the kind of external communications at issue here.  Neither party specifically addresses paragraph 7-44(f), which appears to require faculty like Plaintiff to submit their research for preapproval if it is to be publicly released, rather than merely shared inside the Academy.  It is unclear whether that requirement is limited to "articles for official DoD publications" or applies to all "[u]nofficial . . . writing and speaking."  *See* Army Regulation 360-1 ¶ 7-44(f).  But it appears to be the former, as the regulation provides that "DoD personnel, while acting in a private capacity and not in connection with their official duties, have the right to prepare information for public release through non-DoD media," and while such "information must be reviewed for clearance if it meets the criteria in DoDI 5230.29," Army Regulation 360-1 ¶ 7-44(f)(7), DoDI 5230.29 appears to apply only to official speech, *see* Department of Defense Instruction 5230.29(3) ("[I]t is DoD policy that a security and policy review will be performed on all official DoD information intended for public release that pertains to military matters, national security issues, or subjects of significant concern to the DoD.").  But whatever this Regulation means, Plaintiff's declaration makes clear that it was not enforced with respect to the kinds of speech at issue here, as he avers (without contradiction) that until the promulgation of DPOM 03-24, he had never had to obtain prepublication approval.  (First Bakken Decl. ¶ 5.)  Moreover, paragraph 7-44(f) specifically states that "[c]learance will be granted if classified information is not disclosed, DoD interests are not jeopardized, and the author accurately portrays official policy, even if the author takes issue with that policy," Army Regulation 360-1 ¶ 7-44(f)(2)(a) – in contrast to DPOM 03-24, which, according to Defendant Berry, will result in disapproval if the writing conflicts with an EO or DoD policies.  (*See* AC ¶ 80; ECF No. 49-3.)  Paragraph 7-44(f) thus does not contain the content restrictions of DPOM 03-24.  DPOM 03-24

Nor does the existence of these rules mean that these new policies – which are far broader in scope, wholly alter quintessential aspects of the nature of Plaintiff's job, and restrict off-duty private speech – are mere "working conditions" under the CSRA. Defendants' argument that the policies are nothing new is belied not only by Plaintiff's statement that no similar review had previously been required, but by the allegations in the AC (undisputed by Defendants) describing meetings and emails introducing the faculty to the new regulation and the protocols for compliance with it. (*See* AC ¶¶ 57-80.) Defendant Berry's July 18, 2025 email to Plaintiff made plain that speech that conflicts "with applicable Presidential Executive Orders" will not be approved, and Defendants point to no previous regulation that prevented criticism of the administration or otherwise turned on the content of the proposed speech. (ECF No. 50 ("P's Mem.") at 15; *see* AC ¶ 98.) At the very least, these allegations, which Defendants do not deny, suggest the policy was a significant departure from prior standards regarding external engagements.

Instead, the plain meaning of "working conditions" and thus "personnel action," refers to things like salaries and assignments. *Cf. Tiltti*, 155 F.3d at 602 (reserving judgment on the CSRA's jurisdictional reach and finding speech relating to "working conditions" – "the nature of the work [employees] were assigned and their pay" – was speech relating to personal matters, rather than public concern, for First Amendment purposes). "Working conditions" could also encompass actions like the challenged memorandum in *Joseph v. Leavitt*, 386 F. Supp. 2d 487 (S.D.N.Y. 2005). In relevant part, that memo informally admonished the plaintiff, an employee

---

also refers to paragraph 7-44(f)(3), which requires those using a Defense Department affiliation "in an unofficial writing or speech" to include a disclaimer that the views expressed are not official policy or the government's position. A disclaimer, however, is not the same as a preapproval policy. And DPOM 03-24's reference to it suggests at the very least that the policies perform different functions. Otherwise, DPOM 03-24 would be wholly unnecessary.

of the Food and Drug Administration ("FDA"), for an email that he sent to his supervisor, copying the FDA Commissioner, complaining about his performance review.  *Id*. at 488-89.  The memo advised the plaintiff that "any future comments and/or complaints about the workplace should follow the chain of command" and that he "should not assume that [he] can indiscriminately forward e-mails directly" to the Commissioner.  *Id.* at 490.  Although the district court in *Joseph* did not expressly state that the challenged action was a "personnel action" under Chapter 23, its discussion implies as much, *see id.* at 493-94 ("The CSRA provides for an administrative procedure that [plaintiff] may use to pursue his claims of unconstitutional conduct.  Chapter 23 of the CSRA provides that an employee who alleges he or she was subjected to a 'prohibited personnel practice' may file a complaint with the [OSC].").[8]  *Joseph* would be far more apt here if Plaintiff were challenging some discipline that he faced because he circumvented the preapproval procedures pursuant DPOM 03-24 or shared his opinions in the classroom.  But unlike an informal admonition telling an employee how to pursue future workplace grievances, which limits only speech related to personnel actions and workplace disputes,[9] Plaintiff challenges policies that reach a vast amount of speech at work and affect his

---

[8] The Court is doubtful, however, that precedent supports the conclusion that the reprimand in *Joseph* really should be funneled through Chapter 23's procedures.  *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (letter of censure "does not even rise to the level of a minor adverse action under the CSRA").  A letter of reprimand from a supervisor may be so minor that even if the employee were to think it raised a constitutional worry, Congress could have intended to preclude judicial review of this type of after-the-fact employment admonition.  *See id.* at 934-35.  But implementation of the policies here cannot seriously be said to be more minor than the actions listed under Chapter 23, such that it is reasonable to infer congressional intent to preclude review.

[9] And again, even that type of directive might not be fairly said to be a working condition.  In *Firenze v. NLRB*, a blanket ban on "communicat[ing] *in any way* about any discipline" that an employee faced was found to "not come within the definition of a 'personnel action' under the statute."  2013 WL 639151, at *2, *8 (emphasis in original).  The plaintiff there could thus pursue his First Amendment claim without first seeking review by the OSC.  *Id.* at *8.

expression both in official and private capacities.  Such policies are therefore not "personnel action" in the same way the memo in *Joseph* could be.[10]

Accordingly, the plain meaning of the "working conditions" that constitute "personnel action" under the CSRA is simply not capacious enough to encompass DPOM 03-24 and the Classroom Directive.

The structure of 5 U.S.C. § 2302(a)(2)(A) also lends support to the conclusion that DPOM 03-24 and the Classroom Directive are not changes in "working conditions" and therefore not "personnel actions."  The phrase "working conditions" appears as a general catchall at the end of a longer list that makes up the "personnel action[s]" to which the CSRA applies, and the actions in that list support the conclusion that the phrase "working conditions" is narrower than Defendants would have it.  The *ejusdem generis* canon provides that "[w]here

---

Plaintiff's claim here is even stronger, as the challenged directives are not limited to commentary about workplace discipline, but constitute a total ban on sharing opinions in the classroom and require preapproval for all external engagements, lending support to the conclusion that their establishment is not a "personnel action."

[10] Defendants argue in their Reply, relying on *Joseph* and two other cases from this District, that all alleged constitutional violations that "arise[] out of" or are "wholly dependent" on a federal employment relationship are funneled into the CSRA's procedures.  (*See* Ds' Reply at 3-4.)  I disagree.  As previously noted, *Joseph* concerned a challenge to a minor reprimand that either would fall within Chapter 23 or be considered so trivial as to fall outside it.  The other two cases concerned actions for damages under *Bivens* – not, as here, actions seeking injunctive relief for an ongoing constitutional violation.  *See Hightower v. United States*, 205 F. Supp. 2d 146, 155 (S.D.N.Y. 2002); *Jarvis*, 1999 WL 187205, at *6-7.  Federal employees have generally been precluded from pursuing *Bivens* claims against their employers not because all actions that their employers take against them are necessarily "personnel actions," but because "the comprehensiveness of the CSRA's structure" was a "special factor[]" in the Supreme Court's *Bivens* jurisprudence that counseled "against the fashioning of a constitutional damage remedy in employment disputes involving federal workers."  *Jarvis*, 1999 WL 187205, at *6; *see Lucas*, 462 U.S. at 377-78.  This consideration – and the *dicta* that it spawned in subsequent lower court cases – is unique to the *Bivens* context, *see Semper*, 747 F.3d at 239, and does not affect the statutory interpretation analysis as to whether a policy affecting federal employees' speech is a change to a "working condition" and thus "personnel action."

general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545-46 (2015) (*Ejusdem generis* "ensure[s] that a general word will not render specific words meaningless."). "After defining Chapter 23's 'personnel actions' to include things such as appointments, promotions, and reassignments, Congress concluded the list by covering 'any other significant change in duties, responsibilities, or working conditions.'" *Feds for Med. Freedom*, 63 F.4th at 375. Because "[a]ll eleven of the personnel actions that precede [the catchall] are typical, everyday employment decisions to, say, promote or reassign a single employee," the Fifth Circuit held, and the Court agrees, that the catchall includes only "discrete employment decisions." *See id.* (finding vaccination mandate for federal employees was not "working condition"). Although DPOM 03-24 and the Classroom Directive may not be as far-reaching as the government-wide vaccine mandate at issue in *Feds for Medical Freedom*, they are not discrete employment decisions or typical workplace policies.

The Fourth Circuit in *NAIJ* came out the other way, based on the inclusion in the list of "the implementation or enforcement of any nondisclosure policy, form, or agreement," 5 U.S.C. § 2302(a)(2)(A)(xi); *see NAIJ*, 139 F.4th at 310, but *NAIJ* does not change my view. Even though a nondisclosure policy can affect more than one employee, that phrase cannot be read in a vacuum. The statute states that "'personnel action' means . . . (xi) the implementation or enforcement of any nondisclosure policy, form, or agreement . . . *with respect to an employee in, or applicant for, a covered position in an agency.*" 5 U.S.C. § 2302(a)(2)(A) (emphasis added). It thus refers not to the imposition of such a policy in general, which is what we have here, but to how it is applied to a particular employee.

Moreover, the policy at issue in *NAIJ* is at least closer to being a "working condition" than the policies Plaintiff challenges here.  In that case the Fourth Circuit considered a preapproval policy that applied when immigration judges ("IJ"s)  were "invited to participate in an event because of their official position [where they are] . . . expected to discuss agency policies, programs, or a subject matter that directly relates to their official duties or otherwise appear on behalf of the agency."  *NAIJ*, 139 F.4th at 300.  Examples of covered speaking engagements included "immigration conferences or similar events where the subject is immigration (including litigation), meetings with stakeholders, pro bono training related to immigration, and the [Executive Office for Immigration Review ("EOIR")] Model Hearing Program."  *Id.*  The IJ policy, however, did not cover what an IJ wrote when drafting an opinion in her official capacity or what she said from the bench.  The Fourth Circuit found that the policy was a working condition because seeking approval for speaking engagements or writing "broadly affects how immigration judges interact with their supervisors and the EOIR and governs what types of speaking or writing they may do within their official capacities," and "[a]n exchange with a supervisor about what an employee may say or write in an official capacity speech represents a typical exchange between supervisor and employee as to how an employee should represent her employer."  *Id.* at 310.

DPOM 03-24 and the Classroom Directive are far broader in their effect on USMA professors than the *NAIJ* policy is on IJs.  First, the *NAIJ* policy seems to be more closely cabined to situations in which the IJ is representing the agency in an official capacity.  Second, Plaintiff may have to interact with his supervisors under the Academic Engagement Policy, but it is not a "typical exchange between supervisor and employee," *id.*, for a professor to get pre-clearance for every paper or article or social media post that includes a reference to her academic

34

affiliation.  Likewise, a ban on a professor sharing any views on the subjects of her instruction in the classroom can hardly be said to be a typical workplace exchange between a university professor and student.  The Classroom Directive is akin to restricting what an IJ could say to counsel at argument and DPOM 03-24, at least as it applies to job-related scholarship, is akin to requiring approval for an IJ's draft opinion – both of which would go beyond the "typical exchange between supervisor and employee."  *Id.*  Consistent with *Elgin*, it is the nature of the policies at issue – here, their breadth and atypicality – not the constitutional nature of Plaintiff's challenge, that takes Plaintiff's claims outside the scope of the CSRA.  *See* 567 U.S. at 15.[11] Thus, even if the policy in *NAIJ* were a typical working condition along the lines of transfer, pay, discipline or the other actions set forth in the statute – a conclusion with which I respectfully disagree – that case would not apply here.  To the contrary, the list of eleven personnel actions in § 2302(a)(2)(A) preceding the phrase "working conditions" suggests that that catchall is not so broad as to include DPOM 03-24 and the Classroom Directive.

Finally, the CSRA's purpose would not be served by broadly interpreting "working conditions" to include those policies.  "A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil

---

[11] Further, while a nondisclosure policy "can altogether prohibit speech on certain topics," *NAIJ*, 139 F.4th at 310, such policies are typically far more circumscribed than the ones at issue here.  They usually contain a nexus to government-controlled information, (*see, e.g.*, USMA Reg. 150-4 ¶ 5-4(n) ("Academic freedom does not allow faculty members to publicly publish works containing official Department of Defense information or works directed by the Department of Defense or the Army until the works have been cleared for public release."), and do not restrict what an employee can say at work or what he can say in a personal capacity about non-confidential matters.  Restricting an employee's ability to share information that he learns on the job and that should be kept confidential so as not to impede his work is a "typical, everyday" condition of employment.  *See Feds for Med. Freedom*, 63 F.4th at 375.  The policies here cast a much wider net.

service system." *Fausto*, 484 U.S. at 444 (quoting S. Rep. No. 95-969, at 3 (1978)).  The CSRA instead was meant to be "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445.  Finding "working conditions" to encompass the policies at issue here would throw off that balance, given that the CSRA was meant only to "govern *personnel action* taken against members of the civil service." *Id.* (emphasis added). Treating these speech policies as personnel actions would risk sweeping every employer-employee interaction into the CSRA's reach and "strip jurisdiction over every claim any federal employee could ever bring." *Feds for Med. Freedom*, 63 F.4th at 374.  If that had been Congress's intent, it would have had no need to specify eleven discrete personnel actions in Chapter 23.  It also would saddle the MSPB and OSC with reviewing all agency policies that conceivably affect federal employees even when divorced from personnel actions. *See id.*  The MSPB may well be capable of considering some constitutional questions, but their expertise is "brought to bear" when those questions are "unique to the employment context." *Elgin*, 567 U.S. at 22-23.  Prior restraints (DPOM 03-24) and content-based restrictions on speech (the Classroom Directive) are in no way unique to the employment context. *See generally, e.g.*, *Lovell v. City of Griffin*, 303 U.S. 444 (1938) (city ordinance implementing licensing regime for distributing literature); *United States v. Alvarez*, 567 U.S. 709 (2012) (federal statute banning false statements regarding military honors).  Channeling all speech claims by federal employees into the OSC and MSPB even when no personnel action has resulted from the challenged policy would require these entities to adjudicate the constitutionality of federal policies outside the

context of prohibited personnel actions.  Doing so would threaten the balance that Congress struck when drafting the CSRA.[12]

Instead, the better interpretation of the statute is that DPOM 03-24 and the Classroom Directive are not "working conditions," but rather implicate "the unusual case in which the constitutional claim raises issues totally unrelated to the CSRA procedures."  *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990); *see Firenze*, 2013 WL 639151, at *8.

> b.     *Thunder Basin* Factors

Although not necessary to my analysis, *see Turner*, 502 F. Supp. 3d at 366-72 (not reaching *Thunder Basin* factors after determining CSRA does not cover challenged actions), the three factors set forth in the second half of the *Thunder Basin* test reinforce the conclusion that Congress did not mean to strip district court jurisdiction over Plaintiff's claims, *see Feds for Med. Freedom*, 63 F.4th at 379 (analysis of *Thunder Basin* factors not required where "CSRA's

---

[12] That Plaintiff's challenge need not be funneled into the CSRA review process is not inconsistent with *Lucas*, where the challenged personnel action was a retaliatory demotion because of the employee's speech and where the plaintiff sought money damages.  *See* 462 U.S. at 368, 381.  Although the plaintiff there was subject to the review scheme of a predecessor to the CSRA, the process for his claim was similar to that of the CSRA.  *See id.* at 386 (comparing the two regimes).  The Court "decline[d] to create a new substantive legal liability" in the form of nonstatutory damages, *id.* at 390, but at its core *Lucas* focused more on whether to extend *Bivens* actions to a new context than on whether the CSRA or its predecessor applied to the claim.  *See id.* at 388. ("The question is . . . whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.").  In fact, the CSRA surely would have applied because the plaintiff challenged a demotion.  *See id.* at 381-86.  But here Plaintiff does not challenge discipline or some other personnel action brought against him for violating the policy; he brings a pre-enforcement challenge to the policy itself, and seeks an injunction against its continuation, which is chilling his constitutional right to free speech.  The difference is not unlike the distinction the *Lucas* court itself drew when it noted with regard to the CSRA's text that "certain actions by supervisors against federal employees, such as wiretapping, warrantless searches, or uncompensated takings, would not be defined as 'personnel actions' within the statutory scheme."  *Id.* at 385 n.28.

text, structure, and purpose foreclose the Government's implicit-jurisdiction-stripping theory," but finding those factors confirm existence of jurisdiction).

i.      *Meaningful Judicial Review*

Preclusion of district court review "could," and in all likelihood would, "foreclose all meaningful judicial review" of Plaintiff's claim, *Thunder Basin*, 510 U.S. at 212-13, which "alone is arguably fatal to the Government's position," *Maryland v. U.S. Dep't of Agric.*, 770 F. Supp. 3d 779, 804-05 (D. Md. 2025), *extended by* No. 25-CV-748, 2025 WL 919507 (D. Md. Mar. 26, 2025); *see Chau*, 665 F. App'x at 70 (factor one is "most important" and "weighs strongly in the overall analysis").

"The first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review." *Axon Enter.*, 598 U.S. at 186. Yet if Plaintiff's claims were to be funneled into the CSRA's review scheme, his challenge could start and end at its first step, without any path forward for meaningful review. Plaintiff has not been subject to any action under Chapter 75, so the first – and potentially only – entity that would review his claim is the OSC, which alone would decide whether to bring the challenge to the MSPB. *See* 5 U.S.C. §§ 1212, 1214, 7512. The OSC has "total and unfettered discretion" to decide whether Plaintiff's claim can move forward, and if it decides against Plaintiff, he has no redress. *Feds for Med. Freedom*, 63 F.4th at 380; *Comey*, 2026 WL 1142679, at *10; *see Krafsur*, 736 F.3d at 1034. Even if Plaintiff's challenges are regarded as Chapter 23 personnel actions, courts have found that the CSRA's review processes for these types of claims fail the first *Thunder Basin* factor. *See, e.g.*, *Feds for Med. Freedom*, 63 F.4th at 379-80; *Comey*, 2026 WL 1142679, at *10. Thus, review of Plaintiff's claims pursuant to the CSRA's procedures

38

provides "no guarantee of judicial review – much less a meaningful one." *Feds for Med. Freedom*, 63 F.4th at 379-80; *see Dotson*, 398 F.3d at 164 n.3.

The mere possibility that Plaintiff's claim could reach the MSPB and thus the Federal Circuit is not enough.  Review before the MSPB creates a direct path to judicial review before the Federal Circuit, which the *Elgin* court found adequate under the first *Thunder Basin* factor even though the CSRA precluded district court review.  567 U.S. at 16-21.  But in *Elgin*, the employees were challenging under Chapter 75 the constitutionality of a statute in connection with their terminations, meaning the scheme guaranteed that the employees' complaints would reach the MSPB and the Federal Circuit.  *See id.*  No OSC decision would prevent that.  But a plaintiff with a claim that does not fall under Chapter 75 is at the mercy of the OSC.  The question is not whether Plaintiff's claim could potentially wriggle through the administrative review process to reach federal court; it is whether the review scheme itself as applied to Plaintiff's claim could potentially foreclose all meaningful judicial review.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490-91 (2010).  Whereas the answer in *Elgin* was clearly no, the answer here is clearly yes.  "[I]f [the OSC] declines to refer the case to the [MSPB], [Plaintiff] is out of luck."  *Krafsur*, 736 F.3d at 1034; *see Comey*, 2026 WL 1142679, at *10.  The only way Plaintiff could be sure to receive meaningful judicial review of his claims, not subject to the sole discretion of the OSC, would be to subject himself to a Chapter 75 disciplinary action.  (*See* P's Reply at 7.)  But as the Supreme Court has observed, "[w]e normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law, and we do not consider this a meaningful avenue of relief" under the *Thunder Basin* inquiry.  *Free Enter. Fund*, 561 U.S. at 490-91 (petitioners could not meaningfully obtain judicial review of challenge to accounting oversight board because statute provided for judicial

review only of SEC decision and not every board action results in SEC decision).  Accordingly, the CSRA's scheme undoubtedly could foreclose all meaningful judicial review of Plaintiff's claim.

The need for judicial review for Plaintiff's claim is particularly acute because he alleges ongoing, unremedied constitutional injuries.  In *Axon Enterprise, Inc. v. Federal Trade Commission*, the Supreme Court focused the analysis under the first *Thunder Basin* factor on "the interaction between the alleged injury and the timing of review," as well as whether claimants were suffering injuries that the administrative scheme might never remedy.  598 U.S. at 191-92.[13]  Here, Plaintiff seeks to enjoin the enforcement of two policies that he alleges have a daily, ongoing chilling effect on his speech.  Each time he foregoes opportunities to engage in speech as a result of these policies, he suffers a new and justiciable constitutional injury.  *See Weaver*, 87 F.3d at 1434.  Yet unlike an employee seeking backpay or reinstatement, he may never get those opportunities back and the harm would go unremedied absent meaningful review.

---

[13] The plaintiffs in *Axon Enterprise* were suffering a "here-and-now injury," sufficient to give them standing to challenge ongoing administrative proceedings collaterally, insofar as they alleged being "subject[ed] to an illegitimate proceeding, led by an illegitimate decisionmaker." *Id.* at 191.  Rather than providing an avenue for redress, the administrative regime was itself the harm, meaning that delayed judicial review would "come too late to be meaningful." *Id.*  A "here-and-now injury" like the one providing standing in *Axon Enterprise*, is distinct from the irreparable harm sufficient to warrant a preliminary injunction, and the former implicates only whether judicial review, but not necessarily judicial relief, is warranted.  *See Care One, LLC v. Nat'l Lab. Rels. Bd.*, 166 F.4th 335, 345 & n.6 (2d Cir. 2026).  But there is no reason such an injury could not, in the right circumstances, suffice for both.  Even if the presumption of judicial review "may not be quite as strong when the question is now-or-later instead of now-or-never," precedent "does not establish that the presumption lacks *any* force in the former context." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 45-46 (2000) (Thomas, J., dissenting) (emphasis in original); *see Mathews v. Eldridge*, 424 U.S. 319, 331 n.11 (1976) ("[T]he core principle that statutorily created finality requirements should, if possible, be construed so as not to cause . . . potentially irreparable injuries to be suffered remains applicable.").  Thus, while not precisely analogous to the claim in *Axon Enterprise*, Plaintiff likewise alleges an injury that would not be fully remedied even if after-the-fact review were guaranteed (which, as discussed in the text, it is not).

Coupled with the possibility that the OSC could prevent any further review of his challenge at its outset, it is indisputable that "a finding of preclusion could foreclose all meaningful judicial review" of Plaintiff's constitutional claim. *Thunder Basin*, 510 U.S. at 212-13.[14]

This conclusion is further buttressed by the Supreme Court's decision in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), where the Court addressed a challenge brought by certain federal employees to a statute preventing Executive Branch officials from receiving honoraria, *i.e.*, compensation for an article, speech or similar public appearance. *See* 513 U.S. at 459-61. It applied when the speech or article related to their official duties, or the payment was being made because of their status as government employees, as well as when their speech was wholly unrelated to their employment. *Id.* at 460-61, 473-74. The Supreme Court and lower courts did not address the applicability of the CSRA, and it does not appear that the employees challenged the policy through the CSRA's mechanisms or that they were subject to discipline under Chapter 75. *See Nat'l Treasury Emps. Union v. United States*, 788 F. Supp. 4, 6 (D.D.C. 1992) (district court suggesting plaintiffs only "face civil penalties and *possible* disciplinary action" if they continued to be paid for their speech) (emphasis added), *aff'd*, 990 F.2d 1271 (D.C. Cir. 1993), *aff'd in part, rev'd in part sub nom.*, *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995). Plaintiff contends that this silence constitutes an

---

[14] The Government's position is that even the most blatantly unconstitutional conditions – the hypothetical the Court posed at argument was a regulation saying that only white professors get offices and Black professors have to work out of their cars – would have to be endured while the aggrieved persons waited to see if OSC would move their case forward (with no obvious next step if it did not). The Court in *Thunder Basin* warned against "the serious constitutional question that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." *Thunder Basin*, 510 U.S. at 215 n.20. I regard as almost as serious the constitutional question that would arise if a statute were construed to prevent a court from remedying an ongoing constitutional deprivation (provided the requisites for preliminary relief were met) while the victim waited out an administrative process, let alone one that could easily be a dead end.

41

implied finding of jurisdiction, (*see* P's Reply at 6), and Defendants do not address the point in their papers.

Given that it is "axiomatic that federal courts may not decide cases over which they lack subject matter jurisdiction" and "if subject matter jurisdiction is lacking and no party has called the matter to the court's attention, the court has the duty to dismiss the action *sua sponte*," *Behrens v. JPMorgan Chase Bank, N.A.*, 96 F.4th 202, 208 (2d Cir. 2024), the Supreme Court's failure to discuss the CSRA, while not conclusive, suggests that it saw no jurisdictional problem. *NTEU* was decided roughly a year after the Supreme Court's decision on implied preclusion in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and the Court had already discussed the scope and effect of CSRA preclusion on multiple occasions, *see, e.g.*, *Fausto*, 484 U.S. at 455; *Lindahl v. Off. of Pers. Mgmt.*, 470 U.S. 768, 793-94 (1985).  It is unlikely that the Supreme Court ignored a recently litigated potential limitation on its own jurisdiction.  Nor does the subsequent decision in *Elgin* suggest that the *NTEU* Court lacked jurisdiction.  *Elgin* rejected an exception to the CSRA for constitutional challenges to CSRA-covered actions, *see* 567 U.S. at 10, 12. ("*[C]overed* employees appealing *covered* agency actions [must] proceed exclusively through the statutory review scheme.") (emphasis added), but it did not hold that *all* actions affecting a federal employee are a change in working conditions, *see Turner*, 502 F. Supp. 3d at 369.  Moreover, *Elgin* involved employees who had been fired, not employees whose speech was being chilled on an ongoing basis, and because the employees had been fired, under Chapter 75 they had an absolute right to a judicial forum if the MSPB rejected their claim, *see* 567 U.S. at 6-7, unlike Plaintiff here, who has no such right.  Thus, that the Supreme Court in *NTEU* entertained the pre-enforcement challenge "without a word about CSRA preclusion," *Feds for Med. Freedom*, 63 F.4th at 378-79, suggests that district court review of a speech policy similar

42

to the one at issue here – where no disciplinary action has been taken and no path to federal court is guaranteed – is permissible.[15]

Defendants' reliance on *Dotson* is misplaced.  There, the Second Circuit held that courts could not bypass the CSRA and afford aggrieved federal judicial employees supplemental judicial review when bringing actions in equity.  *See Dotson*, 398 F.3d at 182-83.  In *Dotson*, a judicial employee sought damages through a *Bivens* action and equitable relief in the form of reinstatement for his firing.  *See id.* at 159-61.  But the CSRA provided the employee no path for administrative or judicial review because, as a "non-preference-eligible excepted service employee[] of the judicial branch," he did not fall into one of the three categories into which "the CSRA meticulously categorizes the thousands of federal civil service employees."  *Id.* at 163-65; *see id.* at 167 (The lack of judicial review "was 'not an uninformative consequence of the limited scope of the CSRA, but rather manifestation of a considered congressional judgment that in certain contexts, certain federal employees should not have statutory entitlement to review for *adverse action of the type governed by Chapter 75*.'") (emphasis added) (quoting *Fausto*, 484 U.S. at 448-49).  Finding the plaintiff's exclusion from the CSRA intentional, the Second Circuit declined to afford the employee an equitable remedy.  *Id.* at 180-82.  But here, Plaintiff is not

---

[15] At oral argument, the Government contended that the court could not infer anything from the Supreme Court's silence on jurisdiction in *NTEU*.  While the Supreme Court does not consider itself bound "when questions of jurisdiction have been passed on in prior decisions *sub silentio*," *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974), and while lower courts should not infer that *sub silentio* assumptions of jurisdiction are precedential, *see Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 261 n.16 (2d Cir. 2021); *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 128 n.2 (2d Cir. 2016), that does not mean that a lower court is compelled to ignore the fact that the Justices apparently saw no jurisdictional issue at a time when such a problem, if it existed, would have been fresh in their minds.  Moreover, adopting Defendants' reading of *Elgin*, which is that the Supreme Court "held that the CSRA precludes facial constitutional challenges," (Ds' Mem. at 24 n.6), would similarly require relying on a *sub silentio* holding, given that *Elgin* does not "address pre-enforcement challenges at all," *Feds for Med. Freedom*, 63 F.4th at 379.

43

seeking damages through *Bivens* for a personnel action – such as termination – that otherwise would have fallen within the CSRA's scheme.  And although he is covered by the CSRA, his challenge is not to some minor adverse action for which Congress likely did not intend the CSRA to offer a remedy or judicial review.  *See Graham*, 358 F.3d at 934-35.  Instead, Plaintiff challenges policies that simply are not "personnel actions" under the CSRA.  *See Lucas*, 462 U.S. at 385 n.28 (distinguishing "suspensions for 14 days or less," for which there is no provision for appeal, from actions that are not "defined as 'personnel actions' within the statutory scheme").  *Doston* is also distinguishable because, as the Government conceded at oral argument, in concluding that Congress's decision to omit judiciary employees from the remedies of the CSRA was "deliberate and rational," 398 F.3d at 176, the Circuit focused on "the judiciary's own comprehensive procedures for review of adverse employment actions," *id.* at 171, which provided for "some opportunity for review by a judicial officer," *id*. at 176.  Similarly comprehensive processes culminating in judicial review are lacking here if the challenged policies are merely Chapter 23 personnel actions.  Congress is unlikely to have intended to leave unremedied an ongoing chilling of the First Amendment rights of someone who is still employed, and it would present a "serious constitutional question . . . if an agency statute were construed to preclude all judicial review of a constitutional claim."  *Thunder Basin*, 510 U.S. at 215 n.20.

Accordingly, the answer to the first *Thunder Basin* factor is emphatically yes, and that alone warrants a finding of district court jurisdiction.

ii.        <em>Wholly Collateral</em>

The second *Thunder Basin* factor asks whether the claims are "wholly collateral" to the statute's review provisions.  Again, the answer is yes.

44

Under this factor, courts are to consider "the nature of the claim," *Axon Enter.*, 598 U.S. at 194, and whether it is "the type of personnel action regularly adjudicated" within the CSRA's scheme, *Elgin*, 567 U.S. at 21-22.  In *Elgin* it was, because the plaintiffs' constitutional claims were the "vehicle" by which they sought remedies (reinstatement, back pay and attorney's fees) ordinarily awarded by the MSPB and Federal Circuit for the kinds of actions (removal) regularly addressed by those bodies.  *See id.*  In *Dotson*, the claim for damages through *Bivens* and the equitable claim for reinstatement were likewise connected to a firing.  *See* 398 F.3d at 165, 176. Here, in contrast, Plaintiff's claim is "wholly collateral" to the CSRA's review scheme because Plaintiff does not seek relief from some adverse employment decision of the sort that the CSRA review process ordinarily adjudicates and does not seek a remedy of the sort ordinarily awarded. His claim is not the CSRA's "standard fare," such as "employee misconduct, hostile work environments, whistleblowing, and the like," *Feds for Med. Freedom*, 63 F.4th at 381, and his requested remedy of an injunction against a prior restraint of speech is not like the backpay or reinstatement awarded for unlawful termination, discipline or similar employer decisions.  He seeks protection against an ongoing constitutional injury that is not related to any specific action taken against him at work.[16]  Nor is "the challenged agency action . . . taken pursuant to the very statute whose review scheme was invoked." *Comey*, 2026 WL 1142679, at *6.  The nature of Plaintiff's claim thus makes it "wholly collateral" to any relief typically adjudicated in the CSRA scheme.

Thus, this is not "the ordinary case of a failure to exhaust CSRA remedies, in which the employee would have no claim that she could file directly in federal court if isolated from her

---

[16] And no such action appears likely, given that the policies have chilled Plaintiff's speech.  (*See* AC ¶¶ 100-02; First Bakken Decl. ¶¶ 10-11, 28-32.)

claims for relief from a personnel action against her." *Weaver*, 87 F.3d at 1434. That is because, like the plaintiff in *Weaver*, Plaintiff launches "a simple pre-enforcement attack on a regulation restricting employee speech," and there is no reason to prevent him "from pursuing in federal court a constitutional claim that under First Amendment principles is as final, ripe and free from exhaustion difficulties as it need be." *Id.* Plaintiff's claim is "wholly collateral" because it falls into a "long line of cases [that] establishes that federal employees can bring facial, pre-enforcement actions against federal policies outside of the CSRA." *Feds for Med. Freedom*, 63 F.4th at 378-79 (collecting cases). The second *Thunder Basin* factor accordingly suggests that district court jurisdiction is not precluded.

iii.    *Agency Expertise*

Under the final *Thunder Basin* factor, a court must determine whether the claims are "outside the agency's expertise," 510 U.S. at 212. Again the answer is yes, because Plaintiff's challenge does not implicate issues within the OSC's and MSPB's wheelhouse under the CSRA.

Where an agency's subject matter expertise "could be brought to bear" on the claims at issue, factor three of the *Thunder Basin* inquiry militates in favor of preclusion. *See Elgin*, 567 U.S. at 23. Because the OSC and MSPB are charged with resolving workplace disputes, Plaintiff's First Amendment challenge falls outside its expertise. The OSC and MSPB are equipped to resolve employment issues, but "while the MSPB . . . and OSC know a good deal about unlawful dismissal of federal employees, they know nothing special about" prior restraints or content-based restrictions on speech. *Maryland*, 770 F. Supp. 3d at 805; *cf. Comey*, 2026 WL 1142679, at \*7 (describing MSPB as "Executive Branch agency with questionable competence to adjudicate a dispute with substantial constitutional stakes" in context of congressional intent at *Thunder Basin* step one). To be sure, the MSPB has in the past applied the *Pickering* First

Amendment balancing test when considering restrictions on government employee speech, but its expertise lies in doing so where the restriction is linked to some employment action, like a retaliatory suspension. *See Elgin*, 567 U.S. at 12 (citing *Smith v. Dep't of Transp.*, 106 M.S.P.R. 59, 78-79 (2007)). Plaintiff's claims are solely addressed to the constitutionality of DPOM 03-24 and the Classroom Directive, and would not require consideration of any adverse action against him in relation to the policies. (*See* AC ¶¶ 118-130; First Watts Decl. ¶ 26). As discussed in more detail below, the proper First Amendment lens through which to view Plaintiff's challenge is the heightened *NTEU* application of *Pickering*, but the Court located only one MSPB decision ever citing *NTEU* – and it did so for an unrelated proposition raised in the *NTEU* dissent. *See Special Couns. v. DeMeo*, 77 M.S.P.R. 158 (1997), *aff'd sub nom.*, *DeMeo v. Merit Sys. Prot. Bd.*, 230 F.3d 1372 (Fed. Cir. 1999). Accordingly, Plaintiff's claims fall outside the agencies' expertise.

Nor do Plaintiff's claims raise any "preliminary questions unique to the employment context [that] may obviate the need to address the constitutional challenge." *Elgin*, 567 U.S. at 22-23. In *Elgin*, the Supreme Court observed that even though the plaintiffs' claims raised constitutional questions, the MSPB, applying its expertise, could resolve a threshold question of employment law – whether the resignation of one of the plaintiffs amounted to a constructive discharge – that "would avoid the need to reach [the] constitutional claims." *Id.*; *see Tilton v. Sec. & Exch. Comm'n*, 824 F.3d 276, 289 (2d Cir. 2016) ("[A]n agency may bring its expertise to bear on a constitutional claim indirectly, by resolving accompanying, potentially dispositive issues in the same proceeding."). But here, Plaintiff's constitutional claims are the whole ballgame. There are no subsidiary issues that could resolve Plaintiff's pre-enforcement challenge without determining whether DPOM 03-24 and the Classroom Directive are

47

constitutional, and so the OSC and MSPB's expertise would contribute nothing to the inquiry, further indicating that Congress did not want such claims funneled to these bodies.

***

In sum, the Court has jurisdiction to review Plaintiff's claims. While the CSRA is intended to be exclusive where it applies, it is plain from the text, structure and purpose of the statute that Congress did not intend it to apply here – a conclusion reinforced by the fact that Plaintiff satisfies all three prongs of the second half of the *Thunder Basin* test, including the most important factor: the unavailability of judicial review. The CSRA created an intricate remedial scheme to channel many (but not all) issues that arise in the federal employment context into an administrative review scheme that, in certain cases, includes a path to judicial review. Some doubt has been raised over whether that system on a macro level is functioning independently and as Congress intended. But the Court need not take up that question because the application of the system to Plaintiff's challenge here would so clearly undermine the delicate balance Congress struck when enacting the CSRA. Neither the text, structure nor purpose of the CSRA support Defendants' assertion that the challenged policies are merely "working conditions" and thus "personnel actions" under Chapter 23. Adopting Defendants' position could foreclose all meaningful judicial review for many claims that are both wholly collateral to the CSRA's scheme and outside its agencies' expertise – not to mention allow an ongoing constitutional violation to persist while a claim wends its way through an administrative process that promises no judicial review at the end. "Congress cannot bar all remedies for enforcing federal constitutional rights." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986). Precluding district court review would implicate "the serious constitutional question" of

48

"deny[ing] a judicial forum for constitutional claims."  *Id.*  The Court will not deny such a forum today.

### B.    First Amendment

Having assured itself of jurisdiction to hear Plaintiff's challenge, the Court now turns to the merits of Plaintiff's claims and begins with his motion for a preliminary injunction.  Plaintiff seeks an order enjoining Defendants from enforcing DPOM 03-24 against him and the members of the putative class he seeks to represent – that is, civilian faculty at West Point, (*see* AC ¶ 109) – and enjoining Defendants from prohibiting or restraining Plaintiff from expressing or offering his opinions, beliefs or views to his students on the subjects he teaches.  (*See* ECF No. 47.)

### 1.    Preliminary Injunction

#### a.    Likelihood of Success on the Merits

Likelihood of success on the merits "is the dominant, if not the dispositive, factor" in deciding whether to grant a preliminary injunction in a First Amendment challenge.  *Volokh v. James*, 148 F.4th 71, 82 (2d Cir.), *certified question on other ground accepted*, 44 N.Y.3d 963 (2025).

#### i.    *First Amendment Principles*

Plaintiff's three claims implicate several areas of First Amendment precedent related to public employee speech:  the academic setting, prior restraints on publication and the military's ability to regulate speech.

It is well established that government employees retain First Amendment rights even upon accepting employment with the government.  *Latino Officers Ass'n, N.Y., Inc. v. City of N.Y.*, 196 F.3d 458, 462-63 (2d Cir. 1999).  "Under the First Amendment, '[the government] cannot condition public employment on a basis that infringes the employee's constitutionally

protected interest in freedom of expression.'" *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 200 (2d Cir. 2010) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).  "Speech by citizens on matters of public concern lies at the heart of the First Amendment," and when public employees speak as citizens on matters related to or learned through their public employment, their speech is even more valuable, given their "position to know what ails the agencies for which they work."  *Lane v. Franks*, 573 U.S. 228, 235-36 (2014).  At the same time, the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968).  Of particular concern is the government's interest in controlling its workplace, *Lane*, 573 U.S. at 236, and the government as a result may impose limits on public employees' speech "'that would be plainly unconstitutional if applied to the public at large,'" *Latino Officers Ass'n*, 196 F.3d at 463 (quoting *NTEU*, 513 U.S. at 465).

To address whether a restriction on government employee speech is constitutional, courts are "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  *Pickering* thus created a two-prong framework requiring courts to determine (1) whether the employee was speaking on a matter of public concern and (2) if so, whether the government's restriction on that speech is justified given its interest as an employer in promoting efficiency of public services when balanced against the employee's interest in commenting on matters of public concern.  *See Heim*, 81 F.4th at 223-24.  In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court narrowed the *Pickering* framework by precluding its application to employees' speech pursuant to their official duties, meaning "[o]nly where the speech at issue is

so-called 'citizen speech' does a court then proceed, under *Pickering*, to determining whether the speech addressed a matter of public concern and, if so, to balancing the relevant employee and employer interests." *Heim*, 81 F.4th at 224.  In *Lane v. Franks*, the Supreme Court further clarified that *Garcetti* did not eliminate protections for public employees' speech on subjects related to their employment but still outside the scope of their ordinary job duties.  *See* 573 U.S. at 238-240.

Still, the Supreme Court's precedent left open whether *Garcetti*'s limit on the application of *Pickering* when an employee speaks pursuant to official job duties applies "in the special context of academia." *Heim*, 81 F.4th at 224; *see Garcetti*, 547 U.S. at 425.  In *Heim v. Daniel*, the Second Circuit addressed that question directly and joined other circuits in holding that *Garcetti* does not apply to professors' speech related to scholarship or teaching.  *See Heim*, 81 F.4th at 225-26.  "[A]cademic freedom is a special concern of the First Amendment," *id.* at 225, and "a professor's academic speech is anything but speech by an ordinary government employee," *id.* at 227.  Accordingly, it would be inconsistent with First Amendment principles to apply *Garcetti* to a public university professor's teaching and academic writing, and in that context courts should bypass *Garcetti* and instead apply *Pickering*'s framework.  *Id.* at 227-28. In doing so, however, courts must consider not only a public employer's typical interest in efficiently providing public services but also "the countervailing First Amendment principles that propel a public university's own underlying mission," including "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 230.

Separately, it is also "well established that prior restraints constitute the most serious and the least tolerable infringement on our freedoms of speech and press." *Citizens United v.*

*Schneiderman*, 882 F.3d 374, 386 (2d Cir. 2018).  The Supreme Court has long noted that the

"main purpose" of the First Amendment at the time of its enactment was to prevent prior

restraints on speech.  *See, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556-59 (1976);

*Grosjean v. Am. Press Co.*, 297 U.S. 233, 245-48 (1936); *Near v. State of Minnesota ex rel.*

*Olson*, 283 U.S. 697, 713-14 (1931).  Whereas a criminal penalty or defamation lawsuit after

publication can "chill" speech due to the threat of sanctions, a prior restraint "freezes" speech, by

applying the "immediate and irreversible sanction" of the prohibition of the publication of

particular information or commentary before it occurs.  *Neb. Press Ass'n*, 427 U.S. at 559.

The Second Circuit has described two types of prior restraints:  "(1) preventing the

printed publication of disfavored information, and (2) a facially-neutral law that sets up an

administrative apparatus with the power and discretion to weed out disfavored expression before

it occurs." *Schneiderman*, 882 F.3d at 386-87.  These restrictions roughly correspond to facial

challenges for content-based restrictions on speech and facial overbreadth and vagueness

challenges, but "with the added element that the regulation prevents speech rather than merely

burdening it." *Id.* at 387.  As a result, any system of prior restraints carries with it a "a heavy

presumption against its constitutional validity." *Id.* at 386.  And an *ex ante* restriction on broad

categories of employee speech and affecting many employees requires the government employer

to meet a higher burden of justification than it would have for an *ex post* punishment of an

individual.  *Latino Officers Ass'n*, 196 F.3d at 463, 465.

The Supreme Court laid out the test for this higher burden in *NTEU* – the case concerning

government employees' ability to receive honoraria.  There, the Supreme Court held that with

respect to a restriction that "chills potential [employee] speech before it happens," as opposed to

an "isolated disciplinary action" after the fact, the government "must show that the interests of

both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *NTEU*, 513 U.S. at 468.  Moreover, "the government 'must do more than simply posit the existence of the disease sought to be cured.  It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" *Latino Officers Ass'n*, 196 F.3d at 463 (quoting *NTEU*, 513 U.S. at 475).

An as-applied challenge to a speech restriction is an "attack on a defined subset" of the applications of a statute or regulation.  *See United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010).  "In an as-applied challenge a court must assess whether a statute, even if constitutional on its face, deprived the individual to whom it was applied of a protected right." *United States v. Griffith*, 515 F. Supp. 3d 106, 118 (S.D.N.Y. 2021).  On the other hand, "[t]o mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep." *Antonyuk v. James*, 120 F.4th 941, 983 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025).  Put another way, "a facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Id.* at 999.[17]  Under the *NTEU* standard, however, the distinction between a facial

---

[17] In the First Amendment context, another type of facial challenge under the "overbreadth" doctrine employs a slightly different standard, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).  That doctrine, however, is not at issue here because it typically applies when a person seeks "to attack overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *New York v. Ferber*, 458 U.S. 747, 769 (1982); *see United States v. Hansen*, 599 U.S. 762, 769 (2023) ("[T]he overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be

and as-applied challenge "is largely elided." *Sanjour*, 56 F.3d at 92; *see Harman v. City of N.Y.*, 140 F.3d 111, 118 (2d Cir. 1998) (calling the distinction "unimportant"). But in applying the test in *NTEU*, the Supreme Court still recognized that the application of a challenged scheme to one set of employees might "present[] a different constitutional question" than in its application to a different set. 513 U.S. at 478; *see Sanjour*, 56 F.3d at 93 ("[W]hile analyzing this broad category of speech requires that we look beyond the particular facts of the appellants' case, we cannot go so far as to include every possible application of the challenged scheme."). Where the government's interest must be balanced against the interests of potential audiences and numerous employees in a broad range of speech, by definition the inquiry cannot be based on the circumstances of the single plaintiff-employee, but it could well be based on the circumstances of a particular group of employees. "The most accurate characterization of [a] challenge" to such a speech restriction "may therefore be . . . that it is an as applied challenge to a broad category of" speech. *Sanjour*, 56 F.3d at 93.

Finally, speech by military personnel and on military bases is subject to an additional line of precedent. The Supreme Court held in *Parker v. Levy*, 417 U.S. 733 (1974), that although military personnel are public employees with First Amendment protections, they are subject to "a different application" of those protections in light of the different character of military service compared to civilian society. *Id.* at 758. "The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Id.* The Supreme Court further held in *Greer v. Spock* that a regulation on a military base that prohibited the distribution of political

---

lawfully applied."); *Sanjour v. EPA*, 56 F.3d 85, 92 n.10 (D.C. Cir. 1995) (describing an overbreadth challenge as an "exception to traditional standing requirements").

campaign literature that the commander found to "constitute a clear danger to (military) loyalty, discipline, or morale" was permissible.  424 U.S. 828, 840 (1976).  The majority noted that it was "the business of a military installation . . . to train soldiers, not to provide a public forum" for speech, *id.* at 838, and in his concurrence Justice Powell observed that the regulation was "responsive to the unique need of the military to insist upon a respect for duty and a discipline without counterpart in civilian life," *id.* at 848 (Powell, J., concurring).[18]  Applying these cases and others, the Second Circuit has similarly noted that review of military regulations is generally deferential, in light of the "long-recognized distinctive conditions of military life."  *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 283 (2d Cir. 1997); *see Able v. United States*, 155 F.3d 628, 633-34 (2d Cir. 1998) ("[W]hile we are not free to disregard the Constitution in the military context, we owe great deference to Congress in military matters.").

ii.      *DPOM 03-24*

Applying the above principles to Plaintiff's claims related to DPOM 03-24, the Court finds Plaintiff is likely to succeed on the merits of his First Amendment challenge.  Regardless of whether Plaintiff is speaking "on duty" or "off duty," the *Pickering* framework applies; Plaintiff's speech addresses matters of public concern; the regulation must survive the heightened *NTEU* standard; and even affording Defendants due deference in the realm of military affairs, their stated justifications for the Academic Engagement Policy do not warrant such a broad and standardless intrusion on Plaintiff's speech and that of other USMA civilian faculty members.

---

[18] Central to *Greer*'s holding is the Supreme Court's "public forum" analysis under the First Amendment, which the parties do not argue is applicable here.

55

As an initial matter, under *Heim* courts are to apply *Pickering* directly, and bypass *Garcetti*'s inquiry into whether an employee is speaking pursuant to their official duties, when addressing challenges to restrictions on public university professors' speech rights.  *See* 81 F.4th at 227-28.  The Academic Engagement Policy concerns any of Plaintiff's external engagements using his USMA affiliation – whether they be "on duty" scholarly writings and conference attendance that are part of his job as an Academy professor or "off duty" media interviews and postings that he chooses to undertake on his own time – as long as the subject is within his "disciplinary areas of expertise."  (DPOM 03-24 ¶ 4(b); *see* AC ¶¶ 118-27.)  Thus, regardless of whether Plaintiff is addressing a legal issue in order to meet the evaluation standards for USMA faculty or simply because he finds the topic interesting, and regardless of whether he is speaking to an academic conference or a member of the media or social media users – in other words, regardless of whether the speech is "on duty" or "off duty" – the policy always affects a USMA "professor's academic speech," and thus *Pickering* applies.  *See Heim*, 81 F.4th at 227-28.[19]

(a)     Matter of Public Concern

Plaintiff's challenge to DPOM 03-24 easily meets the first *Pickering* prong because his external engagements subject to the policy constitute speech on matters of public concern – meaning speech that "can be fairly considered as relating to any matter of political, social, or other concern to the community, or . . . a subject of legitimate news interest; that is, a subject of

---

[19] As the Second Circuit explained, while "professors at public universities are paid – if perhaps not exclusively, then predominantly – to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines," applying "*Garcetti*'s bar on First Amendment protection for any 'official-duty' speech would . . . have the [impermissible] effect of exiling all public-university faculty scholarship and instruction from the shelter of the First Amendment."  *Heim*, 81 F.4th at 226-27.

general interest and of value and concern to the public." *Lane*, 573 U.S. at 241.  Although not all academic scholarship will necessarily be considered speech on a matter of public concern, academic writing and research typically meets this standard because "the entire premise powering academic freedom is that the advancement of the arts and sciences is of long-term value to society." *Heim*, 81 F.4th at 229.  Plaintiff, a USMA professor of law, has written or spoken on a wide range of legal topics and has also foregone certain speaking engagements as a result of DPOM 03-24, such as commenting on academic freedom at colleges and universities, ethical considerations for prosecutors and the legality of certain U.S. military actions.  (First Bakken Decl. ¶¶ 6, 11.)  These issues are "paradigmatic matter[s] of public concern." *Heim*, 81 F.4th at 229.  Plaintiff's upcoming book on decision-making, which draws on Plaintiff's experiences at West Point and at times criticizes the Academy, is of a similar vein.  (*See* First Bakken Decl. ¶ 7; Second Bakken Decl. ¶ 5; AC ¶ 101.)  This sort of speech by public employees relating to their employment is particularly valuable.  *Lane*, 573 U.S. at 236.  Plaintiff therefore satisfies the first part of the *Pickering* test because his speech at issue is on matters of public concern.

(b)    <u>Balancing Test</u>

The Court turns next to balancing the government's interest as an employer in implementing DPOM 03-24 against Plaintiff's interest, but notes first that when applying *Pickering*, the regulation is subject to the higher standard laid out in *NTEU*, in which the interest of potential audiences must also be considered.  As noted above, that higher standard applies where the challenged action is a restriction on speech imposed in advance rather than a punishment imposed afterwards.  *See Latino Officers Ass'n*, 196 F.3d at 463.  That is true even if the policy affects a smaller group of government employees than the more than one million federal employees subject to the sweeping policy at issue in *NTEU*.  *Id.* at 464.  DPOM 03-24 is

57

exactly the type of *ex ante* restriction on speech that warrants the higher standard because it is "a generally applicable" policy that is a "wholesale deterrent to a broad category of expression." *Id.* at 463-64. Under DPOM 03-24, faculty who want to speak or write on their subject matter expertise to an external audience (the broad category of expression) must first get approval before the speech occurs (the *ex ante*, generally applicable restriction). And Defendant Berry's July 18, 2025 email essentially states that speech that conflicts with, among other things, Executive Orders, or speech that reflects opinions about current events, will not be approved if the speaker's USMA affiliation will be mentioned. (*See* AC ¶ 80; ECF No. 49-3.)

### (i)        Interest of Employees and Audience

Under *NTEU*, the government must show that the restriction on speech is justified because its impact on governmental operations outweighs "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression." 513 U.S. at 468. Plaintiff's interest in his speech as an academic is great in large part for the same reasons that make it speech on a matter of public concern, *see Sweezy*, 354 U.S. at 250; *Heim*, 81 F.4th at 230, and he seeks to engage in it "without first obtaining prior approval from the Defendants of the content of [his] contemplated speech or writing," (First Bakken Decl. ¶ 6). Plaintiff also notes his interest in being able to use his USMA affiliation as a means of demonstrating credibility and expertise when undertaking external engagements in his academic discipline. (P's Mem. at 24.) *See Latino Officers Ass'n*, 196 F.3d at 466 (rejecting government argument that employees could communicate same message or do so as effectively without using government employee affiliation). Compliance with DPOM 03-24 has caused Plaintiff to forego speaking opportunities that he would otherwise have pursued because of concerns that his request would be denied or that he would be punished for the speech. (First Bakken Decl. ¶¶ 11-13.) Plaintiff further has material interests in his expression, such as being

58

able to publish and earn from his upcoming book and his ability to gain promotions and salary increases. (AC ¶¶ 88-89.) None of these interests or concerns are unique to Plaintiff as compared to fellow USMA faculty, who are the "present and future employees" with interests "in a broad range of present and future expression." *NTEU*, 513 U.S. at 468. The interest of present and future employees is thus substantial.

Moreover, the interest of "potential audiences" is great, given that Plaintiff seeks through his academic external engagements to engage in speech on matters of public concern. *Id.*; *see Sweezy*, 354 U.S. at 250 ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."); *Heim*, 81 F.4th at 229 ("[W]e would be hard-pressed to declare that the speech [on scholarly debates in a wide range of fields] does not relate to any matter of political, social, or other concern to the community."). Moreover, Plaintiff's upcoming book, which includes criticisms of the U.S. military and West Point, (AC ¶ 101; Second Bakken Decl. ¶ 5), would seem to have "special value" for its audience because it is "speech by public employees on subject matter related to their employment," *Lane*, 573 U.S. at 240. To that end, the public also has an interest in knowing Plaintiff's affiliation with the USMA when he speaks on matters within his subject matter expertise, in order to assess his credibility as a commentator on matters of public concern. (First Bakken Decl. ¶ 12.) The balance on Plaintiff's side of the *Pickering*/*NTEU* scale therefore weighs heavily.

(ii)      <em>Government's Interest</em>

Turning to Defendants' interest as both employer and university, Defendants note, and it cannot seriously be disputed, that West Point has a "unique status as a higher education institution responsible for preparing the future leaders of the Army" and a "role in the country's national security." (Ds' Mem. at 22.) In turn Defendants argue that the Court should defer to

59

"the professional judgment of military authorities on particular military interests." (*Id.* at 20.) DPOM 03-24 is necessary, Defendants say, to standardize how USMA faculty engage with external audiences and prevent the risk of "a faculty member using the imprimatur of West Point in engagements when such speech has the potential to be viewed as containing messaging unapproved by" the Department of Defense, the Army or West Point. (*Id.* at 21-22.) Moreover, Defendants argue, the policy: (1) ensures compliance with other Defense Department and Army rules; (2) provides USMA leadership notice of when faculty are speaking using their USMA affiliation so USMA can recognize and call attention to its professors' academic excellence; (3) allows senior Academy officials to be prepared for follow-up questions if a professor is speaking without a disclaimer; and (4) "delineate[s] the correct line" between external communications using a West Point affiliation and other external communications that do not use that affiliation. (First Watts Decl. ¶ 25.)

None of these arguments is persuasive and they do not tip the balance in Defendants' favor. At the outset, the Court notes that the deference courts have given the military in the cases cited by Defendants concern different contexts, such as military discipline, *see, e.g.*, *Parker*, 417 U.S. at 758-61; congressional determinations implicating its power to raise and support a military, *see, e.g.*, *Rostker v. Goldberg*, 453 U.S. 57, 64-67 (1981); *Able*, 155 F.3d at 633-36; decisions concerning military training exercises or uniforms, *see, e.g.*, *Winter*, 555 U.S. at 24-26; *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986); or the President's actions as Commander-in-Chief, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring). Deference is due where a case involves "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force, which are essentially *professional military judgments*." *Winter*, 555 U.S. at 24 (emphasis added).

Plaintiff's challenge to DPOM 03-24 is different from the typical cases where deference has been afforded because it does not turn on military judgment. DPOM 03-24 is an academic policy that applies to military and civilian professors alike and regardless of whether the affected speech concerns subjects such as military history or warfare tactics, or English or mathematics. And Plaintiff seeks to enjoin enforcement against only himself and other civilian faculty members, not active-duty faculty. (ECF No. 47.) Additionally, DPOM 03-24 cannot seriously be said to influence actual military operations in the field or even the training for military operations that might occur at West Point. The connection between the speech of educators of cadets and any effect on military operations is far more attenuated than in the contexts where great deference has been shown to military judgments.[20] Defendants attempt to link DPOM 03-24 and military readiness in that DPOM 03-24 affects Defendants' ability to know when professors are engaging external audiences in their fields of expertise, which in turn allows the Academy to "leverage" its faculty's work and highlight it to the benefit of West Point, in turn affecting the Academy's ability to "compet[e] for talent," further leading to "a higher caliber of cadet and consequently, a higher caliber of U.S. Army officer." (First Watts Decl. ¶ 25.) The mere recitation of this chain of inferences demonstrates its weakness. A court need not defer to mere conjecture and speculation, even when matters of military readiness could be implicated. *See Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1305 (2022) (Alito, J., dissenting); *see also NTEU*, 513 U.S. at 475 ("Fear of serious injury cannot alone justify suppression of free speech

---

[20] DPOM 03-24 also differs from USMA admissions policies, which were afforded some deference by another court in this District in light of their potential effect on the makeup of the Army's officer corps. *See Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 134-35 & n.11 (S.D.N.Y. 2024), *appeal withdrawn*, No. 24-40, 2024 WL 1494896 (2d Cir. Feb. 13, 2024). But even there, the court noted that deference was to be considered alongside the "strict scrutiny rubric" of an Equal Protection Clause challenge. *See id.* at 134 & n.11 ("The ultimate determination of how deference operates here remains uncertain.").

and assembly."). Thus, although the Court affords some deference to the Government's interest, it does not weigh as heavily as it would if the issue had a more plausible connection to military operations.

Under the *NTEU* standard, the government must do more than articulate interests in support of an *ex ante* limit on employee speech: it "must demonstrate that the recited harms are real" and that the restriction "will in fact alleviate these harms in a direct and material way." 513 U.S. at 475; *see Harman*, 140 F.3d at 123. The Government's arguments on both prongs are weak. Defendants submit Defendant Watts's first declaration to support their argument that the policy alleviates real harms, but Watts's statements in large part describe the Academy at a general level and discuss policies other than DPOM 03-24. (*See* First Watts Decl. ¶¶ 7-16, 19-24.) Further, Watts does not claim to have been involved in the drafting of the Academic Engagement Policy, does not say when consideration of it began or why it was apparently deemed necessary less than three weeks after the issuance of EO 14185, does not state how it was developed or who participated, and does not purport to describe what in fact motivated those individuals in enacting it.[21] Moreover, while Watts says "internal West Point regulations and policies" accomplish the four previously mentioned effects, (*see id.* ¶ 25), she does not say that that was in fact why DPOM 03-24 was enacted, provide evidence of how these effects alleviated real harms to West Point, or describe which harms the policy specifically was necessary to alleviate.

On the issue of actual harm, for example, Watts says several policies collectively "achieve compliance with mandatory" Defense Department and Army regulations, (*id.* ¶ 25), but

---

[21] Nor do Defendants dispute, or even address, the allegations in Plaintiff's complaint that DPOM 03-24 was promulgated to show compliance with EO 14185 and/or as a way to insulate senior West Point leadership from criticism by the Trump administration. (*See* AC ¶¶ 64-65.)

Defendants do not claim that DPOM 03-24 had anything to do with any preexisting violations of policy, nor do they suggest how issuing a duplicative policy would make enforcement any easier or otherwise ameliorate any such alleged harm.  Watts also says the policies give USMA leadership notice of scholarship worth highlighting that in turn allows it to compete for talent and produce better results for cadets, (*id.*), but nowhere in the record is there an allegation that West Point deans or department heads were struggling to highlight their faculty's work or retain high quality professors before DPOM 03-24 was enacted.  Further, Watts says that the policies allow senior Academy officials to "be prepared for follow-up questions or concerns by the American public or by governmental leaders," if a professor were perceived to be speaking on West Point's behalf because she did not utilize a disclaimer, (*id.*), but again, Defendants cite no examples of USMA personnel being unprepared for such questions or any confusion as to whether a professor spoke in an official or personal capacity.  Finally, Watts says the policies "delineate the correct line between a professor's external communications using his or her West Point affiliation, and those unscrutinized, external communications that can occur without using any West Point affiliation."  (*Id.*)  This statement fails to identify a harm to West Point and does not actually describe a goal, just the effect of the policy itself in creating the line between the external engagements subject to DPOM 03-24 and those not subject to it.

Watts's first declaration – which focuses on what the policies "allow" rather than on what they were designed to achieve – appears to be more a reverse-engineered justification for the policy than a serious attempt to either explain the true motivations for it or to connect it to genuine military needs.  It does little to undermine Plaintiff's evidence that the regulation is an attempt, in compliance with EO 14185, to force Plaintiff and other faculty to conform their speech to the President's views.  (*See* AC ¶¶ 45-49, 64-65; First Bakken Decl. ¶¶ 11, 13-21, 23-

24.)  The declaration does not describe any harm that would result from a professor expressing a view, for example, decrying that America's founding documents allowed the enslavement of Black people or gave the vote only to men.  It does not explain why the education of cadets would suffer if a professor were, for example, to opine, internally or externally, that Jesus Christ (or Mohammed or the Buddha) was the greatest force for good in human history or that transgender troops are no less capable of serving in the military than their cisgender counterparts.  Indeed, the ability to engage in serious and respectful discussion of topics as to which reasonable minds may differ strikes the Court as a skill necessary for effective military decision-making and leadership.  *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection.").  The purported benefits of the regulation set out in the First Watts Declaration appear to be a pretext for an effort to channel speech to conform to the President's liking and to prevent dissenting views from entering the marketplace of ideas.

It is also unclear how the purported effects to which Watts points relate to what Defendants call West Point's "unique status as a higher education institution responsible for preparing the future leaders of the Army."  (Ds' Mem. at 22.)  Defendants seize on *Heim*'s instruction that courts are to consider a "university's own underlying mission" when conducting the *Pickering* balancing in the academic context.  (*Id.* at 19 (quoting *Heim*, 81 F.4th at 230), 22.)  Ensuring compliance with existing rules, having notice of employees' external statements, achieving consistency of messaging and providing clarity to employees are neither unique to the public university setting generally nor to West Point specifically.  *See, e.g.*, *Latino Officers Ass'n*, 196 F.3d at 468 (rejecting argument that government preapproval policy was necessary to

64

prevent public from thinking employees are speaking on agency's behalf); *Harman*, 140 F.3d at 124 (rejecting argument that government preapproval policy was necessary to ensure employees had additional information about agency policies before speaking with press).  Moreover, the interests that *Heim* considered when discussing a university's underlying mission related to collaboration between academic departments and the standards used to assess scholarship.  *See* 81 F.4th at 231-32.  DPOM 03-24 does not implicate the former, and Defendants' submissions suggest that the latter is implicated only to the extent that it allows West Point to "call[] attention to" and "recogniz[e] excellence" in scholarship, (First Watts Decl. ¶ 25), not that DPOM 03-24 is itself a means of ensuring West Point faculty adhere to "the standard that [the Academy] expect[s] for tenure" or "make judgments informed by [USMA leadership's] own scholarly views[] when making academic appointments," *Heim*, 81 F.4th at 232, 234.[22]

Further, even assuming that the alleged harms were real and affect West Point in its military role, Defendants still fail to show DPOM 03-24 will "direct[ly] and material[ly]" alleviate those harms.  *NTEU*, 513 U.S. at 475.  First, Watts identifies "internal West Point regulations and policies" as achieving the four specified effects but neither explains how DPOM 03-24 independently achieves those goals nor claims that they could not be achieved without DPOM 03-24.  (*See* First Watts Decl. ¶ 25.)  Further, DPOM 03-24 is ill-suited to achieve these stated goals, and both overinclusive and underinclusive of speech.  *See NTEU*, 513 U.S. 470-77 (analyzing fit of disputed regulation to achieve stated government interests); *Latino Officers*

---

[22] Moreover, in *Heim*, unlike here, there was no indication of "a pretextual veil to obscure discrimination, or a cudgel to stamp out controversial or dissenting viewpoints, or some other mechanism to advance the views of non-academic public officials."  81 F.4th at 233.  Plaintiff has alleged, and Defendants' submissions do not directly dispute, that DPOM 03-24 was motivated by concerns about compliance with the current administration's directive as to what service academy professors are to teach.  (*See* AC ¶¶ 45-49, 64-65.)

*Ass'n*, 196 F.3d at 468 (even if employer could have banned conduct altogether, it could not allow it for approved employee groups but not others); *Harman*, 140 F.3d at 124 (holding "blanket approval process" for government employee speech invalid because it was overinclusive). To achieve compliance with mandatory Defense Department and Army rules, West Point can enforce those rules, rather than promulgate a new policy that restricts more speech. For example, the Department of Defense and West Point have existing policies concerning the preclearance requirements for release of official information on behalf of the Academy or the use of USMA social media accounts. (*See, e.g.*, First Watts Decl. ¶¶ 15, 20.) Creating a new rule to require adherence to existing rules can hardly be said to "directly and materially" advance a Government interest.

Second, as to alerting West Point leadership of scholarship worth highlighting, DPOM 03-24 drastically overburdens speech, given that West Point could ask faculty to alert their supervisors of their published scholarship – rather than review or approve it before it is published.[23] Defendants provide no argument as to how a regulation mandating approval of the

---

[23] Defendants argue that DPOM 03-24 is similar to the prepublication review process that the D.C. Circuit approved in *Weaver v. U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996). (Ds' Mem. at 24.) In that case the government stipulated that the disputed preapproval process did not "authorize any form of punishment for publication of material disapproved by the agency, so long as it was submitted for review beforehand," despite language in the disputed regulation suggesting otherwise. 87 F.3d at 1435. Because the policy "require[d] only that employees submit to a process of prepublication review" and "[n]o speech [wa]s forbidden," the D.C. Circuit held that it survived under *Pickering* and *NTEU*. *Id.* at 1440. Defendants argue in their opening submission that DPOM 03-24 similarly "does not prohibit speech, but instead establishes a process for reviewing speaking engagement or publication requests consistent with ethical and professional obligations." (Ds' Mem. at 24.) This argument, however, is belied by Defendants' argument in their reply submission that "[DPOM 03-24] only prohibits speech that could be attributed to West Point or [the Defense Department]," (Ds' Reply at 8), by Defendant Berry's email stating what sort of content would or would not be approved, (AC ¶ 80; ECF No. 49-3), by Defendants' counsel's statements at oral argument that mere notice would be insufficient for the Academy, and by examples Plaintiff provides of other professors being

---

content of speech alleviates the claimed harm of being allegedly unprepared to trumpet its

faculty's achievements.  Plaintiff does not object to providing notice in advance of external

speech, (P's Reply at 19), and the additional requirement in DPOM 03-24 that the content of the

speech meet a supervisor's approval does nothing to address the harm from allegedly being

unaware in advance of a faculty member's appearance or writing.

Third, and likewise, notice rather than content approval would ensure that USMA

leadership would be prepared to answer questions by the public or government.  For one thing,

DPOM 03-24 is underinclusive in that it only applies to USMA faculty external engagements in

their areas of expertise using USMA affiliation.  For example, if Plaintiff, a law professor,

wanted to publish an article criticizing the effectiveness of the USMA's physical training

procedures while still identifying himself as West Point faculty, or if an engineering professor

---

punished for not complying with the Academic Engagement Policy, (First Bakken Decl. ¶¶ 13-21).

Defendants also argue that DPOM 03-24 reflects a proper balance of the interests at hand because the policy "in no way prohibits civilian faculty like Plaintiff from speaking or publishing in his personal capacity" and "comes into effect only where Plaintiff seeks to use his West Point affiliation." (Ds' Mem. at 24.)  The Second Circuit rejected a similar argument in *Latino Officers Association*, which concerned a New York Police Department policy that allowed only recognized groups of officers to march in parades in uniform.  *See* 196 F.3d at 461.  The City argued that the officers "could communicate the same message – or that they could communicate their message as effectively – without wearing their police uniforms," but the Second Circuit observed that wearing a uniform "has a unique expressive quality." *Id.* at 466.  Here, the Court agrees with Plaintiff that identifying himself as a USMA professor gives him "significant credibility" when speaking on matters within his subject matter expertise. (P's Mem. at 24.)  As discussed, that also affects the interests of the potential audiences of Plaintiff's speech, whom I must consider when balancing the competing interests at play.  *See NTEU*, 513 U.S. at 468.  There is value to the public in knowing that when Plaintiff comments on issues concerning criminal and constitutional law – and even when he criticizes the Academy – he does so as a West Point professor.  *See Lane*, 573 U.S. at 240.  Defendants fail to show how their purported interests outweigh Plaintiff's and the public's on this point, and provide no explanation as to why prior approval of the content of the speech would do anything to enlighten the audience about the capacity of the speaker.

wanted to give an interview to the media questioning the legality of military actions while being similarly identified, DPOM 03-24 would not require prior approval because those matters do not concern the professors' areas of expertise.  Yet Defendants do not explain why they would not need to be equally prepared for follow-up questions from the public or government leaders on these external engagements.  Further, as with the previous alleged goal, Defendants provide no argument as to how a regulation mandating approval of the content of speech alleviates the alleged harm of being unprepared to respond to its faculty's statements.

Moreover, Watts's first affidavit identifies another, less burdensome way it could alleviate this identified risk:  by requiring a disclaimer that a faculty member is not speaking on behalf of West Point.  (*See* First Watts Decl. ¶ 25.)  *See All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 270 (S.D.N.Y. 2006) ("The burden of providing disclaimers would be inordinately less restrictive than an indefinite ban on certain types of speech."), *aff'd*, 651 F.3d 218 (2d Cir. 2011), *aff'd sub nom.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013); *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 696 (D.C. Cir. 2010) ("[T]he [Supreme] Court has approvingly noted that disclosure is a less restrictive alternative to more comprehensive regulations of speech.").  Indeed, Department of Defense and Army regulations already require that an employee who uses his affiliation in connection with teaching, speaking, or writing must make a disclaimer if the subject relates to the employee's agency and the employee is not speaking as an authorized representative thereof. 5 C.F.R. § 3601.105 (2023); Army Regulation 360-1 ¶ 7-44(f)(3).  Plaintiff has no objection to a disclaimer requirement.  (P's Reply at 19.)  DPOM 03-24, however, requires prior approval of

68

the content of the speech even where a disclaimer is used as required under existing regulations. (*See* DPOM 03-24 ¶¶ 4.b, 4.d).[24]

Finally, to "delineate the correct line between" speech that needs prior approval while using a USMA affiliation and speech that does not, DPOM 03-24 is not only unnecessary but also woefully inadequate, given that the policy itself and USMA leadership's explanation of its application provide no objective standard that would allow faculty to know what types of external engagements will be approved.  In other words, DPOM 03-24 does not delineate that line.  Outside of the *Pickering*/*NTEU* context, the Supreme Court has stated that to be constitutional, a preapproval policy "must contain narrow, objective, and definite standards to guide the licensing authority" and that the decision about what speech can occur cannot be "left to the whim of the administrator."  *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131-33 (1992); *see Schneiderman*, 882 F.3d at 387-88; *see also Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 103 (2d Cir. 2007) (although narrow, objective and definite standards are required, courts "do not require perfect clarity and precise guidance").  On its face, DPOM 03-24 requires preapproval for external engagements, but it does not explain which

_____

[24] The Government at oral argument stated that a disclaimer, or mere notice, would be insufficient to alleviate the harms the Academy could face absent DPOM 03-24.  For example, it argued, a speech by a professor could be posted online with the disclaimer edited out, leading the audience to believe the professor's views were those of the Academy.  But it has provided no evidence that any such thing has happened, or that – in this day and age, when almost anything can be falsified – the fear of such conduct outweighs the value of the speech at issue.  The Government also contended that notice was insufficient because the Academy has an interest in its messaging being portrayed accurately.  But existing regulations provide for preapproval when a speaker communicates officially on behalf of West Point, *see, e.g.*, Army Regulation 360-1 ¶ 7-44(a); (USMA Reg. 150-4¶ 5-4(n)), and again Defendants provide no evidence that the public has been mistaking professors' external speech as official Academy policy.  Indeed, it is difficult to see how the kind of speech Defendants seek to control – communications that criticize or conflict with official policy – could be construed by listeners as the Government's view.  Defendants' assertions simply identify speculative fears, not real harms, to which the Court need not defer without more.

engagements will be approved.  (*See* DPOM 03-24.)  The March 5, 2025 email to the Law and

Philosophy Department faculty describing how Defendant Williams had delegated approval

authority but not disapproval authority similarly contains no standards.  (*See* AC ¶¶ 71-72.)

Defendant Berry's email to Plaintiff when Plaintiff sought clarification on DPOM 03-24's scope

does better but still falls short of being "narrow, objective, and definite."  The email says that

"the vast majority" of engagements that have been approved are those that "yield[] in-depth

disciplinary knowledge accepted by other scholars" and "do[] not conflict with applicable

Presidential Executive Orders, Department of Defense . . . , or Department of the Army

directives or memoranda."  (AC ¶ 80; ECF No. 49-3.)  But Berry's statements imply both that

some approved engagements may not have met these two criteria and that meeting both would

not necessarily warrant approval.  The second criterion also is hardly objective and definite,

given that it provides no guidance as to the point at which a professor's statements might deviate

from innumerable EOs, directives and memoranda sufficiently to amount to a "conflict."  These

criteria may give USMA faculty some idea of whether their requests may be approved, but they

"vest [Defendants] with enough discretion that it could be abused."  *Schneiderman*, 882 F.3d at

387.  Moreover, even if the policy and its implementation guidance from Defendants simply

clarified existing policies, the more logical course would be to amend those existing policies to

be clearer, rather than enacting a new regulation that restricts more speech than before and more

speech than is necessary.[25]

---

[25] Plaintiff seeks an order enjoining enforcement of DPOM 03-24 against himself and the putative class he wishes to represent, which consists of USMA's civilian faculty.  (*See* ECF No. 47; AC ¶ 109.)  I thus need not consider the policy as it affects the speech of faculty who are also active-duty members of the military.  *See NTEU*, 513 U.S. at 478 (balancing test may "present[] a different constitutional question" when considering speech restriction's impact on different groups of employees).

Ultimately, Defendants have not shown that any of the four interests – or rather effects – that Defendant Watts identifies are real harms to the Academy, rather than *post-hoc* rationalizations for the policy.  This disconnect "cast[s] serious doubt on the Government's submission" that the restricted speech is "so threatening" to the Academy "as to render [DPOM 03-24] a reasonable response to the threat."  *NTEU*, 513 U.S. at 473.  Even if real harms were at play, Defendants have not demonstrated that the Academic Engagement Policy "alleviate[s] these harms in a direct and material way."  *Id.* at 475.  At best, Defendants speculate that DPOM 03-24 could accomplish the four recited interests, but conjecture alone will not suffice.  *Id.*  At worst the Academic Engagement Policy reflects an effort to control the content of USMA professors' speech in a way that censors their academic writing and research where the Government disagrees with its message and seeks to align their scholarship with the preferred views of the current administration.  The First Amendment does not tolerate restrictions where "the government is regulating speech because of its own 'hostility' toward the targeted messages. If the First Amendment prohibits anything, it is the 'official suppression of ideas.'"  *Chiles v. Salazar*, 146 S. Ct. 1010, 1030 (2026) (Kagan, J., concurring) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386, 390 (1992)).  The "speculative benefits [DPOM 03-24] may provide [Defendants] are not sufficient to justify this crudely crafted burden on [Plaintiff's] freedom to engage in expressive activities."  *NTEU*, 513 U.S. at 477.  Even considering West Point's unique role compared to other public universities, Plaintiff is still likely to succeed on the merits of his challenge to DPOM 03-24.  Plaintiff's, USMA civilian faculty's and the public's interests in USMA civilian faculty speech on matters of public concern heavily outweigh Defendants' interest as employers and educators – even educators of future military officers – given the weak justifications Defendants cite and the poor fit of the regulation to meet those goals.

### iii.    *Classroom Directive*

The Court turns next to Plaintiff's likelihood of success on the merits of his challenge to the Classroom Directive, which stems from remarks Defendant Reeves gave to USMA faculty on August 12, 2025.  (AC ¶¶ 103, 128-130.)  Reeves stated that while faculty are teaching cadets in the classroom, if they "start to feel that perhaps maybe you're starting to advocate for a particular position or ideology," or "when you're taking a position where you're like why we believe this so I'll help the Cadets believe this way," then the faculty are "wrong" because "[t]hat's not what we do.  [Cadets] don't need to know what I believe."  (*Id.* ¶ 103.)  According to Plaintiff, the Classroom Directive therefore limits USMA faculty from sharing their opinions on the subject matters that they teach while in the classroom, and Plaintiff understood Reeves's comments to be a directive from a superior.  (*Id.* ¶¶ 103-07; First Bakken Decl. ¶¶ 27-28.)  When Plaintiff sought guidance from Defendant Berry on the scope of DPOM 03-24, Plaintiff took Defendant Berry's comment that external engagements reflecting "personal opinions" had been disapproved under DPOM 03-24 to be aligned with the Classroom Directive.  (First Bakken Decl. ¶¶ 24, 28, 33.)  Plaintiff also sees a connection between the Classroom Directive and EO 14185.  (AC ¶ 104.)  Plaintiff further provides four examples of his students asking him his opinion on a topic in class and Plaintiff declining to answer.  (First Bakken Decl. ¶¶ 29-32.)

At oral argument on May 6, 2026, the Government disclaimed the existence of any such directive, and Plaintiff conceded that he was not aware of any instance of the Classroom Directive leading to discipline of any USMA faculty.  A little more than two weeks later, the Government submitted a second declaration of Col. Watts, (ECF No. 66-1 ("Second Watts

Decl.")),[26] in which she stated that Plaintiff had been informed in writing on May 12, 2026 that DPOM 03-24 applied only to external communications, that the rules governing classroom teaching had remained substantially unchanged during Plaintiff's tenure at West Point, and that Reeves's comments did not alter longstanding policy and had to be "considered only in conjunction with USMA Reg. 150-4 and the Dean's Annual Guidance," (*id*. at 3).[27]  I am persuaded that the Classroom Directive exists, at least as unofficial policy, for several reasons. The Government does not deny that Reeves made the quoted remarks.  Given his position as Dean of the Academic Board and Chair of the Faculty Council, (AC ¶¶ 5, 58), his statements are reasonably interpreted as West Point faculty policy, especially because they are consistent with Berry's explanation that the official DPOM 03-24 disapproves of the expression of personal opinions, (*see* First Bakken Decl. ¶¶ 28, 33), and because, as the Government conceded at argument, West Point took no steps, in the more than seven months after this lawsuit was filed,

---

[26] I have considered whether I should take the Second Watts Declaration into account. Defendants' opposition to Plaintiff's preliminary injunction motion was due on January 16, 2026, (ECF No. 46), and they did not make a motion for extension of time under Federal Rule of Civil Procedure 6(b).  Further, Federal Rule of Civil Procedure 6(c)(2) provides that affidavits opposing a motion "must be served at least 7 days before the hearing, unless the court permits service at another time."  The Government had the opportunity to address the Classroom Directive in its initial submission and did not ask to file additional evidence after oral argument. Although I suggested at argument that the parties ought to discuss whether they might be able to settle Plaintiff's third claim if, as counsel suggested, there was no Classroom Directive, "that plainly did not call for the submission of new evidentiary materials." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 895 (1990); *cf. Shapiro v. Cantor*, 123 F.3d 717, 722 (2d Cir. 1997) (district court did not abuse discretion in disregarding affidavit submitted after hearing); *Rice v. Wells Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 31 (D. Mass. 2014) (The "court has broad discretion in deciding what evidence to consider in connection with a motion for preliminary injunction.").  I need not reach a definitive conclusion on the matter, however, because I conclude that Plaintiff prevails even considering the Second Watts Declaration.

[27] Although the memo provided to Plaintiff stated that USMA Reg. 150-4 (regarding Academic Freedom) and the Dean's 2026 Annual Guidance were enclosed, they were not attached to the copy provided to the Court.  The regulation was attached to the First Watts Declaration. (ECF No. 55-5.)

73

to withdraw or clarify Reeves's comments.  Further, those comments came on the heels of an

Executive Order that prohibited the service academies from "promoting, advancing, or otherwise

inculcating" various viewpoints of which the current Administration does not approve.  EO

14185, 90 Fed. Reg. at 8764.  Despite its last-minute attempt at disavowal, West Point has

provided no declaration from Reeves explaining what he meant, if it was not what he said, and

has made no effort to reconcile his statements with its current position that nothing has changed.

Nor has it now retracted those remarks or affirmatively indicated that professors may express

their personal views in the classroom.  I accept that the Classroom Directive is not a formal

policy, but notwithstanding the Second Watts Declaration, it is plain that West Point prefers that

its faculty not express personal opinions in the classroom, at least on several issues central to

Plaintiff's teaching, and that Reeves's remarks were intended to curb such expression.  For

purposes of the instant motion, Plaintiff has shown by a preponderance of the evidence that the

Classroom Directive exists as informal policy.

Both Plaintiff and Defendants devote most of their briefing to DPOM 03-24, rather than

addressing the Classroom Directive independently, even though it forms the basis for an

independent claim in the AC.  (*Id.* ¶¶ 128-130).  It also differs from DPOM 03-24 for First

Amendment purposes, as it is not a preapproval policy for external engagements but instead a

limit on faculty speech in the classroom.  (*Id.* ¶ 103.)  As alleged in the AC, (*id.* ¶¶ 103-07), and

described in Plaintiff's affidavit, (First Bakken Decl. ¶¶ 27-33), the Classroom Directive is a

content-based restriction because "it applies to particular speech because of the topic discussed

or the idea or message expressed," *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596

U.S. 61, 69 (2022) – the sharing of opinions in the classroom on the topic of instruction, *see*

*Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) ("[A] speech regulation targeted at specific

subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").

As with Plaintiff's DPOM 03-24 challenge, Defendants' burden is high.  As discussed, *Heim* dictates that the Court proceed to the *Pickering* test, rather than applying *Garcetti*, because the restriction is on a public university professor's speech.  *Latino Officers Association*'s guidance to apply the heightened *NTEU* standard for an *ex ante* restriction on employee speech, rather than *ex post* disciplinary action, applies to Plaintiff's challenge to the Classroom Directive, given that Plaintiff is challenging a limit on what he can say in the classroom, rather than discipline for what he said.  Like scholarly research, a professor's speech in class is speech on a matter of public concern, and Plaintiff's interest in being able to express an opinion while instructing students, as well as the students' interest in engaging with that opinion, is therefore great.  *See Heim*, 81 F.4th at 230 ("[T]he First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation that cast a pall of orthodoxy over the free exchange of ideas in the classroom."); *see also Keyishian*, 385 U.S. at 603 ("The classroom is peculiarly the marketplace of ideas."); *Mahoney v. Hankin*, 593 F. Supp. 1171, 1175 (S.D.N.Y. 1984) (professors have interest in "develop[ing] and us[ing] his or her own pedagogical method" in the classroom).[28]

But unlike DPOM 03-24, which limits what professors can say outside the Academy and to audiences that do not constitute military personnel, the Classroom Directive affects

---

[28] Specifically, Plaintiff has indicated that he has been asked to share his views on issues such as the Supreme Court's death penalty jurisprudence and the interplay of mental illness and drug addiction with criminal law. (*See* First Bakken Decl. ¶¶ 29-32.)  Such views are undoubtedly speech on a matter of public concern, and Plaintiff's pedagogical interest in sharing them as a part of classroom instruction is great under the First Amendment. *See Heim*, 81 F.4th at 228-29, 230.

professors' internal speech to cadets, who are military personnel.  (*See* First Watts Decl. ¶ 8.) Thus, with respect to internal rather than external speech, greater deference to West Point as both a military institution and public university is appropriate, given that the policy implicates classroom instruction of future Army leaders.  As previously discussed, courts are to defer to military discretion on matters affecting military interests, such as the "composition, training, equipping, and control of a military force." *Winter*, 555 U.S. at 24.  While the Court must also consider the interests of these cadets, as the audience, in hearing their professors' opinions and receiving an education where ideas can be freely shared, (*see* First Bakken Decl. ¶¶ 29-32); *see NTEU*, 513 U.S. at 468, West Point as a military academy has a weighty interest in controlling the education of cadets and as a public university has more general interest in controlling its classroom curriculum, *see Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring in the result) ("It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation.  It is an atmosphere in which there prevail 'the four essential freedoms' of a university – to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.").

Even considering this deference, the Court is "not free to disregard the Constitution in the military context." *Able*, 155 F.3d at 634.  Plaintiff's challenge to the Classroom Directive is limited to its application to him and other civilian faculty, (*see* AC ¶ 130), and he seeks a preliminary injunction enjoining enforcement only against himself, (*see* ECF No. 47). Restricting what USMA civilian faculty can say to cadets in courses outside of their military training does not affect "professional military judgments." *Winter*, 555 U.S. at 24.  A blanket ban on professors' sharing of their views on the subjects of instruction is a blunt force instrument that cannot be said to implicate "the *prima* business of armies and navies to fight or be ready to

76

fight wars should the occasion arise." *Greer*, 424 U.S. at 838.  The limit might be more appropriate as applied to military professors, but as applied to a civilian professor teaching courses separate from a cadet's military training, the Classroom Directive runs afoul of the First Amendment's guarantee to "tolerate[] neither laws nor other means of coercion, persuasion or intimidation that cast a pall of orthodoxy over the free exchange of ideas in the classroom." *Heim*, 81 F.4th at 230.  This concern is particularly heightened given Plaintiff's plausible allegation, unaddressed by Defendants, connecting the Classroom Directive to EO 14185.  (*See* AC ¶ 104.)

Further, no real justification for the Classroom Directive has been provided.  And it is nonsensical if the mission is to prepare the nation's future military officers.  For genuine strength and leadership to result, cadets must be exposed to a variety of viewpoints and trained to think critically about them.  West Point cadets are already, by definition, smart, tough and patriotic.  They are not snowflakes who will somehow be harmed by learning about controversial issues or competing viewpoints.  They will not somehow be weakened in their future defense of our country if their classroom discussions are robust and open.  The Supreme Court in *Keyishian v. Board of Regents* observed that "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." 385 U.S. at 603.  That case involved a civilian public university, but the principle is, if anything, even more important when it comes to our future military leaders.

In balancing these competing interests, the Court finds that Plaintiff is likely to succeed on the merits of his challenge to the Classroom Directive as applied to civilian professors.

b.      Irreparable Harm

Given that Plaintiff has demonstrated a likelihood of success on the merits of his challenges to DPOM 03-24 and the Classroom Directive, he has demonstrated irreparable harm. "Constitutional violations – particularly First Amendment violations – have been presumed irreparable when, by their nature, their injury cannot be undone." *Care One*, 166 F.4th at 348. "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Generally, when a challenged law directly limits speech, irreparable harm is presumed. *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021).

Both DPOM 03-24 and the Classroom Directive directly limit Plaintiff's speech. DPOM 03-24 requires prior approval *before* Plaintiff engages in speech within his academic expertise and external to the Academy using a USMA affiliation – one of "the most serious and the least tolerable" burdens on his First Amendment rights. *Schneiderman*, 882 F.3d at 386. The Classroom Directive similarly "targets speech based on its communicative content," *City of Austin*, 596 U.S. at 69 – *i.e.*, the sharing of opinions on the topic of instruction.

Defendants' citation to *American Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 766 F.2d 715 (2d Cir. 1985), does not warrant a different result. (Ds' Mem. at 15-16.) There, the Second Circuit held that a postal worker and his union had not demonstrated irreparable harm sufficient to warrant an injunction against the worker's discharge pending a grievance and arbitration procedure because they had not alleged "a clearcut infringement of [F]irst [A]mendment rights." *Am. Postal Workers Union*, 766 F.2d at 722. That case is consistent with Second Circuit precedent that has required a greater showing than a presumption of irreparable injury where the challenged action "may only potentially affect speech." *Bronx Household of*

*Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003) (discussing *American Postal Workers Union* and related cases).  But here Plaintiff's likely meritorious challenges concern policies that directly affect speech, and Defendants' focus on the speculative nature of Plaintiff's fear that he may be fired for violating either policy misunderstands the nature of the First Amendment harms that Plaintiff's claims implicate.  As to DPOM 03-24, "the relevant harm . . . arises not from the fact that a request to speak has actually been denied, or that particular sanctions have been imposed, but rather from [P]laintiff['s] obligation to provide advance notice, obtain permission, and report [his] speech to [his] employer, all under a threat – even if vague – of professional discipline."  *Latino Officers Ass'n v. Safir*, No. 97-CV-3143, 1997 WL 426099, at *4 (S.D.N.Y. July 30, 1997), *vacated*, 170 F.3d 167, 171 (2d Cir. 1999) (vacating injunction after parties' stipulation that challenged policy no longer required prior approval to speak, only notification of a speech beforehand and summary of comments after the fact, because the new policy created only a "conjectural chill" on speech).  And for both policies, the harm is also that Plaintiff's speech is being chilled on an ongoing basis – a harm that is irreparable.  *See Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 976 (N.D. Cal. 2025) (finding irreparable harm from "significant, ongoing chilling effect of Defendants' actions," including that plaintiffs' "members have changed the way they teach, research, and engage in public discourse"), *appeal dismissed*, No. 26-263, 2026 WL 1049175 (9th Cir. Feb. 11, 2026).

Defendants' argument that Plaintiff's delay in filing his lawsuit and his motion for a preliminary injunction shows that he has not suffered irreparable injury, (Ds' Mem. at 17), is unavailing.  It is true that Plaintiff initiated this action on September 22, 2025, (ECF No. 1), and first moved for preliminary injunction on December 5, 2025, (ECF No. 47), while DPOM 03-24 went into effect on February 13, 2025, the faculty was notified of it on March 4, 2025, and

Defendant Reeves's remarks constituting the Classroom Directive occurred on August 12, 2025, (AC ¶¶ 50, 57-58, 103; Second Bakken Decl. ¶ 8). "To be sure, the need for relief may appear less urgent in light of" this delay. *Yafai v. Cuccinelli*, No. 20-CV-2932, 2020 WL 2836975, at *4 (S.D.N.Y. June 1, 2020). But in the First Amendment context, delay in moving for a preliminary injunction does not by itself show the absence of irreparable injury. *Tripathy v. Lockwood*, No. 22-949, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022) (summary order); *see Marquez v. Annucci*, No. 20-CV-1974, 2020 WL 3871362, at *5 (S.D.N.Y. July 9, 2020) ("[I]n balancing the presumed irreparable harm stemming from an alleged constitutional violation on [the] one hand and a delay in seeking injunctive relief on the other hand, the alleged constitutional deprivation is the more compelling consideration.") (collecting cases); *Yafai*, 2020 WL 2836975, at *4 ("[W]here, as here, an alleged wrongful governmental act has resulted in an ongoing deprivation of constitutional rights, delay in seeking relief does not defeat the presumption of irreparable harm – at least when the delay is not so severe as to implicate the equitable doctrine of laches, which Defendants have not asserted.").[29]

Further, the cases on which Defendants rely, or the cases on which those cases rely, concern trademark and licensing disputes, where delay rebuts a presumption of irreparable injury, given the commercial implications of those claims. *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (trademark case); *Council for Responsible Nutrition v. James*, No. 24-CV-1881, 2024 WL 1700036, at *9 (S.D.N.Y. Apr. 19, 2024) (citing

---

[29] "Laches can be asserted as a defense only when plaintiffs are guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 42 (S.D.N.Y. 2020). No such prejudice is alleged here.

contract, trademark, copyright and unfair competition cases)[30]; *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028, 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (trademark and unfair competition case); *see also Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (delay rebuts presumption of irreparable harm in trademark and copyright cases where "owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition.").

Moreover, even if it were proper for a court to consider delay in this context, Plaintiff pursued his claims before bringing the instant action by "speaking personally to the Defendants, discussing the issues in large groups, through writings, and by requesting that a free-speech organization provide its opinion to the Defendants – to convince the Defendants that the prior restraint policy at issue in this action is unconstitutional." (Second Bakken Decl. ¶ 6.) Plaintiff cites specific examples of his protests to his superiors and email exchanges involving a free-speech advocacy organization. (*Id.* ¶¶ 8-19.) These actions demonstrate that rather than sitting on his claims, Plaintiff diligently sought ways to resolve his dispute before bringing the instant lawsuit. And after Plaintiff initiated this lawsuit on September 22, 2025, the federal government shut down from October 1, 2025 to November 12, 2025, which accounts for more than half of

---

[30] *Council for Responsible Nutrition v. James*, No. 24-CV-1881, 2024 WL 1700036 (S.D.N.Y. Apr. 19, 2024), *aff'd*, 159 F.4th 155 (2d Cir. 2025), is a First Amendment case, but it is clearly distinguishable. First, it relied on non-First Amendment cases. Second, the plaintiff's First Amendment challenge was not likely to succeed on the merits and thus (unlike here) no irreparable harm could be presumed. *See id.* at *9. Further, having already rejected the First Amendment claim, the Court's discussion of delay seems to have referred only to the other alleged harm at issue, which was the cost of compliance with the challenged statute. *See id.* at *9-10 ("Plaintiff's unwarranted delay in moving for emergency preliminary relief further demonstrates that the purported compliance-related economic injuries are neither immediate or irreparable."). Moreover, the Second Circuit in affirming expressly declined to address whether the District Court had properly considered the plaintiff's delay in seeking relief in its irreparable harm analysis. *See Council for Responsible Nutrition*, 159 F.4th at 172 n.9.

the time between his filing the complaint and moving for a preliminary injunction.  (*See id.* ¶ 20.)

Moreover, Defendants requested additional time to respond to the complaint given the shutdown,

and on November 20, 2025, Plaintiff's counsel informed Defendants that a preliminary

injunction motion would be forthcoming.  (*Id.* ¶ 21.)  On December 4, 2025, the parties proposed

a briefing schedule, (ECF No. 45), which the Court adopted, (ECF No. 46), and the preliminary

injunction motion followed on December 5, 2025, (ECF No. 47).  (Second Bakken Decl. ¶ 21.)

This back-and-forth between counsel before filing motion papers is not atypical and does not

suggest Plaintiff's harms are any less irreparable.

Because Plaintiff has demonstrated a likelihood of success on the merits in his First

Amendment challenges and is experiencing an ongoing chill of his right to expression, he has

demonstrated that he will suffer irreparable harm in the absence of an injunction.

c.        Balance of Equities and Public Interest

Next, the Court addresses the balance of equities and the public interest.  When the

government is a party to the suit, the final two factors in assessing a motion for preliminary

injunction merge.  *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (*per

curiam*).  The Court's finding that Plaintiff is likely to succeed on the merits of his First

Amendment challenges to DPOM 03-24 and the Classroom Directive, and that he will face

irreparable harm in the meantime, suggests that a preliminary injunction would serve the public

interest.  *See Emilee Carpenter, LLC v. James*, 784 F. Supp. 3d 557, 569 (W.D.N.Y. 2025).

"There is generally no public interest in the perpetuation of unlawful agency action.  To the

contrary, there is a substantial public interest in having governmental agencies abide by the

federal laws that govern their existence and operations."  *New York v. Noem*, 812 F. Supp. 3d

321, 337 (S.D.N.Y. 2025); *see N.Y. Progress & Prot. PAC*, 733 F.3d at 488.  Moreover,

82

"securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC*, 733 F.3d at 488.

Defendants, however, argue that this factor weighs in their favor because of the effects that they articulate to justify their policies and the Academy's role in ensuring that future Army officers are trained in a consistent manner. (Ds' Mem. at 25-26.) They allege that these interests in turn affect the public interest in "ensur[ing] that the U.S. has a well-trained and prepared military." (*Id.*) But for the same reasons that Defendants are entitled to reduced deference in enforcing DPOM 03-24 and applying the Classroom Directive to their civilian faculty, and the same reasons that the challenged restrictions do not appear to in fact alleviate any real harm, a preliminary injunction in Plaintiff's favor will not present any serious threat to the public's interest in having a well-trained and prepared military force – a mission West Point fulfilled for more than two hundred years before the promulgation of EO 14185 without any discernable damage to the education of its cadets. In short, the risks that Defendants identify do not warrant an ongoing infringement on the First Amendment right of Plaintiff and other USMA civilian faculty. The application for a preliminary injunction is therefore granted.

### 2.    Motion to Dismiss

Having decided that Plaintiff is likely to succeed on the merits, the Court will nevertheless briefly address why Plaintiff has plausibly stated a claim that both DPOM 03-24 and the Classroom Directive violate the First Amendment. In doing so, the Court accepts as true the facts, but not the conclusions, set forth in the AC, draws all reasonable inferences in Plaintiff's favor, and considers DPOM 03-24 as a document that the AC incorporates, but it does not rely on facts outside the AC (as it did in deciding whether the Court had subject matter jurisdiction or plaintiff was entitled to a preliminary injunction). *See Doherty v. Bice*, 101 F.4th

169, 172 (2d Cir.) (noting materials outside the pleadings may be considered for a motion to dismiss for lack of subject matter jurisdiction but not a Rule 12(b)(6) motion), *cert. denied*, 145 S. Ct. 381 (2024); *Melendez v. City of N.Y.*, 16 F.4th 992, 1037 n.66 (2d Cir. 2021) (distinguishing materials court may consider on motion to dismiss versus motion for preliminary injunction); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020) (to the same effect).

First, the AC plausibly states a claim regarding DPOM 03-24. As noted above, the *Pickering*/*NTEU* standard would apply because the AC alleges on its face an *ex ante* restriction on a government employee's speech. (*See* DPOM 03-24.) Moreover, much of the evidence that Plaintiff submitted in support of his preliminary injunction motion that the Court considered in applying the balancing test is set forth in corresponding allegations in the AC, such as his email exchanges with Defendant Berry, his interest in using his USMA affiliation in external engagements and his upcoming book. (AC ¶¶ 79-82, 87-93, 101-02.) Other details are only in his affidavits, not the AC, such as descriptions of specific speaking engagements that Plaintiff turned down, (First Bakken Decl. ¶ 11), or more specific details about his book's content, (Second Bakken Decl. ¶ 5), but such allegations are not necessary to render Plaintiff's claims plausible. The allegations in the AC are sufficient to state a plausible First Amendment claim against Defendants that DPOM 03-24 unconstitutionally infringes on Plaintiff's speech.

Second, the AC plausibly states a claim concerning the Classroom Directive. In the AC, Plaintiff alleges that Defendant Reeves's August 12, 2025 remarks to USMA faculty constituted a new policy at the Academy limiting professors' sharing of their opinions in classroom instruction. (AC ¶¶ 103, 105.) Although Plaintiff does not allege any specific discipline that he faced for sharing his opinion, he plausibly alleges that the Classroom Directive is intended "to

control, chill and suppress faculty speech" and that Plaintiff has "altered his classroom conduct to comply with this directive." (*Id.* ¶¶ 104-05.) Plaintiff also draws the link between the Classroom Directive and EO 14185 in his AC. (*See id.* ¶ 104.) Drawing all reasonable inferences in Plaintiff's favor, it is plausible that Plaintiff has stated a valid First Amendment claim and that Defendants cannot meet the high burden of the *Pickering*/*NTEU* standard in defending the policy.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is GRANTED. Defendants' motion to dismiss is DENIED. The Clerk of Court is respectfully directed to terminate the pending motions. (ECF Nos. 47, 53.) It is hereby ORDERED that pending permanent resolution of this action, Defendants are enjoined from (1) enforcing Dean's Policy and Operating Memorandum 03-24, dated February 13, 2025, against civilian faculty members of USMA, and (2) prohibiting or restraining Plaintiff from expressing or offering his opinions, beliefs or views to his students on the subjects he teaches. The parties are to appear for a conference on June 11, 2026 at 3 p.m.

**SO ORDERED.**

Dated:  May 26, 2026
　　　　White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.